Shiloh S. Hernandez
Melissa A. Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org
hornbein@westernlaw.org

*Attorneys for Plaintiffs*

Nathaniel Shoaff (*pro hac vice*)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorney for Plaintiff Sierra Club*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> DAVID BERNHARDT *et al.*, <br><br> Defendants. | Case No. 1:19-cv-00130-SPW-TJC <br><br><br> **PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................... ii

TABLE OF AUTHORITIES .............................................................. iv

ABBREVIATIONS ........................................................................ viii

EXHIBITS ...................................................................................... ix

INTRODUCTION ............................................................................2

FACTUAL BACKGROUND..............................................................3

I.      Lay of the land ......................................................................3

II.     Area F expansion ..................................................................5

III.    Strip-mining has begun in Area F.........................................8

LEGAL STANDARDS .....................................................................8

I.      Preliminary injunction .........................................................8

II.     National Environmental Policy Act......................................9

III.    The Endangered Species Act ..............................................10

IV.     Administrative Procedure Act .............................................11

ARGUMENT .................................................................................11

I.      The Conservation Groups are likely to succeed on the merits. .....................11

        A.      Federal Defendants failed to take a hard look at
                cumulative impacts to water resources. ...............................11

        B.      Federal Defendants' consideration of only a no action
                alternative and two virtually identical alternatives
                violated NEPA.....................................................................15

C.      Federal Defendants' failure to reinitiate consultation
        regarding impacts to pallid sturgeon from coal
        combustion violated the Endangered Species Act. ............................23

II.     WRM's strip-mining of the prairies in Area F and burning the
        coal from Area F will cause irreparable injury................................25

III.    The equities strongly support an injunction because WRM's
        strip-mining activities in Area F are unnecessary. ........................28

IV.     The public interest in upholding the rule of law and protecting
        the environment strongly supports an injunction. ........................29

V.      The Court should not impose a bond............................................30

CONCLUSION ....................................................................................31

CERTIFICATE OF COMPLIANCE ......................................................33

# TABLE OF AUTHORITIES

## Cases

*'Ilio'ulaokalani Coal. v. Rumsfeld*,
    464 F.3d 1083 (9th Cir. 2006) ............................................................16

*Alaska Conservation Council v. USFS*,
    413 F. Supp. 3d 973 (D. Alaska 2019) .................................... 25, 28, 29

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...........................................................29

*All. for the Wild Rockies v. Pena*,
    865 F.3d 1211 (9th Cir. 2017) .............................................................8

*Am. Rivers v. FERC*,
    895 F.3d 32 (D.C. Cir. 2018) .............................................................10

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987) ..........................................................................25

*Bark v. USFS*,
    958 F.3d 865 (9th Cir. 2020) ....................................................... 11, 12

*California v. BLM*,
    286 F. Supp. 3d 1054 (N.D. Cal. 2018) ..............................................26

*Calvert Cliffs Coordinating Comm. v. U.S. Atomic Energy Comm'n*,
    449 F.2d 1109 (D.C. Cir. 1971) .............................................. 9, 10, 16

*Colo. Envtl. Coal. v. Dombeck*,
    185 F.3d 1162 (10th Cir. 1999) .........................................................16

*Dine Citizens v. OSM*,
    No. 12-CV-01275-JLK, 2015 WL 1593995 (D. Colo. Apr. 6, 2015) ................29

*Friends of Yosemite Valley, v. Kempthorne*,
    520 F.3d 1024 (9th Cir. 2008) ...........................................................16

*High Country Conservation Advocates v. USFS*,
    951 F.3d 1217 (10th Cir. 2020) .................................................. 16, 19

*Indigenous Envtl. Network v. U.S. Dep't of State*,
   369 F. Supp. 3d 1045 (D. Mont. 2018) ................................................................28

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
   387 F.3d 989 (9th Cir. 2004)............................................................... 12, 13

*Landwatch v. Connaughton*,
   905 F. Supp. 2d 1192 (D. Or. 2012) ..................................................31

*League of Wilderness Defenders v. Connaughton*,
   752 F.3d 755 (9th Cir. 2014)..................................................................28

*MEIC v. OSM*,
   No. CV 15-106-M-DWM, 2017 WL 5047901 (D. Mont. Nov. 3,
   2017)........................................................................................... 26, 29

*Muckleshoot Indian Tribe v. USFS*,
   177 F.3d 800 (9th Cir. 1999)................................................................ 16, 18

*N. Plains. Res. Council v. Bd. of Natural Res.*,
   181 Mont. 500, 594 P.2d 297 (1979) ...................................................4

*Neighbors of Cuddy Mountain v. USFS*,
   137 F.3d 1372 (9th Cir. 1998) ............................................... 12, 13, 15

*NRDC v. Kempthorne*,
   506 F. Supp.2d 322 (E.D. Cal. 2007)...................................................25

*NWF v. Coleman*,
   529 F.2d 359 (5th Cir. 1976)................................................................23

*NWF v. NMFS*,
   886 F.3d 803 (9th Cir. 2018)............................................................. 9, 28

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
   361 F.3d 1108 (9th Cir. 2004) ............................................................12

*Or. Nat. Desert Ass'n v. BLM*,
   625 F.3d 1092 (9th Cir. 2010) ........................................................ 9, 10

*Pacific Coast Fed'n of Fishermen's Ass'ns v. Gutierrez,*
606 F. Supp. 2d 1122 (E.D. Cal. 2008) ................................................25

*Protect Our Communities Found. v. LaCounte,*
939 F.3d 1029 (9th Cir. 2019) ..........................................................17

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) ..........................................................................9

*Rodriguez v. Robbins,*
715 F.3d 1127 (9th Cir. 2013) ..........................................................28

*S. Fork Band Council v. Dep't of Interior,*
588 F.3d 718 (9th Cir. 2009) ............................................................30

*Seattle Audubon Soc. v. Evans,*
771 F. Supp. 1081 (W.D. Wash.) ......................................................30

