Michelle M. Sullivan
Adrian A. Miller
Sullivan Miller Law PLLC
3860 Avenue B, Suite C East
Billings, MT 59102
Phone: (406) 403-7066
michelle.sullivan@sullivanmiller.com
adrian.miller@sullivanmiller.com

*ATTORNEYS FOR AMICUS
CITY OF COLSTRIP*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, INDIAN PEOPLE'S ACTION, 350 MONTANA, SIERRA CLUB, WILDEARTH GUARDIAN, <br><br> Plaintiffs, <br><br> vs. <br><br> DAVID BERNHARDT, et al., <br><br> Defendants, <br><br> and <br><br> WESTMORELAND ROSEBUD MINING, LLC, <br><br> Intervenor. | Case No. CV 19-130-BLG-SPW-TJC <br><br> **CITY OF COLSTRIP'S AMICUS BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

The City of Colstrip ("Colstrip"), pursuant to this Court's Order dated October 6, 2020 (Doc. 85), hereby files its amicus brief in opposition to Plaintiffs' Motion for a Preliminary Injunction (Doc. 62).

## I. BACKGROUND

*Colstrip's History*

Colstrip was originally established in the early 1920s. *See* Declaration of Mayor John Williams, attached hereto as Exhibit 1, at ¶ 3. Mining started in 1924, with the coal used by steam locomotive boilers on the Northern Pacific Railway. *Id.* at ¶ 4. Forty-four million tons of coal were mined during the first 34 years of operation. *Id.* In 1958, mining operations ended after diesel engines replaced the coal-fired steam locomotives. *Id.* at ¶ 5.

A year later, Montana Power Company purchased the rights to the mine and the town, and mining operations resumed in 1967, with an eye toward building coal-fired electrical plants. *Id.* at ¶ 6. Units 1 and 2 went online in 1975 and 1976, and Units 3 and 4 went online in 1984 and 1986. *Id.* at ¶ 7.

Colstrip incorporated in 1998. *Id.* at ¶ 8. With a population of 2,214 as of the 2010 census, it is the largest city in Rosebud County. *Id.* at ¶ 9. That census also recorded 863 households. *Id.* As noted in Westmoreland's briefing, over 500 mine and power plant workers and their families live in

Colstrip. *See* Doc. 73, p.3. The Rosebud Mine (the "Mine") and Colstrip Power Plant (the "Power Plant") are, far and away, the primary industries in Colstrip. Williams Decl. at ¶ 10. Nearly all the remaining employers in Colstrip – education, retail, dining, medical, government, etc. – support the families that reside in Colstrip because of the Mine and Power Plant. *Id.*

<u>Colstrip's Infrastructure</u>

Colstrip draws its drinking water from Castle Rock Lake. Williams Decl. at ¶ 11. The lake is a 168-acre reservoir that was originally built in 1975 to supply water to the Power Plant. *Id.* Water is pumped into Castle Rock Lake from the Yellowstone River by way of two pipelines. *Id.* at ¶ 12. Colstrip takes its water from the lake, which is then treated at the Colstrip Water Treatment Plant. *Id.* Castle Rock Lake is owned by the Power Plant, and Colstrip depends on the continued viability of the Power Plant (and in turn, the Mine), for the operation of the water pipelines and the maintenance of Castle Rock Lake. *Id.* at ¶ 13.

Colstrip's tax base also pays for a wastewater treatment facility, garbage collection, weed control, mosquito abatement, snow plowing, and street maintenance. *Id.* at ¶ 14. Colstrip has a K-12 public school system and a medical center. *Id.* All of these services are dependent upon the Mine, the Power Plant, and their combined workforce. *Id.*

*Medical Services*

In 1989, the Colstrip Hospital District ("CHD") was formed to provide medical services for the residents of Colstrip. Williams Decl. at ¶ 15. The CHD collected taxes for three years, before receiving a Coal Board grant in 1992. *Id.*