*Shell Offshore v. Greenpeace,*
709 F.3d 1281 (9th Cir 2013) ............................................................8

*Sierra Club v. Marsh,*
816 F. 2d 1376 (9th Cir. 1987) .................................................. 23, 25

*Sierra Club v. Trump,*
963 F.3d 874 (9th Cir. 2020) ..................................................... 28, 30

*TVA v. Hill,*
437 U.S. 153 (1978) ........................................................................10

*W. Watersheds Project v. Bernhardt,*
392 F. Supp. 3d 1225 (D. Or. 2019) ....................................... 25, 27, 30

*W. Watersheds Project v. Kraayenbrink,*
632 F.3d 472 (9th Cir. 2011) .................................................... 10, 12

*W. Watersheds Project v. Schneider,*
417 F. Supp. 3d 1319 (D. Idaho 2019) ....................................... 17, 19

*W. Watersheds Project v. Zinke,*
336 F. Supp. 3d 1204 (D. Idaho 2018) ..............................................25

*Wildearth Guardians v. BLM*,
   No. CV-18-73-GF-BMM, 2020 WL 2104760 (D. Mont. May 1,
   2020) ................................................................................................. 9, 12

*Winter v. NRDC*,
   555 U.S. 7 (2008) ................................................................................. 8

*WORC v. BLM*,
   No. CV 16-21-GF-BMM, 2018 WL 1475470 (D. Mont. Mar. 26,
   2018) ........................................................................................ 16, 19, 21

## Statutes

16 U.S.C. § 1536 .................................................................................... 10

42 U.S.C. § 4321 ..................................................................................... 9

42 U.S.C. § 4332 ................................................................................... 15

5 U.S.C. § 706 ....................................................................................... 11

Or. Rev. Stat. Ann. § 757.518 ............................................................... 22

Wash. Rev. Code Ann. § 19.405.030 ..................................................... 22

## Rules

Fed. R. Civ. P. 65 .................................................................................. 30

## Regulations and Administrative Materials

40 C.F.R. § 1500.1 ................................................................................. 9

40 C.F.R. § 1502.14 ............................................................................... 15

40 C.F.R. § 1508.7 ................................................................................. 11

50 C.F.R. § 402.16 ..................................................................... 10, 23, 25

Admin. R. Mont. 17.24.322 ................................................................... 21

**ABBREVIATIONS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| CEQ | Council on Environmental Quality |
| EIS | Environmental impact statement |
| ESA | Endangered Species Act |
| NEPA | National Environmental Policy Act |
| OSM | U.S. Office of Surface Mining, Reclamation, and Enforcement |
| PSE | Puget Sound Energy |
| ROD | Record of decision |
| WRM | Westmoreland Rosebud Mining, LLC |
| Federal Defendants | David Bernhardt, U.S. Office of Surface Mining, Marcelo Calle, David Berry, Lanny Erdos, Casey Hammond, Aurelia Skipwith, U.S. Fish and Wildlife Service |

**EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Report of Marcus Griswold, Ph.D. (Nov. 9, 2019) |
| Exhibit 2 | Email from Flynn Dickenson, Hydrologist, OSM, to Frank Bartlett, Program Analyst, OSM (June 15, 2016) |
| Exhibit 3 | OSM & DEQ, Notes from Comment Resolution Meeting (July 28, 2016) |
| Exhibit 4 | Email from Roberta Martinez-Hernandez, Engineer, OSM, to Frank Bartlett, Policy Analyst, OSM (June 15, 2016) |
| Exhibit 5 | OSM & DEQ, Meeting Notes (June 6, 2018) |
| Exhibit 6 | OSM, Comment Review Form (Nov. 11, 2016) |
| Exhibit 7 | OSM & DEQ, Meeting Notes (Apr. 4, 2018) |
| Exhibit 8 | Br. in Response to Mot. in Limine, *In re NorthWestern Energy's Application for Approval of Capacity Acquisition* (July 1, 2020 Mont. Pub. Service Comm'n) |
| Exhibit 9 | Resp. by Northern Cheyenne Tribe Objecting to NorthWestern Energy's Mot. in Limine, *In re NorthWestern Energy's Application for Approval of Capacity Acquisition* (July 7, 2020 Mont. Pub. Service Comm'n) |
| Exhibit 10 | OSM & DEQ Call Notes at 4 (Jan. 6, 2017) |
| Exhibit 11 | Declaration of Derf Johnson |
| Exhibit 12 | Email from Karen Jass, Mining Engineer, OSM to Nicole Bauman, ERO (July 26, 2016) |
| Exhibit 13 | Declaration of John Horning |
| Exhibit 14 | Declaration of John Woodland |
| Exhibit 15 | Declaration of Aaron Isherwood |

| Exhibit 16 | Declaration of George Price |
| --- | --- |

*The coal company came with the world's largest shovel.*
*They tortured the timber and striped off the land.*
*They dug for their coal til the land was forsaken.*
*And they wrote is all down as the progress of man.*

-*Paradise*, John Prine (1946-2020)

*Remember that sandrock on Emmells Crick*
*Where Dad carved his name in 'thirteen?*
*It's been blasted down into rubble*
*And interred by their dragline machine.*
*Where Fadhls lived, at the old Milar Place,*
*Where us kids stole melons at night?*
*They 'dozed it up in a funeral pyre*
*Then torched it. It's gone alright.*
*The "C" on the hill, and the water tanks*
*Are now classified, "reclaimed land."*
*They're thinking of building a golf course*
*Out there, so I understand.*
*The old Egan Homestead's an ash pond*
*That they say is eighty feet deep.*
*The branding corral at the Douglas Camp*
*Is underneath a spoil heap.*
*And across the crick is a tipple, now,*
*Where they load coal onto a train,*
*The Mae West Rock on Hay Coulee?*
*Just black and white snapshots remain.*
*There's a railroad loop and a coal storage shed*
*Where the bison kill site used to be.*
*The Guy Place is gone; Ambrose's too.*
*Beulah Farley's a ranch refugee.*

*But things are booming. We've got this new school*
*That's envied across the whole state.*
*When folks up and ask, "How's things goin' down there?"*
*I grin like a fool and say, "Great!"*
*Great God, how we're doin'! We're rollin'in dough,*
*As they tear and they ravage The Earth.*
*And nobody knows…or nobody cares…*
*About things of intrinsic worth.*

1

-*Things of Intrinsic Worth*, Wallace McCrae

## INTRODUCTION

This motion is made in an emergency. Defendant-Intervenor Westmoreland Rosebud Mining, LLC (WRM), has begun strip-mining the irreplaceable prairie landscape in the headwaters of the West Fork Armells Creek basin in the area designated by Federal Defendants as Area F.