Construction of the Colstrip Medical Clinic began in 1992, and the clinic opened in 1993. *Id.* at ¶ 15. It has employed physicians, physician assistants, nurses, and other caregivers, who provide care for Colstrip residents and respond to Colstrip's medical needs. *Id.*

*Recreation in Colstrip*

Today, Colstrip is fortunate to have multiple opportunities for recreation in its community. Williams Decl. at ¶ 17. That wasn't always the case. In the early 1970s, thousands of men and women had relocated to Colstrip to work on the construction of the power plants, but the town had little to offer by way of recreation. *Id.* at ¶ 18. A "Recreation Director" was hired in late 1974, and her salary was shared equally between Western Energy Company, Montana Power Company, and the Units 1 & 2 Partners. *Id.* Children's programs were developed. *Id.* at ¶ 19. Adult basketball and softball teams were formed. *Id.* In the fall of 1975, construction began on a Community Center. *Id.* A Board of Directors was formed, along with the

Colstrip Area Recreation and Parks Association. *Id.* Throughout the late 1970's and early 1980's, parks were constructed, along with soccer fields and a softball complex. *Id.*

Fisherman enjoy catching walleye, pike, and bass from Castle Rock Lake. *Id.* at ¶ 20. Bike paths and picnic areas surround the lake. *Id.* Biking and hiking trails, a playground, and a volleyball court provide additional recreational options for visitors. *Id.*

In 1987, Colstrip formed a tax district for parks and recreation (hereafter, "CPRD"). *Id.* at ¶ 21. Through the CPRD, Colstrip further developed Castle Rock Lake and constructed a 9-hole golf course. *Id.* Today, baseball, softball, soccer, basketball, fitness programs, and open gym are available to Colstrip's youth. *Id.* at ¶ 22. Adult activities provided by the CPRD include golf, softball, basketball, racquetball, volleyball, and many fitness programs. *Id.* CPRD maintains the community center, the pool, the park system, bike paths, Castle Rock Lake area and trail, an ice skating/hockey rink area, and the clubhouse and golf course. *Id.*

<u>Colstrip's Contribution to the State</u>

Beyond Colstrip and Rosebud County, the Mine and Power Plant provide vital electricity to the Northern Plains of Montana, which regularly experience sub-zero winter temperatures. Williams Decl. at ¶ 23.

NorthWestern Energy, Inc. ("NorthWestern") currently owns a 30% share of Unit 4. *Id.* Northwestern Energy reports having over 700,000 customers in Montana, South Dakota, and Nebraska, with over 370,000 of those customers from Montana alone. *Id.* Northwestern serves customers across the State, including customers in Butte, Billings, Bozeman, Missoula, Great Falls, and Helena. *Id.* In short, Colstrip's industry supplies Montana with affordable power, plain and simple.

Colstrip also supports the state and local coffers through excise taxes. As reported by the Helena Independent Record, coal taxes provided $81 million to state and local governments in 2016. *See* [https://helenair.com/news/state-and-regional/coal-mining-remains-significant-source-of-revenue-for-montana/article_332acea7-b019-5f10-8123-1c864d6cff36.html](https://helenair.com/news/state-and-regional/coal-mining-remains-significant-source-of-revenue-for-montana/article_332acea7-b019-5f10-8123-1c864d6cff36.html). Without Colstrip and its industry, those tax dollars would disappear.

*Colstrip's Future*

The fate of the Mine and Power Plant – and thus Colstrip itself – has been the subject of much attention and speculation in recent years. In early 2020, Units 1 and 2 were shuttered prematurely, as a result of a different lawsuit, even though they had a remaining productive life of 20-25 years. Williams Decl. at ¶ 24. Units 3 and 4 remain operational, however, as does the Mine. *Id.* Recently, Northwestern offered to purchase the ownership

interest of Puget Sound Energy, Inc. in Unit 4. *Id.* at ¶ 25. Approval of that purchase is currently being considered by the Montana Public Service Commission. *Id.* If approved, the Power Plant could continue operating for many more years, meaning the adjacent Rosebud Mine would remain operational, as well. *Id.*

If either the Mine or the Power Plant were to permanently shutter, the community of Colstrip would effectively collapse. *Id.* at ¶ 26. Five hundred families would immediately be forced to leave for lack of work. *Id.* The remainder of Colstrip's residents would likely follow, and what is now a vibrant and successful community would become a ghost town. *Id.* Colstrip needs the Mine to survive.