Federal Defendants unlawfully approved this expansion by (1) failing to take a hard look at the cumulative impacts of the mining operation on water resources; (2) failing to consider a reasonable range of alternatives, in particular a mid-range alternative that recognizes the anticipated closure of the Colstrip Power Plant; and (3) failing to consider impacts to endangered pallid sturgeon (*Scaphirhynchus albus*) from water withdrawals from the Yellowstone River to burn the coal from Area F at the power plant.

Strip-mining and burning the coal from Area F will inflict irreparable harm. Worse, the strip-mining is wholly unnecessary, as coal can be obtained from existing permit areas at the strip-mine, without shutting down the mine or the adjacent power plant.

Accordingly, Plaintiffs Montana Environmental Information Center, Indian People's Action, 350 Montana, Sierra Club, and WildEarth Guardians

(collectively, "Conservation Groups") seek a preliminary injunction enjoining strip-mining activities in Area F.

## FACTUAL BACKGROUND

### I.      Lay of the land

The Rosebud Mine is a sprawling 30,000-acre coal strip-mine located in Colstrip, Montana.[1] The mine is larger in area than Billings.[2] Virtually all coal from the strip-mine is burned at the Colstrip Power Plant, an adjacent mine-mouth coal plant connected to the mine by a coal conveyor belt, with a small amount of high-sulfur "waste coal" burned at the next-door Rosebud Power Plant. FEIS at S-1 to S-2. Since the 1970s the Rosebud strip-mine and Colstrip Power Plant have operated in tandem, mining and combusting millions of tons of coal each year. *Id.* at S-3. The power plant is owned by a conglomerate of utilities from Montana, Idaho, Washington, and Oregon. *Id.* at S-3.

///

///

---

[1] OSM & DEQ, Western Energy Company's Rosebud Mine Area F: Final Environmental Impact Statement at S-1 (2018) (existing operations 25,949 acres, Area F expansion 6,746 acres), *available at* https://www.wrcc.osmre.gov/initiatives/westernEnergy/documentLibrary.shtm (follow "Final Environmental Impact Statement" hyperlink) [hereinafter "FEIS"].

[2] Wikipedia, Billings, Montana, https://en.wikipedia.org/wiki/Billings,_Montana (Billings is approximately 43 square miles or 27,520 acres).

3

**Image 1:** Mine and power plant



When Montana Regulators permitted construction of the first two units of

the power plant in the mid-1970s, they warned of a boom-and-bust operation that

would ultimately destroy the original economic base of the region—agriculture.

(Doc. 1, ¶ 2.) Ninety-five percent of public commenters (2,867 out of 2,997)

opposed construction of Units 1 and 2 of the power plant. (*Id.*, ¶ 41.) In 1975, the

Montana Department of Natural Resources recommended against construction of

Units 3 and 4, but was overruled by a political board in a divided vote. *See N.*

*Plains. Res. Council v. Bd. of Natural Res.*, 181 Mont. 500, 505, 508-09, 594 P.2d

297, 300, 302 (1979).

The Rosebud strip-mine and Colstrip Power Plant are located in the Armells

Creek basin, which is tributary to the Yellowstone River. FEIS at 3, 199. The

primary streams in the basin, East Fork and West Fork Armells Creek, are impaired and fail to meet water quality standards. FEIS at 199. Pollution seeping from the power plant's ash ponds has contaminated the local water table. FEIS at 9. While regulators have long been aware of the polluted nature of the area's streams and groundwater, they have not developed remedial plans for the former or implemented remedial plans for the latter. (Doc. 1, ¶¶ 44-48.) Similarly, while approximately 20,000 acres have been strip-mined over the past 50 years, only a tiny fraction (651 acres or 3%) have been fully reclaimed. FEIS at 34. Federal regulators have bemoaned the "extremely slow reclamation process" at the mine. (Doc. 1, ¶ 44.) The power plant burns the coal to boil water to turn a turbine and thereby generate electricity: to do this the plant withdraws and consumes approximately 47,000 acre-feet of water annually from the Yellowstone River near Forsythe, Montana. Report of Marcus Griswold, Ph.D. at 1 (Nov. 9, 2019) (attached Exhibit 1).

## II.    Area F expansion

Federal Defendants approved the federal mining plan authorizing the Area F expansion of the Rosebud Mine on June 18, 2019.[3] Area F approves 6,746 acres of

---

[3] OSM, Record of Decision at 28 (June 18, 2019), *available at* https://www.wrcc.osmre.gov/initiatives/westernEnergy/documentLibrary.shtm (follow "Record of Decision" hyperlink) [hereinafter ROD].

strip-mining operations through the prairies at the foot of the Little Wolf

Mountains. FEIS at S-1, S-12. WRM plans to strip-mine 70.8 million tons of coal

from Area F over 19 years—through 2039. *Id.* at S-9, S-12, S-15. Virtually all the

coal will be burned at the Colstrip Power Plant. *Id.* at S-12.

**Image 2:** Grasslands in prairie designated as Area F


     Federal Defendants prepared a deficient final environmental impact

statement for the Area F expansion. In particular, the FEIS failed to provide any

*detailed*, *quantitative* analysis of the cumulative impacts to surface waters,

contrary to the specific recommendations of Federal Defendants' own experts.