And yet, Colstrip is not naïve. The Mine and Power Plant will close one day, but Colstrip and its citizens deserve an orderly winding-down of the industry that has sustained their way of life for more than 40 years. Colstrip's citizens deserve to continue making a living in the energy industry for as long as it is feasible to do so. Providing the injunctive relief that Plaintiffs demand would harm the City's transition plans.

## II.   ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Resources Def. Council, Inc.* 555 U.S. 7, 24

(2008). When seeking a preliminary injunction, a plaintiff must establish that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of the preliminary injunction, (3) the balance of equities tip in its favor, and (4) an injunction is in the public interest. *Id.* at 20.[1] The balance of equities and the public interest prongs do not support Plaintiffs' requested injunction. If a preliminary injunction is issued, it is Colstrip and its citizens who will suffer hardships. Plaintiffs – who do not live, work, or recreate in the area – will not. Further, when considering the public interest, the citizens of Colstrip constitute the public who will be most affected. Plaintiffs' request for a preliminary injunction should be denied.

### A. The Balance of Hardships Does Not Tip in Plaintiffs' Favor.

Plaintiffs argue for a preliminary injunction under the Ninth Circuit's "sliding scale" approach. *See* Doc. 63, p. 8. Under this standard, if there are "serious questions going to the merits" and "a balance of hardships that tips sharply towards the plaintiff", then a preliminary injunction may issue "so long as the plaintiff also shows that there is likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild*

---

[1] Colstrip will not weigh in on the first two factors, success on the merits or irreparable harm. It joins Intervenors' and Federal Defendants' arguments on those points.

*Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In other words, instead of showing that it is "likely to succeed on the merits", the Ninth Circuit allows a party to make a lesser showing of "serious questions going to the merits" but <u>only if</u> the balance of equities also tips <u>sharply</u> in their favor and the other factors are met. *Id*. Here, Plaintiffs are not entitled to the sliding scale approach and are not entitled to an injunction because the balance of equities does not tip in their favor. The hardships that they will suffer, if any, are tenuous compared to those of others.

Plaintiffs do not argue that any of their members will suffer a <u>specific</u> hardship. That is not surprising since Plaintiffs' members do not live, work, or recreate in Colstrip or the nearby area. In fact, when faced with a standing challenge, Plaintiffs' responded by putting forth: (1) a member of WildEarth Guardians and the Sierra Club who lives in <u>Golden, Colorado</u> and visits the Rosebud Mine area once every two years for purposes of gathering information for this very type of litigation, (2) a member of MEIC and Sierra Club who lives in <u>Helena, Montana</u> and who lasted hunted in the Colstrip area in <u>1986</u>, (3) the Director of Indian People's Action who currently lives in <u>Butte, Montana</u> and last lived in Lame Deer in <u>1996</u>, and (4) a member of 350Montana.org who has been a Montana resident since 2006, lives in <u>Superior, Montana</u>, and visited Colstrip <u>once in 2015</u>. *See*

Docs. 44-2, 44-1, 44-3, and 44-4. These individuals will suffer no hardship if the preliminary injunction is denied. Making the logical assumption that these members are Plaintiffs' best examples of a causal connection to the area, it is doubtful that any of Plaintiffs' members will face hardship.