Instead the FEIS contained only a perfunctory qualitative statement that cumulative effects would range from "minor to major." The FEIS also failed to consider reasonable alternatives, despite repeated statements by agency experts that the selected range of alternatives—a no action alternative and two virtually identical alternatives—was inadequate. In particular, the agencies refused to consider a mid-range alternative that would involve less mining, over a shorter period. Such an alternative would have allowed the public, including local communities, and agencies to visualize and analyze a just transition from coal to clean energy.

Thus, though Federal Defendants were aware that two units of the four-unit power plant would close by 2022; that the majority of the owners of the Colstrip Power Plant are planning to exit the plant by 2027 or sooner (well before 2039, the temporal extent for strip-mining authorized in Area F); and that the mine and plant face a highly uncertain life expectancy as a result; Federal Defendants steadfastly refused to disclose any alternative detailing a just transition.

Federal Defendants were also aware of the significant water withdrawals from the Yellowstone River required to burn Area F coal, but also refused to evaluate those impacts. The Conservation Groups twice provided the agencies with new information that endangered pallid sturgeon had migrated up the Yellowstone River to just below the power plant's intake bays and that the impacts of the water

withdrawals would harm the species. The agencies, however, resolutely refused to reinitiate consultation regarding impacts to sturgeon.

## III.   Strip-mining has begun in Area F.

In April 2020, the Conservation Groups reached out to WRM about the status of strip-mining in Area F. WRM refused to disclose the status or timeline of for mining in Area F. Subsequently, the Conservation Groups learned that WRM has begun strip-mining the land in Area F, necessitating the instant motion.

## LEGAL STANDARDS

## I.   Preliminary injunction

To obtain a preliminary injunction, a party must establish (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Alternatively,

> [u]nder the 'sliding scale' variant of the *Winter* standard, if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied.

*All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (internal quotation marks omitted) (quoting *Shell Offshore v. Greenpeace*, 709 F.3d 1281 (9th Cir 2013)).

"When considering an injunction under the ESA [Endangered Species Act], [courts] presume that remedies at law are inadequate, that the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." *NWF v. NMFS*, 886 F.3d 803, 817 (9th Cir. 2018). Thus, to obtain an injunction under the ESA, a plaintiff need only demonstrate the likelihood of irreparable injury." *Id.*

## II.    National Environmental Policy Act

The National Environmental Policy Act (NEPA) "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It is the "'the broadest and perhaps most important' of the [federal] environmental statutes." *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1100 (9th Cir. 2010) (quoting *Calvert Cliffs Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971)).

Congress intended NEPA to "promote efforts which will *prevent or eliminate* damage to the environment and biosphere and stimulate the health and welfare of [people]." 42 U.S.C. § 4321 (emphasis added). "NEPA protects the environment by requiring federal agencies to take a 'hard look' at environmental consequences of their decision-making." *Wildearth Guardians v. BLM*, No. CV-18-73-GF-BMM, 2020 WL 2104760, at *1 (D. Mont. May 1, 2020) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)).

9

Thus, rather than impose substantive standards, NEPA mandates agencies to tell the public the truth about the effects of its proposed actions on the environment and then "relies upon democratic processes to ensure … that 'the most intelligent, optimally beneficial decision will ultimately be made.'" *Or. Nat. Desert Ass'n*, 625 F.3d at 1099-100 (quoting *Calvert Cliffs*); *Am. Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018) (NEPA requires "hard and honest look").

## III.    The Endangered Species Act

"[T]he Endangered Species Act of 1973 [is] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978). "The ESA reflects a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011) (quoting *TVA*) (internal quotation marks omitted).

Section 7(a)(2), 16 U.S.C. § 1536(a)(2), is the "heart" of the ESA, requiring agencies to consult with the U.S. Fish and Wildlife Service (Service) to "insure that any action authorized" by an agency is not likely to "jeopardize the continued existence" of listed species. *Kraayenbrink*, 632 F.3d at 495. An agency must reinitiate consultation if "new information reveals effects of the action that may affect listed species … in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b) (1986).

10

## IV.   Administrative Procedure Act

The Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), "provides the governing standard for courts reviewing an agency's compliance with NEPA." *Bark v. USFS*, 958 F.3d 865, 869 (9th Cir. 2020). Under the APA, courts "shall … hold unlawful and set aside agency action … found to be … arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Bark*, 958 F.3d at 869 (quoting *WildEarth Guardians v. EPA*, 759 F.3d 1064 (9th Cir. 2014)).

## ARGUMENT

## I.   The Conservation Groups are likely to succeed on the merits.

### A.   Federal Defendants failed to take a hard look at cumulative impacts to water resources.

NEPA requires agencies to consider the cumulative impacts of their actions. 40 C.F.R. § 1508.7 (1978). Cumulative impact is

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.

11

*Id.* "To 'consider' cumulative effects, *some quantified or detailed information is required*. Without such information, neither the courts nor the public, in reviewing the [agency's] decisions, can be assured that the [agency] provided the hard look that it is required to provide." *Neighbors of Cuddy Mountain v. USFS*, 137 F.3d 1372, 1379 (9th Cir. 1998) (emphasis added).[4] "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Id.* at 1380. The cumulative effects analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994 (9th Cir. 2004) (quoting *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108 (9th Cir. 2004)).

Consideration of expert opinions, especially from an agency's own experts, is another important factor in determining if an EIS is deficient. *Kraayenbrink*, 632 F.3d at 492-93 (finding that BLM failed to address concerns of its own experts as well as those of other agencies, and consequently the EIS did not provide a "full and fair" discussion of the environmental impacts).

---

[4] *Accord Bark*, 958 F.3d at 872; *Wildearth Guardians*, 2020 WL 2104760, at *9.