Instead of a specific hardship, Plaintiffs point to generalized environmental harm, citing *Se. Alaska Conservation Council v. U.S.*, 431 F.Supp.3d 973 (D. Alaska 2019) for the proposition that the balance of harms will usually favor an injunction where environmental injury is sufficiently likely.[2] However, not every "potential environmental injury warrants an injunction." *Cottrell*, 632 F.3d at 1135 (internal quotations and citations omitted). The plaintiffs in *Se. Alaska Conservation Council* are starkly different from Plaintiffs here. In that case, the plaintiffs were challenging a timber sale on Prince of Wales Island in the Tongass National Forest. *Se. Alaska Conservation Council*, 413 F.Supp.3d at 975. The plaintiffs' members used the national forest area for hunting, fishing, gathering, and recreation. *Id.* at 979.

Here, Plaintiffs do not presently fish or hunt in the Rosebud Mine area. In fact, the last time one of their members hunted in that area was over

---

[2] Such injury is not "sufficiently likely" for all the reason set forth in Intervenor's Response Brief. *See* Doc. 38.

10

30 years ago. *See* Doc. 44-1, ¶ 9. Another member claims to "recreate" near Colstrip when he visits the mine area every few years for the specific purpose of bringing and sustaining lawsuits like this current one. *See* Doc. 44-2, ¶ 8. For these reasons, Plaintiffs' claim of environmental harm is suspect. While Plaintiffs argue that there will be speculative environmental harm, they still must show how the speculative harm creates hardships for their members. *See, e.g., Se. Alaska Conservation Council*, 413 F.Supp.3d at 984 (several members filed affidavits in support of preliminary injunction motion showing how their use of the area would be disrupted). Plaintiffs cannot do so here because they have no members who spend time in the area for purposes other than litigation.

In contrast to Plaintiffs' unidentifiable hardships, Colstrip and its citizens will suffer substantially if the preliminary injunction is granted. The people who live in the Colstrip area rely upon the Mine for more than just jobs. The Mine and Power Plant have been the economic lifeblood of Colstrip and Rosebud County for more than 40 years. While there are over five hundred people who work directly for the Mine or Power Plant in Colstrip, the other remaining employers also largely exist because of them. *See* Williams Decl. at ¶ 10. If the Mine or Power Plant prematurely closed, Colstrip would effectively collapse. Five hundred families would be forced

11

to leave for lack of work, and the remaining industries that exist to support those families – education, retail, dining, medical, recreation – would disappear for lack of need.

Make no mistake, premature closure of the Rosebud Mine is exactly what Plaintiffs are seeking here. While mining Area F may not increase annual mine production, it will extend the life of the Mine by eight years. *See* Doc. 73, p. 4. Plaintiffs would prefer that the Mine and Power Plant shutter today, but those additional eight years will make a significant difference to Colstrip's citizens.

If the Court grants Plaintiffs' preliminary injunction, endangering the Mine, then the people who live in the area will face significant hardships. Colstrip's infrastructure is dependent on continued operation of the Mine and Power Plant. Williams Decl. at ¶¶ 11-16. Colstrip's police department, fire department, medical facilities, and public schools all rely upon the tax base provided by those entities. *Id.* If the Mine and Power Plant cease to exist, Colstrip will lose the infrastructure that supplies the city with water. *Id.* at ¶¶ 11-12. Unlike Plaintiffs' members, who "recreate" near the Mine for the sole purpose of bringing and sustaining lawsuits, Colstrip's citizens rely upon recreational opportunities made possible by the CPRD. *Id.* at ¶¶ 18-22.

Colstrip's hardships are real and measurable. Plaintiffs' alleged hardships, on the other hand, are speculative and unclear. Plaintiffs suggest that potential environmental harms (that will somehow affect their members living hundreds of miles away) should be considered above the hardships that will be suffered by the local citizens. Meanwhile, Colstrip residents are facing the possible loss of property values, their water supply, and emergency services. The balance of hardships does not tip "sharply" in Plaintiffs' favor. *Cottrell*, 632 F.3d at 1135. The balance tips in favor of the people who will <u>actually</u> be affected by closure of the Rosebud Mine: its employees and Colstrip's citizens.