Here OSM failed to conduct a *detailed* and *quantified* analysis of cumulative impacts to surface water, against the recommendation of its own experts. Instead, the agency offered only a *perfunctory* and *qualitative* statement about generalized impacts to surface water. Specifically, after briefly listing other activities that would affect surface waters, including the other mine areas and the power plant, OSM offered only three sentences of analysis:

> The Proposed Action would contribute long-term adverse cumulative impacts on surface water hydrology that would range from minor to major. This would occur due to changes in stream and spring flows, loss of springs, loss of ponds or reduction in water supply to ponds, and changes in the hydrologic balance. The Proposed Action would contribute short-term and long-term adverse cumulative effects on water quality due to backfilling with spoil, surface disturbances, and changes in the hydrologic balance that would range from minor to major.

FEIS at 685. These perfunctory and generalized statements are nearly identical to those found inadequate in *Klamath-Siskiyou*, 387 F.3d at 994 (statements that cumulative impacts would be "'minor' or 'major'" insufficient); *see Neighbors of Cuddy Mountain*, 137 F.3d at 1380 (statements that cumulative effects would cause "some risk" and "possible" impacts insufficient).

This failing is egregious because Federal Defendants' own expert staff repeatedly stated that this purely qualitative and perfunctory cumulative effects analysis was insufficient and that the agencies possessed abundant historical data to conduct a detailed and quantitative cumulative affects analysis:

13

- One agency hydrologist explained: "At a minimum, the available water monitoring datasets for the other areas of the Rosebud Mine (Areas A, B, C, etc.) need to be analyzed along with the Area F data to determine the cumulative effects. *I don't know what our story would be if we avoided this and someone were to challenge us on it given that a historic dataset exists, some analysis is no doubt already done in the CHIA, PHC and other documents, and there isn't a significant cost (drilling wells, etc.) associated with obtaining the data*." Email from Flynn Dickenson, Hydrologist, OSM, to Frank Bartlett, Program Analyst, OSM, at pdf. 3 (June 15, 2016) (emphasis added) (Exhibit 2).

- On another occasion, OSM staff observed that the cumulative impacts "discussion of other mine permit areas needs to be *quantitative* and not just qualitative for all resources. Really needs to be beefed up for all resource areas." Notes from Comment Resolution Meeting at 8 (July 28, 2016) (emphasis added) (Exhibit 3).

- An agency hydrologist further objected that the "[c]umulative impacts to water resources (surface and ground) from the other areas of the Rosebud Mine need to be analyzed more thoroughly," noting that the existing analysis "is mostly qualitative" and that "[d]atasets from water quality and water quantity monitoring should be used and disclosed in this document." *Id.* at pdf. 14.

- Citing Council on Environmental Quality (CEQ) guidance, the hydrologist emphasized that the perfunctory analysis was inadequate: "Please describe impacts in much greater detail. NEPA requires *all available data to be utilized* for these types of analyses. *This is not sufficient*." *Id.* at pdf. 15 (emphasis added).

- An OSM engineer agreed, explaining that the "cumulative impacts discussion" required "greater detail" and that the "cumulative impacts discussion needs to be expanded throughout." Email from Roberta Martinez-Hernandez, Engineer, OSM, to Frank Bartlett, Policy Analyst, OSM (June 15, 2016) (attached as Exhibit 4).

In sum, OSM's own staff recognized that it possessed the necessary "historical dataset" to conduct the required *detailed* and *quantitative* assessment of cumulative impacts to surface waters and could have done so "without significant cost." This analysis was critical given that the major receiving waters in the Armells Creek basin (East Fork and West Fork Armells Creek) are already impaired and not meeting water quality standards. FEIS at 199. OSM, however, ignored this information and the advice of its own experts and, instead, proffered a *perfunctory* and purely *qualitative* analysis that cumulative effects to water quantity and quality would "range from minor to major." As in *Bark*, *Neighbors of Cuddy Mountain*, and *Klamath-Siskiyou*, this arbitrary decision to ignore existing data and the expertise of staff was not a hard look, and therefore violates NEPA.

### B. Federal Defendants' consideration of only a no action alternative and two virtually identical alternatives violated NEPA.

NEPA requires agencies to consider "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). The alternatives analysis is the "heart" of the NEPA process and mandates agencies to "rigorously explore and evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. This requirement

> ensure[s] that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made.

15

*Calvert Cliffs*, 449 F.2d at 1114. "The existence of reasonable but unexamined alternatives renders an EIS inadequate." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1095 (9th Cir. 2006).

"An agency first violates this provision of NEPA when it considers 'essentially identical' alternatives." *WORC v. BLM*, No. CV 16-21-GF-BMM, 2018 WL 1475470, at \*7 (D. Mont. Mar. 26, 2018) (quoting *Friends of Yosemite Valley, v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008)). Thus, an agency fails to consider an adequate range of alternatives if its "EIS consider[s] only a no action alternative along with two virtually identical alternatives." *Muckleshoot Indian Tribe v. USFS*, 177 F.3d 800, 813-14 (9th Cir. 1999). Courts, including the District of Montana, have repeatedly held that agencies violate NEPA by failing to consider mid-range alternatives for coal development proposals. *High Country Conservation Advocates v. USFS*, 951 F.3d 1217, 1224 (10th Cir. 2020) (agency violated NEPA by failing to consider coal leasing alternatives "that fall between the obvious extremes" (quoting *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162 (10th Cir. 1999)); *WORC*, 2018 WL 1475470 at \*7-9 ("BLM's failure to consider any alternative that would decrease the amount of extractable coal available for

16

leasing rendered inadequate the Buffalo EIS and Miles City EIS in violation of NEPA.").[5]

Here, Federal Defendants' crabbed alternatives analysis violated NEPA by considering only a no action alternative and two virtually identical alternatives: the proposed action and the proposed action with a handful of insignificant mitigation measures related to water management and soil stockpiling. FEIS at S-11 to S-17, 104-08. The environmental effects under both action alternatives are identical for most resources[6] and "similar" for the remaining resources.[7] Further demonstrating that the insignificant mitigation measures in alternative 3 did not create *any meaningful distinction* between the alternatives, the ROD dismissed each proposed measure as "unnecessary"; providing only "limited," "not measurable," or "negligible benefit"; or "already covered" by provisions in Alternative 2. ROD at 15-19; *see also* OSM & DEQ, Meeting Notes at pdf. 1-8 (June 6, 2018) (attached

---

[5] *W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1332 (D. Idaho 2019) (failure to consider mid-range alternative arbitrary).