### B.  The Public Interest Will Be Harmed if the Preliminary Injunction Is Granted.

When considering a preliminary injunction, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defenders/Blue Mountains Biodiversity v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). Even if Plaintiffs can prevail on every other factor, they cannot show that the requested injunction will be in the public's interest.

The "public" at issue here is not people who live in Golden, Colorado and briefly visit the area every two years to advance litigation efforts. The public is – first and foremost – the residents of Colstrip and Rosebud County. Once again, Plaintiffs allege general environmental impacts as a basis for their injunction, arguing that it is in the public interest that nature be preserved. Yet, Plaintiffs are not members of the public impacted. The only reason Plaintiffs even knew that mining had started in Area F, months after filing this action, is because one of Plaintiffs' attorneys travelled to the Mine area specifically for this case. *See* Doc. 63-11. Of course, if Plaintiffs had even one member who was part of the actual public at interest, Plaintiffs would have known about the mining in Area F before nine months had passed. A random Colstrip citizen on the street would have known.

The public interest will be substantially harmed if the preliminary injunction is granted. Colstrip relies upon the mine for continued economic viability. Economic impacts to the immediate community <u>must</u> be considered when determining public impact. *See, e.g., Connaughton*, 752 F.3d at 766-67. Here, however, it is more than just economic prosperity at issue. Services that are vital to Colstrip's citizens are only possible because of the Mine and Power Plant. *See, generally,* Williams Declaration. Without the tax base provided by these industries, several essential programs –

24/7 police protection, the fire department, and public schools – may no longer exist. *Id.* Colstrip receives its water supply from the Yellowstone River, 30 miles away, and it is transported by the same pipe that provides water to the Power Plant. The Power Plant maintains the pond where the water is stored. Emergency services and drinking water are important to the public interest. Uncertain environmental damage, that troubles someone who lives five hundred miles away, is not.

There is a reason why Plaintiffs do not have any members who are part of the actual public affected here. Nobody in Colstrip or Rosebud County wants to lose their livelihood, their healthcare, or their schools. No member of the true "public" wants to stop safe, clean mining in Area F. The public knows that Plaintiffs' Motion is just another attempt to prematurely shut down the Mine, the Power Plant, and the City of Colstrip itself. The Court should deny Plaintiffs' requested injunction because it is not in the public interest.

### III.   CONCLUSION

Colstrip's citizens are tired of outside special interest groups trying to destroy their town, their infrastructure, and their livelihood. Plaintiffs' members live hundreds of miles away and will not suffer any harm if their relief is not granted. Meanwhile, Colstrip faces economic collapse. Issuance

of a preliminary injunction is not warranted. The people who will face hardships are the people of Colstrip and Rosebud County. The true public consists of those same people. The balance of equities does not tip toward Plaintiffs, and an injunction is not in the public interest. For these reasons and as stated above, Colstrip asks this Court to deny Plaintiffs' request for a preliminary injunction.

DATED this 9th day of October, 2020.

       /s/ Michelle M. Sullivan
Michelle M. Sullivan
Adrian A. Miller
Sullivan Miller Law PLLC
3860 Avenue B, Suite C East
Billings, MT 59102
*ATTORNEYS FOR AMICUS*
*CITY OF COLSTRIP*

## **CERTIFICATE OF COMPLIANCE**

The undersigned, Michelle M. Sullivan, certifies that this Amicus Brief complies with the requirements of Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman Font typeface consisting of fourteen characters per inch. The total word count of this Brief is less than 6,500 words, excluding caption and certificates of compliance and service. The undersigned relies on the word count of the word processing system used to prepare this document.

                                                /s/ Michelle M. Sullivan
                                                Michelle M. Sullivan

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of October, 2020, I filed the foregoing document electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

    /s/ Michelle M. Sullivan
Michelle M. Sullivan