[6] *See* FEIS at 112-19, tbl. 13 (impacts *identical* for air quality, climate change, water rights, fish and wildlife, special status species, socioeconomic conditions, environmental justice, recreation, access and transportation, solid and hazardous waste, and noise).

[7] *Id.* (impacts *similar* for topography, public health, geology, surface water, groundwater, vegetation, wetlands and riparian zones, visual resources, land use, and soil).

as Exhibit 5) (noting that all proposed "mitigation" measures in alternative 3 are unnecessary and that WRM would not agree to them anyhow).

Second, Federal Defendants' own technical staff explained that the limited and virtually indistinguishable mitigation measures in alternative 3 were insufficient to establish a valid range of alternatives:

- One agency engineer noted that "[t]he EIS confuses the description of alternatives with mitigation measures. Mitigation measures are added after analysis of impacts and are in addition to items which are already required under regulatory compliance with other laws." Exhibit 4 at pdf. 1;

- And agency hydrologist noted that "there isn't much distinction between alternatives and mitigation," Exhibit 2 at pdf. 3;

- At a comment resolution meeting multiple agency experts objected that alternative 3 (the "agency-mitigated alternative") was not a "true alternative": "To be a true alternative under NEPA, an alternative would need to have an actual change to the mine plan (which is rare). The 'agency-mitigated alternative' contains no actual change to the mine plans, but rather is just a list of mitigations, which would be unenforceable." Exhibit 3 at pdf. 7.

Thus, Federal Defendants' consideration of "only a no action alternative along with two virtually identical alternatives" violated NEPA. *Muckleshoot Indian Tribe*, 177 F.3d at 813.

Federal Defendants further violated NEPA by failing to consider any mid-range alternative involving less coal development over a shorter period of time. Instead, the EIS only considered the extremes of no expansion (no action) and strip-mining 70.8 million tons from 6,746 acres over 19 years. EIS at S-11 to S-17.

Federal Defendants never concluded that a reduced mining alternative was inconsistent with the project's purpose and need statement, *see* FEIS at 110, and agency staff noted that this alternative "would be consistent with the agencies' purpose and need as currently written." OSM, Comment Review Form at pdf. 33 (Nov. 11, 2016) (comment #37) (attached as Exhibit 6). Thus, the failure to consider a middle-ground alternative was arbitrary. *W. Watersheds Project v. Schneider*, 417 F. Supp. 3d at 1332; *High Country*, 951 F.3d at; *WORC*, 2018 WL 1475470 at *7-9.

Federal Defendants offered three conclusory excuses for refusing to consider a reduced coal mining alternative: (1) it would not be "operationally feasible"; (2) the effects would be "substantially similar" to those of the proposed action and alternative 3; and (3) it would violate a Montana administrative rule on coal conservation, Administrative Rule of Montana 17.24.322. FEIS at 110. These excuses lack merit. Regarding operational feasibility, the proposed mining sequence shows that Area F is divided into distinct sections, each of which will be developed independently over distinct time periods, as shown below:

///

///

///

///

19



**Figure 1:** Area F reclamation plan, FEIS at S-15

It is clear that a smaller operation—say through 2025 or 2027, to align with the utilities' projected end of the power plant's useful life, FEIS at S-3—would be feasible. Nor is it accurate that reduced mining would have "substantially similar" impacts to the proposed action. For example, reducing mining by one-half would reduce surface disturbance by one-half (thousands of acres), reduce air pollution (thousands of tons of pollutants, FEIS at 448)) and greenhouse gas (GHG) emissions by one-half (tens of millions of tons, FEIS at 489), and reduce water withdrawals for coal combustion by one-half—hardly, "substantially similar" impacts.

Federal Defendants sought to "hang [their] hat"[8] on the Montana coal conservation rule (Admin. R. Mont. 17.24.322), but that rule was no hurdle to considering a mid-range reduced mining alternative. In short, the rule requires permit applications to include a "coal conservation plan" showing the coal company will mine "all of the minable and marketable coal" in a proposed mine plan area. *See* Admin. R. Mont. 17.24.322. That state rule does not apply to the federal agencies, and the plain language of the rule in no way prevents any regulator from approving mining in a smaller "mine plan area." By contrast, under Federal Defendants' interpretation—that all minable and marketable coal in a geographical region must be approved for mining in the same permit application— it would have been illegal for the Rosebud Mine to expand incrementally as it has (from Area A to Area B to Area C to Area D to Area F, with numerous incremental expansions of each separate permit area). The agencies' proffered excuses for refusing to consider a reduced strip-mining alternative have no merit, rending the alternatives analysis doubly unlawful. *WORC*, 2018 WL 1475470 at *7-9.

Federal Defendants' failure to consider a reasonable range of alternatives also foreclosed a public discussion of a just transition following the inevitable cessation of coal mining and combustion in Colstrip. This was a significant

---

[8] Exhibit 6 at pdf. 33 (comment #37).

disservice to the public. The agencies were well aware that the power plant owners were "generally working to move out of coal in the future" and that there were significant doubts about the "economic viability" of WRM. OSM & DEQ, Meeting Notes at 2 (Apr. 4, 2018) (Exhibit 7). Two principal owners of the power plant from Washington (Puget Sound Energy (PSE) and Avista Corporation) determined that "the remaining useful life of those units [Units 3 and 4] is through the end of 2027." FEIS at S-3.[9] What's more, Oregon law[10] requires the Oregon owners (Portland General Electric and PacifiCorp) to leave the plant by 2030. FEIS at 10. And in May 2019, Washington enacted a law requiring all Washington utilities (PSE, Avista, and PacifiCorp) to leave the plant by 2025. Wash. Rev. Code Ann. § 19.405.030. In light of substantial evidence of a plant closure well before 2039, the public—including, the Conservation Groups, the community of Colstrip, and the Northern Cheyenne Tribe[11]—have repeatedly petitioned regulators to discuss a

---

[9] Units 1 and 2 were required to close before 2022. FEIS at S-3. They closed in early 2020. Tom Lutey, *Shutdown of Units 1 and 2 is underway* Billings Gazette (Jan. 2, 2020), *available at* https://billingsgazette.com/news/shutdown-of-colstrip-units-1-and-2-is-underway/article_9cf84136-f56e-51b4-8bf9-e4e90d28bdab.html.

[10] Or. Rev. Stat. Ann. § 757.518.

[11] *See, e.g.*, Br. in Response to Mot. in Limine at 1-3, *In re NorthWestern Energy's Application for Capacity Acquisition* (July 1, 2020 Mont. Pub. Service Comm'n) (Exhibit 8) (City of Colstrip seeking transition planning); Resp. by Northern Cheyenne Tribe Objecting to NorthWestern Energy's Mot. in Limine at 5, *In re NorthWestern Energy's Application for Capacity Acquisition* (July 7, 2020 Mont. Pub. Service Comm'n) (Northern Cheyenne requesting transition planning)

just transition plan. Given these indicators of a mid-term shutdown of the plant, a mid-range alternative was reasonable, as in *High Country* and *WORC*. Federal Defendants refusal to consider a reduced coal alternative was both unlawful, unrealistic, and a disservice to the public.

### C. Federal Defendants' failure to reinitiate consultation regarding impacts to pallid sturgeon from coal combustion violated the Endangered Species Act.

"Reinitiation of consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and … [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2); *Sierra Club v. Marsh*, 816 F. 2d 1376, 1388 (9th Cir. 1987), *abrogated on other grounds in Cottonwood Envtl. Law Ctr. v. USFS*, 789 F.3d 1075 (9th Cir. 2015)). Such "effects of the action" include "indirect effects of an action on the species or critical habitat." 50 C.F.R. § 402.02; *NWF v. Coleman*, 529 F.2d 359, 373-74 (5th Cir. 1976).

Federal Defendants recognize the combustion of coal as an indirect effect of the Area F expansion, FEIS at S-21, and that virtually all 70.8 million tons of coal

---

(Exhibit 9). This Court may take judicial notice of these documents. Fed. R. Evid. 201.

form Area F will be burned at the Colstrip Power Plant, FEIS at S-3. Federal

Defendants also knew that the power plant obtains its water from the Yellowstone

River and that endangered pallid sturgeon inhabit the Yellowstone River. OSM &

DEQ Call Notes at 4 (Jan. 6, 2017) (Exhibit 10). During preparation of the FEIS,

expert agency staff and consultants urged that "water rights from the Yellowstone

River *should be discussed* (since the Colstrip Power Plants get their process water

from the river)." *Id.* (emphasis added). While the agencies determined that they

could only omit analysis of water withdrawals from the Yellowstone River if "a

good rationale can be provided," *id.* at 5, they ultimately refused to analyze such

water *quantity* impacts *without providing any rationale whatsoever*, FEIS

Appendix F at F-175 (response 5-27) (stating without elaboration "water quantity

impacts to the Yellowstone River as a result of power plant cooling operations

were not analyzed in the EIS").

On November 18, 2019, and again on April 8, 2020, Conservation Groups

sent Federal Defendants new information that pallid sturgeon have migrated

upstream to an area very near the water intake for the Colstrip Power Plant. Exhibit

1 at 3, 23-25; *see* Doc. 55, ¶¶ 121-23. The information showed that cumulative

effects of water withdrawals from the power plant, combined with the

environmental baseline and the worsening impacts of climate change, would

adversely affect the survival and recovery of pallid sturgeon by increasing risk of

mortality from increased water temperatures, reduced stream flow, and loss of prey habitat. Exhibit 1 at 4, 18-20, 27. Courts have repeatedly required agencies to consider cumulative effects of climate change on listed fish species. *E.g.*, *Pacific Coast Fed'n of Fishermen's Ass'ns v. Gutierrez,* 606 F. Supp. 2d 1122, 1184 (E.D. Cal. 2008); *NRDC v. Kempthorne*, 506 F. Supp.2d 322, 370 (E.D. Cal. 2007).

Despite new evidence that water withdrawals resulting from combustion of Area F coal would adversely affect endangered pallid sturgeon, Federal Defendants refused to reinitiate consultation. (Doc. 55, ¶ 123; Doc. 57, ¶ 123.) This was arbitrary and violated the ESA. 50 C.F.R. § 402.16(a)(2); *Marsh*, 816 F.2d 1388. Conservation Groups are likely to succeed on this claim.

## II. WRM's strip-mining of the prairies in Area F and burning the coal from Area F will cause irreparable injury.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Se. Alaska Conservation Council v. USFS*, 413 F. Supp. 3d 973, 980 (D. Alaska 2019) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)). Thus, an agency's violation of NEPA "coupled with likely environmental harm" constitutes irreparable injury. *W. Watersheds Project v. Bernhardt*, 392 F. Supp. 3d 1225, 1259 (D. Or. 2019); *accord W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1241 (D. Idaho 2018). "[F]ederal coal, once mined, cannot be put back into the ground—the injury will therefore be irreparable." *MEIC v. OSM*, No.

25

CV 15-106-M-DWM, 2017 WL 5047901, at *3 (D. Mont. Nov. 3, 2017). Once

GHGs are emitted from coal combustion, "they cannot be removed" from the

atmosphere—it is therefore irreparable. *California v. BLM*, 286 F. Supp. 3d 1054,

1074 (N.D. Cal. 2018).

Here, WRM has begun strip-mining Area F, causing irreparable injury. Decl.

of Derf Johnson, ¶ 9 (Exhibit 11). The coal, once mined and burned, cannot be put

back. *MEIC*, 2017 WL 5047901, at *3; *California*, 286 F. Supp. 3d at 1073-74.

///

**Image 3:** Initiation of strip-mining in Area F



**Image 4:** Initiation of strip-mining in Area F



Even if, in theory, the area will be subject to reclamation, the reclamation process will occur at a timescale greater than a human lifetime. Email from Karen Jass, Mining Engineer, OSM to Nicole Bauman, ERO at 1 (July 26, 2016) (Exhibit 12) (observing that "overtime not much of the defined reclamation process actually appears to have taken place in any of the initial areas of A, B, or C" at the Rosebud Mine); *Bernhardt*, 392 F. Supp. 3d at 1254-55 (harm from grazing irreparable even though land would "eventually recover" in decades).

27

Water withdrawals from the Yellowstone River for combustion of coal from Area F will irreparably harm endangered pallid sturgeon. "[C]ontinued operations of the water pumping system for Talen Montana LLC [for the Colstrip Power Plant] from the Yellowstone River over the next 20 years threatens the survival of the pallid sturgeon …." Exhibit 1 at 27. Such threat to the survival of an endangered species constitutes irreparable harm. *NWF*, 886 F.3d at 821. This alone warrants an injunction. *Id.* 817-18.

## III. The equities strongly support an injunction because WRM's strip-mining activities in Area F are unnecessary.

"If [environmental injury] is sufficiently likely ... the balance of harms will usually favor the issuance of an injunction to protect the environment." *Se. Alaska Conservation Council*, 413 F. Supp. 3d at 984 (quoting *Vill. of Gambell*); *accord Indigenous Envtl. Network v. U.S. Dep't of State*, 369 F. Supp. 3d 1045, 1051 (D. Mont. 2018). Permanent environmental harm outweighs a temporary delay of industrial activity. *League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014). A defendant is not harmed by an injunction that "merely ends an unlawful practice." *Sierra Club v. Trump*, 963 F.3d 874, 896 (9th Cir. 2020) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Here, preserving the status quo avoids permanent irreparable environmental injury from temporary delay of strip-mining activities pending resolution of this case. *League of Wilderness Defenders*, 752 F.3d at 765. Neither Federal

28

Defendants nor WRM can complain of an injunction that merely ends their unlawful strip-mining activities. *Sierra Club*, 963 F.3d at 896. Finally, a preliminary injunction of strip-mining in Area F will not cause either a cessation of operations at the mine or the power plant, because WRM can continue to mine existing coal reserves in Areas A, B, and C, which will be sufficient to supply the power plant's reduced coal demands (following closure of Units 1 and 2) for years. FEIS at 431 (showing tens of millions of tons of coal remaining in Areas A, B, and C); *see Dine Citizens v. OSM*, No. 12-CV-01275-JLK, 2015 WL 1593995, at *3 & n.1 (D. Colo. Apr. 6, 2015).

## IV.   The public interest in upholding the rule of law and protecting the environment strongly supports an injunction.

"The public interest analysis involves weighing the importance of preserving the environment, following the rule of law, and avoiding environmental damage to the public against the economic interests of [the public]." *MEIC*, 2017 WL 5047901, at *5. "The Ninth Circuit has recognized the well-established public interest in preserving nature and avoiding irreparable environmental injury. And suspending a project until environmental analysis has occurred comports with the public interest, because the public interest requires careful consideration of environmental impacts before major federal projects may go forward." *Se. Alaska Conservation Council*, 413 F. Supp. 3d at 985-86 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137-38 (9th Cir. 2011), and *S. Fork Band Council v.*

29

*Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009)) (internal quotation and

punctuation omitted). "When the alleged action by the government violates federal

law, the public interest factor generally weighs in favor of the plaintiff."

*Bernhardt*, 392 F. Supp. 3d at 1260.

Here, the public interest supports a preliminary injunction. It is fundamental

that unlawful government conduct should not be countenanced. *Sierra Club*, 963

F.3d 896; *Seattle Audubon Soc. v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash.)

(enjoining unlawful agency action "invokes a public interest of the highest order:

the interest in having government officials act in accordance with law"). Avoiding

irreparable harm from strip-mining the headwater streams and prairies of West

Fork Armells Creek and the irreparable harm from the greenhouse gas emissions

from combustion of coal from Area F is also in the public interest. So too is

requiring Federal Defendants to consider an alternative that recognizes the power

plant owners' plans to exit Colstrip in the next decade and the need for a just

transition for surrounding communities. Exhibit 8 (City of Colstrip seeking

transition planning); Exhibit 9 (Northern Cheyenne seeking transition planning).

## V.     The Court should not impose a bond.

If this Court grants an injunction, the Conservation Groups respectfully

request the Court to waive the bond requirement under Federal Rule of Civil

Procedure 65(c).

"It is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest." *Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012).

The Conservation Groups are non-profit public interest organizations, seeking to force the government to comply with the law. They have limited budgets and have no pecuniary interest in this litigation. Exhibit 11, ¶ 14; Decl. of John Horning, ¶¶ 8-10 (Exhibit 13); Decl. of John Woodland, ¶¶ 3-5 (Exhibit 14); Decl. of Aaron Isherwood, ¶¶ 9-11 (Exhibit 15); Decl. of George Price, ¶¶ 2-3 (Exhibit 16). A bond would impose undue hardship and chill public-interest litigation.

## CONCLUSION

This Court should grant the Conservation Groups' motion for a preliminary injunction.

Respectfully submitted this 28th day of August 2020.

/s/ Shiloh Hernandez
Shiloh S. Hernandez
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org

Melissa A. Hornbein
Western Environmental Law Center

31

103 Reeder's Alley
Helena, Montana 59601
(406) 204-4852
hornbein@westernlaw.org

*Attorneys for Plaintiffs Montana
Environmental Information Center, Indian
People's Action, 350 Montana, WildEarth
Guardians, and Sierra Club*

Nathaniel Shoaff (*admitted pro hac vice*)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorney for Plaintiff Sierra Club*

32

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d)(2)(E), I hereby certify that the foregoing brief

contains 6,496 words, excluding caption, signature, and certificate of service. I

relied on the word count of the word-processing system used to produce this brief.

/s/ Shiloh Hernandez
Shiloh S. Hernandez