Shiloh S. Hernandez
Melissa A. Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org
hornbein@westernlaw.org

*Attorneys for Plaintiffs*

Nathaniel Shoaff (admitted *pro hac vice*)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorney for Plaintiff Sierra Club*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, INDIAN PEOPLE'S ACTION, 350 MONTANA, SIERRA CLUB, WILDEARTH GUARDIANS,<br><br>Plaintiffs,<br><br>vs.<br><br>DAVID BERNHARDT, in his official capacity as Secretary of the Department of the Interior; U.S. | Case No. CV-19-130-BLG-SPW-TJC<br><br><br>**PLAINTIFFS' FOURTH AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

OFFICE OF SURFACE MINING, an
agency within the U.S. Department
of the Interior; U.S.
DEPARTMENT OF THE
INTERIOR, a federal agency;
MARCELO CALLE, in his official
capacity as Program Support
Division Manager of U.S. Office
of Surface Mining Western
Region; DAVID BERRY, in his
official capacity as Regional
Director of U.S. Office of Surface
Mining Western Region; LANNY
ERDOS, in her official capacity as
Director of U.S. Office of Surface
Mining; and CASEY
HAMMOND, in his official
capacity as Assistant Secretary of
Land and Minerals Management of
the U.S. Department of the
Interior, AURELIA SKIPWITH,
Director of U.S. Fish and Wildlife
Service; and U.S. FISH AND
WILDLIFE SERVICE, an agency
within the U.S. Department of the
Interior,

        Defendants,

    and

WESTMORELAND ROSEBUD
MINING, LLC,

        Defendant-Intervenor.

2

**INTRODUCTION**

1.      Plaintiffs Montana Environmental Information Center, Indian

People's Action, 350 Montana, Sierra Club, and WildEarth Guardians

(collectively, "Conservation Groups") bring this civil action for declaratory and

injunctive relief against Secretary of the Interior David Bernhardt, the U.S. Office

of Surface Mining Reclamation and Enforcement, the U.S. Department of the

Interior, Marcelo Calle, David Berry, Lanny Erdos, and Casey Hammond

(collectively, "Federal Defendants") in accordance with the Administrative

Procedure Act (APA), 5 U.S.C. §§ 701-706, and the National Environmental

Policy Act (NEPA), 42 U.S.C. §§ 4321-4370h. Plaintiffs file this Fourth Amended

Complaint with leave of court and in accordance with the Court's Order dated

October 13, 2020.  (Doc. 93).

2.      Nearly fifty years ago the Montana Department of Health and

Environmental Sciences warned that building a mine-mouth coal-fired power plant

in Colstrip would create a boom-and-bust cycle that ultimately would both harm

people working at the strip-mine and power plants, and also leave the local

environment too polluted to support the sustainable land uses that preceded

industrialization:

> Depletion of coal as a resource is not the only long term consideration
> involved here. An economy based on the exploitation of the coal is
> developed in the coal fields themselves, as well as where the electrical
> energy is being consumed. The short term gains to the Colstrip area

> are made known by the interests involved in building the plant and
> mining the coal. Jobs are created and money enters the local economy
> from these jobs. As long as the coal is mined and the power is
> generated, the flow of money through the community is assured.
> When the coal is exhausted, or its use for production of electricity
> becomes obsolete, the economy and way of life dependent on the
> exploitation of the coal will suffer. Many feel that this consequence is
> inevitable; that only its magnitude and timing are in question.
> Improper reclamation of the land may destroy the original economic
> base of the region: the land used for agriculture. Numerous examples
> of boom and bust cycles can be cited. There is little evidence that this
> sort of thing will not happen in the Fort Union Region.

Mont. Dep't of Health and Envtl. Sciences, Environmental Impact Statement on

the Proposed Montana Power Company Electrical Generating Plant at Colstrip

Montana, at 82 (1973). Approximately one-half century later, the Federal

Defendants refused to heed this warning and failed to use their considerable

resources to outline what a just transition would look like in Colstrip.

3.      As predicted by the Department of Health and Environmental

Sciences in 1973, coal's use for the production of electricity is becoming obsolete

and the need for a just transition to clean energy supplies is urgent, both to stave

off the catastrophic impacts of climate change and to protect the people of Colstrip.

However, to the detriment of the climate and Colstrip, the Federal Defendants

failed to recognize this ongoing transformation of the energy system, and instead

approved the 6,500-acre Area F expansion of the Rosebud coal strip-mine

(technically, the mining plan modification Federal Coal Lease C2011003F), which

would supposedly extend active mining operations at the strip-mine through 2040.

4.     In approving the Area F expansion, Federal Defendants violated NEPA's most basic requirement by failing to tell the public the whole environmental truth about numerous harmful impacts of the 6,500-acre Area F expansion of the already sprawling Rosebud coal strip-mine, impacts that, as predicted half a century ago, threaten to "destroy the original economic base of the region: the land used for agriculture."

5.     In the environmental impact statement (EIS) for the Area F expansion, the agencies refused to disclose the extent of numerous harmful impacts from the mine expansion, including major adverse impacts to surface waters and the climate-change worsening impacts of over 100 million tons of greenhouse gases that will be emitted from burning the coal in Area F. The agencies refused altogether to acknowledge harmful impacts to the Yellowstone River from the major water withdrawals from that river that are required to burn the Area F coal.

6.     The agencies flatly refused to consider reasonable alternatives for a just transition that could alleviate the impacts of the "inevitable" "bust" predicted by the Montana Department of Health and Environmental Sciences in 1973. Instead, the agencies' blinkered analysis simply ignored the disappearing market for electricity from highly polluting coal and, specifically, multiple indications that the Colstrip Power Plant will close well before 2040, the date through which strip-mining operations in Area F are assumed to continue. Thus, the agencies increased

the likelihood of an unplanned, abrupt, and painful end to the coal economy in Colstrip.

7.     The reality is that burning coal for energy is driving the severe, pervasive, and potentially irreversible impacts of climate change, while also causing significant localized environmental damage. Consequently, coal as an energy source is, as the Montana Department of Health and Environmental Sciences predicted, becoming obsolete. The majority of the owners of the Colstrip Power Plant have indicated that they intend to exit the plant well before 2030, and units 1 and 2 will be closing by the end of 2019. In this circumstance, Federal Defendants had an obligation to tell the public the clear-eyed truth about the harms of expanded coal mining and offer reasonable alternatives that would lead to a just transition to clean, renewable energy.

8.     Because Federal Defendants failed to fulfill their fundamental obligations under NEPA, the Conservation Groups are forced to bring this action.

## JURISDICTION AND VENUE

9.     This Court has federal-question jurisdiction over this action, 28 U.S.C. § 1331, which arises under NEPA, 42 U.S.C. §§ 4321-4370h, and the APA, 5 U.S.C. §§ 701-706, as well as the citizen suit provision of the Endangered Species Act (ESA), 16 U.S.C. § 1540(g).

10.    The requested declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706, and 16 U.S.C. § 1540(g).

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in Montana and a substantial part of the property that is the subject of the action, the Rosebud Mine, is located in Montana. Venue is also proper under 28 U.S.C. § 1391(e)(1)(C) because officers of the United States are defendants and Plaintiffs Montana Environmental Information Center, 350 Montana, and Indian People's Action reside in Montana. Venue is also proper under 16 U.S.C. § 1540(g)(3)(A).

12.    Divisional venue is proper in the Billings Division of this Court because the strip mine is located within the Billings Division.

13.    The Conservation Groups have standing under Article III of the U.S. Constitution because the challenged actions cause them economic, professional, recreational, and aesthetic harm, which will be remedied by a favorable ruling from this Court.

14.    The challenged actions are final and subject to judicial review under 5 U.S.C. §§ 702, 704, 706.

15.    Conservation Groups have exhausted any and all available and required administrative remedies.

**PARTIES**

16.    Plaintiff Montana Environmental Information Center (MEIC) is a nonprofit organization founded in 1973 with approximately 3,000 members throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the human environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations. MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution. MEIC and its members have intensive, long-standing recreational, aesthetic, scientific, professional, and spiritual interests in the responsible production and use of energy, the reduction of greenhouse gas (GHG) pollution as a means to ameliorate the climate crisis, and the land, air, water, and communities impacted by climate change. MEIC members live, work, and recreate in areas that will be adversely impacted by the Rosebud Mine expansion. MEIC brings this action on its own behalf and on behalf of its adversely affected members.

17.    Plaintiff Indian People's Action is a nonprofit organization that works in Montana urban areas to reach out to and empower Native Americans to address

the social, economic, environmental and racial inequities that shape their lives. Indian People's Action works on multiple fronts: native rights, anti-discrimination, and the injustice in the justice system. Indian People's Action members live, work, and/or recreate in areas that will be adversely impacted by the Rosebud Mine expansion. Indian People's Action members use and plan to continue to use and enjoy areas impacted by the Rosebud Mine Expansion.

18.    Plaintiff 350 Montana is a Montana-based nonprofit organization based in Missoula that works to reduce atmospheric carbon dioxide ($CO_2$) concentrations to 350 parts per million (ppm) by implementing strategic actions and advocating policies to end fossil fuel burning with the greatest urgency. 350 Montana envisions a rapid conversion to a 100 percent renewable global energy system using wind, water, and solar. 350 Montana works with the global grassroots climate movement to achieve these goals and safeguard Earth's life-support systems. 350 Montana members live, work, and/or recreate in areas that will be adversely impacted by the Rosebud Mine expansion. 350 Montana members use and plan to continue to use and enjoy areas impacted by the Rosebud Mine Expansion.

19.    Plaintiff WildEarth Guardians (Guardians) is a nonprofit conservation organization with more than 200,000 members and activists throughout the United States, including nearly 900 in Montana. Guardians has a major office in Missoula,

Montana. Guardians' mission is to protect and restore the wildlife, wild rivers, wild places, and health of the American West. Through its Climate and Energy Program, Guardians is dedicated to protecting the American West from the dangers it faces from the climate crisis. Guardians' members and staff have recreational, aesthetic, scientific, professional, and spiritual interests in a protected and stable climate, and an environment that is sustained by a protected and stable climate. Guardians' members use and plan to continue to use and enjoy landscapes impacted by the Rosebud Mine Expansion. Guardians brings this action on its own behalf and on behalf of its adversely affected members.

20.     Plaintiff Sierra Club is a national nonprofit organization with 64 chapters and over 700,000 members nationwide, including more than 2,900 in Montana, dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's concerns encompass the exploration, enjoyment and protection of the lands and waters of Montana. The Sierra Club's particular interest in this case and the issues which the case concerns stem from the impacts to water resources from the Rosebud Mine expansion, and the air pollution impacts from the eventual combustion of the coal from the Rosebud Mine. The

Sierra Club brings this action on its own behalf and on behalf of its adversely affected members. Sierra Club members live, work, and/or recreate in areas that will be adversely impacted by the Rosebud Mine expansion. Sierra Club members use and plan to continue to use and enjoy areas impacted by the Rosebud Mine Expansion.

21.     Defendant David Bernhardt is Secretary of the U.S. Department of the Interior. Secretary Bernhardt is responsible for implementing and complying with federal laws governing mining plan modifications, including NEPA, the Mineral Leasing Act (MLA), and the Surface Mining Control and Reclamation Act (SMCRA). Secretary Bernhardt is required to assure that any mining of leased federal coal is in the best environmental and economic interests of the American people prior to approving any federal mining plan modification.

22.     Defendant U.S. Department of the Interior is a federal department responsible for implementing and complying with federal laws governing approval of mining plan modifications, including NEPA, the MLA, and SMCRA.

23.     Defendant U.S. Office of Surface Mining Reclamation and Enforcement (OSM) is a federal agency within the U.S. Department of the Interior that is responsible for assuring lawful environmental review of mining plan modifications under NEPA and recommending approval, conditional approval, or disapproval of applications for mining plan modifications. OSM's Western

Regional Office conducted the environmental review of the mining plan modification for the expansion of the Rosebud Mine.

24.     Defendant Marcello Calle is Program Support Division Manager of the U.S. Office of Surface Mining Western Region. Mr. Calle is responsible for managing federal coal resources, including those involved in this action. Mr. Calle is responsible for implementing and complying with NEPA and other federal laws governing review and approval of applications for mining plan modifications.

25.     Defendant David Berry is Regional Director of OSM's Western Region. Mr. Berry is responsible for managing federal coal resources, including those involved in this action, and for making recommendations to the Secretary of the Interior regarding applications for mining plan modifications. Mr. Berry is also responsible for implementing and complying with NEPA and other federal laws governing review and recommendations for approval, conditional approval, or disapproval of applications for mining plan modifications. Mr. Berry recommended approval of the mining plan modification for the expansion of the Rosebud Mine.

26.     Defendant Lanny Erdos is Director of OSM. Mr. Erdos is responsible for assuring that OSM complies with federal laws, including NEPA and other laws governing review and recommendations for approval, conditional approval, or disapproval of applications for mining plan modifications.

27.     Defendant Casey Hammond is Acting Assistant Secretary of Land and Minerals Management of the U.S. Department of the Interior. Mr. Hammond is responsible for complying with federal laws governing approval, conditional approval, or disapproval of applications for mining plan modifications. Mr. Hammond's predecessor, Joseph Balash, approved the mining plan modification, allowing the Rosebud Mine Expansion.

28.     Defendant U.S. Fish and Wildlife Service is an agency of the U.S. Department of the Interior and is responsible for administering the ESA with respect to freshwater aquatic species, including the pallid sturgeon (*Scaphirhynchus albus*).

29.     Defendant Aurelia Skipwith is the Director of U.S. Fish and Wildlife Service and in that capacity is responsible for implementing and complying with federal law, including the laws implicated by this action.

## LEGAL BACKGROUND

### I.     National Environmental Policy Act

30.     "NEPA is our basic national charter for the environment." 40 C.F.R. § 1500.1(a). NEPA's goal is to "prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of" all people. 42 U.S.C. § 4321. NEPA recognizes that "each person should enjoy a healthful environment" and ensures that the federal government uses all practical means to "assure for all

13

Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." *Id.* § 4331(b). NEPA also recognizes that "each person has a responsibility to contribute to the preservation and enhancement of the environment." *Id.* § 4331(c).

31.     Ultimately, NEPA's point is "not better documents but better decisions." 40 C.F.R. § 1500.1(c). "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id.*

32.     NEPA requires agencies to act proactively by requiring them to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id.* § 1501.2.

33.     To meet these goals, agencies must prepare a "detailed statement"— an environmental impact statement or "EIS"—for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

34.     The EIS must discuss "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). These alternatives are "the heart of the environmental impact

statement." 40 C.F.R. § 1502.14. An EIS must "rigorously explore and objectively evaluate all reasonable alternatives…" *Id.* § 1502.14(a). The "existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992).

35.     The environmental impact statement must address "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii). In so doing, the agency must evaluate "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." *Id.* § 4332(2)(C)(iv).

36.     NEPA further requires agencies to "recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment." *Id.* § 4332(2)(F).

## II.     Administrative Procedure Act

37.     The Administrative Procedure Act (APA) provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C.

§ 702. Actions that are reviewable under the APA include final agency actions "for which there is no adequate remedy in a court." *Id.*

38.     Under the APA, a reviewing court shall, *inter alia*, "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions may also be set aside in other circumstances, such as where the action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." *Id.* § 706(2)(B)-(F).

## FACTS

### I.     The Pine Breaks

39.     The Pine Breaks region that surrounds Colstrip, Montana, consists of rugged topography of semi-arid rolling plains, buttes, and badlands, with prominent sandstone rimrocks and stands of juniper and ponderosa pine. The Big Horn Mountains rise in the distance, and expanses of sky and changing weather patterns are visible in all directions.

40.     The landscape supports a diversity of wildlife including pronghorns, elk, black bears, mountain lions, bobcats, burrowing owls, and sage grouse. The creeks in the Colstrip area, East and West Fork Armells Creek and their tributaries, flow north approximately 30 miles to their confluence with the Yellowstone River.

41.     The region has been inhabited for thousands of years, including by the Northern Cheyenne, Shoshone, Crow, Kiowa, Lakota, and Nakota people. Euroamericans arrived in the late Nineteenth Century. Sustainable agricultural operations, predominantly hay growing and ranching that began in the region in the late Nineteenth Century, continue today. Currently the lands within Area F proposed for strip-mining serve as productive pastures for grazing livestock and as wildlife habitat.

42.     Coal mining began in Colstrip in the 1920s, in an effort by the Great Northern Railway to obtain coal for its locomotives without having to deal with the coal miners' unions at underground mines in Red Lodge and Bozeman. Ironically, the railroad's reliance on coal delayed its conversion to diesel locomotives and, ultimately, proved more costly than profitable. When the company eventually switched its locomotives to diesel in the 1950s, it shuttered its strip-mine in Colstrip. The Montana Power Company reopened the Colstrip mine in 1968 to ship coal to the Corrette Power Plant in Billings, which was closed and subsequently demolished in 2015.

## II.     The Rosebud Mine and Colstrip Power Plant

43.     The Rosebud Mine subsequently ramped up production to supply coal to the Colstrip Power Plant. In the face of broad public opposition, Montana regulators allowed the Montana Power Company, together with a conglomerate of

West Coast utilities, to construct Units 1 and 2 of the Colstrip Power Plant in 1975

and 1976. In the public comments on the Montana Department of Health and

Environmental Sciences' EIS on the proposed plants, 130 people supported

construction and 2,867 opposed construction. At the time of construction—1975—

the stated life of the coal plant was 30 years. Montana regulators predicted that the

operation would start with a boom and end with a bust.

44.     Ten years after the construction of Units 1 and 2, following a

protracted struggle with local ranchers, conservationists, and the Northern

Cheyenne Tribe, the utilities, led again by the Montana Power Company,

constructed Units 3 and 4 at the Colstrip Power Plant. Today the four-unit Colstrip

Power Plant has a generating capacity of 2,094 megawatts (MW), making it the

second largest coal plant west of the Mississippi River. It is also one of the single

largest sources of air pollution in the United States.

45.     Having spread to five permit areas, the Rosebud Mine is now a

sprawling operation covering 25,949 acres adjacent to the power plant and the

town of Colstrip. The strip-mine produces 8-10.25 million tons of subbituminous

coal per year, virtually all of which is burned in the nearby Colstrip Power Plant.

By law the Colstrip Power Plant may only burn coal from the Rosebud Mine. The

remainder of the coal from the mine—a small amount of high-sulfur, low-BTU

"waste coal"—is burned at the Rosebud Power Plant, a 38 MW power plant located just north of Colstrip.

## III.   Delayed Reclamation and Polluted Water

46.   Of the approximately 20,000 acres disturbed by mining and associated development, less than 10,000 acres have received Phase I bond release, which occurs after backfilling and regrading—the first step of reclamation. In the half century since strip-mining began in earnest in 1968, only 651 acres—approximately 3% of the permit area—have received full bond release, meaning full reclamation (the final phase, Phase IV bond release, requires reclamation of vegetation and water resources). Scientists at the U.S. Office of Surface Mining have complained about the "extremely slow reclamation process" at the Rosebud Mine, noting that "pits all remain open" and there is scant evidence that "significant amounts of grading has taken place" or that "any seeding has been done to the extent it is successful and visible from photographs." Regulators have recognized the coal company's limited success in establishing shrubs or trees on land that has been strip-mined.

47.   The coal complex has degraded and polluted water resources in the Colstrip area. East Fork Armells Creek, which drains the area in which the mine and power plant are located, has been identified as impaired and not meeting water quality standards since 1996. It is currently deemed impaired for aluminum, iron,

specific conductivity, total dissolved solids, nitrate/nitrite, total nitrogen, total

phosphorous, habitat alterations, and alterations in stream-side or littoral vegetative

covers. The Montana Department of Environmental Quality has identified strip-

mining as a potential cause of the pollution. The agency has been unable to find

reference streams with which to compare East Fork Armells Creek, which,

according to the agency, "could be the result of chance alone, or it may be that EF

[East Fork] Armells [creek's] base chemistry has been altered to such a degree by

human activities that it no longer resembles any of the reference sites." In the 23

years since the Montana Department of Environmental Quality first identified East

Fork Armells Creek as impaired and not meeting water quality standards, the

agency has failed to promulgate a remediation plan for the creek.

48.    The Rosebud coal seam that is being blasted and removed at the strip-

mine functions as an aquifer, where it has not been destroyed. The Montana

Department of State Lands recognized in 1982 that "[s]ome of the best quality

groundwater in the Rosebud Mine area is found in the Rosebud coal aquifer."

Approximately 10% of stock water wells in the area are sourced in the Rosebud

coal aquifer. Federal Defendants' EIS for the Area F expansion found that the

Rosebud coal aquifer is likely "the primary contributor of ground water to …

wetlands and drainages" in the mine area.

49.     After the coal aquifer is strip-mined and the pits are backfilled with the blasted rock above the coal seam (called "spoils"), it may take hundreds of years for the aquifer to recover. This will dewater streams and wetlands. When the "spoils" aquifer eventually fills with water it will be highly polluted. The EIS for the Area F expansion found that water quality monitoring from existing mine areas shows exceedances of water quality standards for "arsenic, cadmium, lead, nitrate, and zinc" and concentrations of "calcium, magnesium, manganese, sodium, sulfate, and TDS [total dissolved solids] exceeding upper recommended limits for livestock." The EIS further noted that the "pre-mining ground water quality of the Rosebud Coal in the project area did not show any exceedances of arsenic, cadmium, lead, and nitrate standards, with the exception of one lead standard exceedance." When this polluted spoils water eventually flows back into creeks in the area, "TDS, sulfate, alkalinity, calcium, sodium, nitrate+nitrite, magnesium, and manganese concentrations in streams below the spoil may increase and exceed nitrate+nitrate and total nitrogen standards, and recommended limits for the other parameters for livestock, other ruminants, and aquatic life when and where ground water discharge is the major or only source of water to streams." That is, mining will extend and exacerbate the current degradation and pollution of water resources in the area for centuries—long after the coal companies and utilities have left the area.

50.     For years, the Colstrip Power Plant disposed its coal ash in ponds that intersect the water table. In total the ponds leak about 200 million gallons of polluted water into the water table annually. As a result, the local aquifer is no longer a viable water source for the community of Colstrip. Though regulators have been aware of the plume of pollution from the ash ponds for years, no clean-up plan has been finalized or implemented.

## IV.    Greenhouse Gas Pollution

51.     The worsening crisis of climate change—driven by greenhouse gas emissions from burning fossil fuels, the dirtiest of which is coal—is one of the greatest and most pressing issues of our time. The Intergovernmental Panel on Climate Change, the global authority on the science of climate change, warned in its 2014 Synthesis Report that continued high levels of greenhouse gas emissions are increasing the "likelihood of severe, pervasive, and irreversible impacts to people and ecosystems." The U.S. Global Change Research Program, the leading federal authority on climate change in the United States, warned in its Fourth National Climate Assessment that "significant reductions in emissions" are necessary to avoid the risk of unanticipated changes and impacts, some of which may be "large and potentially irreversible." In 2015, the nations of the world reached the Paris Agreement to limit greenhouse gas emissions, establishing the goal to "hold[] the increase in the global average temperature to well below 2°C

above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels."

52.    The Rosebud Mine and Colstrip Power Plant complex is one of the largest individual sources of greenhouse gas pollution in the United States, emitting approximately 15 million tons of carbon dioxide equivalent ($CO_2e$) emissions annually. Since 1968, the strip-mine and power plant have emitted approximately 500 million tons of $CO_2e$ emissions.

## V.    The Area F Expansion

53.    On November 2, 2011, Western Energy summited an application packet to the Montana Department of Environmental Quality (DEQ) to permit the addition of Area F to the Rosebud Mine. The Area F expansion adds approximately 6,500 acres to the Rosebud Mine, swelling its size to over 30,000 acres. The Rosebud Coal seam is thinner in Area F, approximately 20 feet thick, than it is in other areas of the mine, and it has higher sodium content. It also has higher stripping ratios than other areas of the mine and is located farther from the power plant, making mining Area F more expensive.

54.    The Area F expansion is located almost entirely in the headwaters of West Fork Armells Creek. It is intersected by five tributaries of West Fork Armells Creek: Black Hank Creek, Donley Creek, Robbie Creek, McClure Creek, and Trail Creek. As elsewhere, the Rosebud coal seam in Area F is saturated and functions

as an aquifer. The Area F EIS recognized that "[g]round water in the Rosebud Coal is of better quality" than other groundwater in the area. Numerous springs and seeps occur below where the coal seam outcrops, indicating that "the Rosebud Coal is the primary contributor of ground water to the[] wetlands and drainages."

55.    The Area F expansion contains approximately 70 million tons of coal, all of which will be stripped and burned at the Colstrip Power Plant and the Rosebud Power Plant. When combusted the coal will cause over 100 million tons of $CO_2e$ emissions over 19 years. Using the social cost of carbon protocol developed by the Federal Interagency Working Group on the Social Cost of Carbon, these emissions will cause billions of dollars in climate change damages, significantly exceeding the value of the coal. That is, strip-mining and burning this coal will lead to a net economic loss to the public (though it may profit the coal company and the utilities that own the coal plant).

56.    In November 2018, the Montana Department of Environmental Quality and U.S. Office of Surface Mining (OSM) jointly issued the final EIS on the mine expansion, and in June 2019 OSM issued a record of decision (ROD) approving the Area F expansion. The EIS recognized that the mine expansion would have major, long-term adverse impacts to surface water quality and water quantity; however, the EIS failed to provide any details about these impacts,

despite Federal Defendants' possession of decades worth of data on which to base a robust analysis.

57.     Similarly, the EIS repeatedly trumpeted the supposed economic benefits of the mine expansion. Yet it refused to acknowledge that, using the social cost of carbon protocol, the social and environmental costs of the mine expansion related to climate change alone would significantly exceed the purported benefits. The EIS similarly refused to assess the inevitable impacts to the Yellowstone River from the massive water withdrawals required for operations of the Colstrip Power Plant where the Area F coal will be burned.

58.     The EIS considered only three alternatives: (1) a no-action alternative, (2) the proposed action, and (3) the proposed action with a dozen additional mitigation measures. Scientists for the agencies noted that "there isn't much distinction between alternatives" and that the use of mitigation measures to distinguish between supposed alternatives was confused and improper. In the EIS process, the agencies opted to remove mitigation measures related to tribal cultural resources and the establishment of a compensatory fund for tribes.

59.     The EIS refused to consider a middle-ground alternative in which less coal would be mined for less than 19 years. Thus, both action alternatives contemplated identical actions: continued strip-mining of 70 million tons of coal until approximately 2040. In doing so, the agencies refused to recognize that laws

passed in Washington and Oregon—where the majority of the power-plant owners are located—preclude the sale of electricity from coal-fired power plants after 2025 and 2030, respectively. That is, the majority of the plant's owners will not be permitted to burn coal at the plant after 2025 and 2030. By refusing to recognize this legal reality, the agencies' limited analysis failed to give detailed consideration to an alternative that would allow for a just transition in Colstrip from coal-mining to clean, renewable energy.

## FIRST CAUSE OF ACTION

### (NEPA Violation: Failure to Adequately Evaluate Cumulative Effects on Surface Water)

60.     Conservation Groups incorporate by reference all preceding paragraphs.

61.     NEPA requires federal agencies' environmental analysis to consider "any adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii).

62.     Agencies are required to take a hard look at direct, indirect, and cumulative impacts of a proposed action. 40 C.F.R. § 1508.25(c).

63.     Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past,

present, and reasonably foreseeable future actions, regardless of what agency

(Federal or non-Federal) or person undertakes such actions." *Id.* § 1508.7.

64.    The Rosebud Mine expansion will cause foreseeable cumulative

environmental impacts to surface water. Federal Defendants conducted only a

perfunctory analysis of impacts to surface water, despite possessing an abundance

of data on which the agency could have conducted a robust quantitative analysis of

impacts from past, present, and foreseeable future mining at Rosebud on nearby

surface waters.

65.    Federal Defendants' failure to adequately consider these impacts was

arbitrary and capricious and unlawful, and/or constitutes "agency action unlawfully

withheld or unreasonably delayed," in violation of NEPA, 42 U.S.C. § 4332(2)(C),

NEPA's implementing regulations, and the APA, 5 U.S.C. §§ 706(2)(A), 706(1).

## SECOND CAUSE OF ACTION

### (NEPA Violation: Failure to Evaluate Indirect and Cumulative Effects to the Yellowstone River)

66.    Conservation Groups incorporate by reference all preceding

paragraphs.

67.    NEPA requires federal agencies' environmental analysis to consider

"any adverse environmental effects which cannot be avoided." 42 U.S.C.

§ 4332(2)(C)(ii).

68.     Agencies are required to take a hard look at direct, indirect, and cumulative impacts of a proposed action. 40 C.F.R. § 1508.25(c).

69.     Direct impacts are "caused by the action and occur at the same place and time." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." *Id.* § 1508.8(b).

70.     Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such actions." *Id.* § 1508.7.

71.     Connected actions are actions that "(i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; [or] (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1508.25(a)(1). Cumulative actions are actions "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." *Id.* § 1508.25(a)(2). Agencies must assess the impacts of connected and cumulative actions.

72.     All coal from the Area F expansion will be burned at the Colstrip Power Plant (with a negligible amount of "waste coal" burned at the Rosebud

Power Plant), resulting, foreseeably, in significant water withdrawals by the Colstrip Power Plant from the Yellowstone River. The impacts of the water withdrawals will especially exacerbate low summer flows in the Yellowstone due to climate change, resulting in magnified and cascading ecological impacts.

73.    Federal Defendants' failure to consider these impacts was arbitrary and capricious and unlawful, and/or constitutes "agency action unlawfully withheld or unreasonably delayed," in violation of NEPA, 42 U.S.C. § 4332(2)(C), NEPA's implementing regulations, and the APA, 5 U.S.C. §§ 706(2)(A), 706(1).

## THIRD CAUSE OF ACTION

## (NEPA Violation: Failure to Adequately Evaluate Greenhouse Gas Pollution from Combustion)

74.    Conservation Groups incorporate by reference all preceding paragraphs.

75.    NEPA requires federal agencies to take a hard look at "any adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii).

76.    Agencies must "recognize the worldwide and long-range character of environmental problems." *Id.* § 4332(2)(F).

77.    Agencies must also "insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." *Id.* § 4332(2)(B).

78.     Agencies may not trumpet the economic benefits of an agency action without also acknowledging the economic costs of the action.

79.     Federal Defendants failed to monetize the economic costs of greenhouse gas (GHG) emissions from the mining plan modification, despite their monetizing and trumpeting the economic benefits of the mining plan modification.

80.     Federal Defendants failed to adequately assess the effects of indirect and cumulative greenhouse gas emissions. Federal Defendants' analysis of greenhouse gas emissions was misleading and arbitrary.

81.     Federal Defendants' failure to adequately consider the impacts of GHG emissions from the Rosebud Mine expansion was arbitrary and capricious and unlawful, and/or constitutes "agency action unlawfully withheld or unreasonably delayed," in violation of NEPA, 42 U.S.C. § 4332(2)(B), (C), (F), NEPA's implementing regulations, and the APA, 5 U.S.C. §§ 706(2)(A), 706(1).

## FOURTH CAUSE OF ACTION

### (NEPA Violation: Failure to Consider a Reasonable Range of Alternatives)

82.     Conservation Groups incorporate by reference all preceding paragraphs.

83.     Agencies must prepare an EIS that discusses "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii).

84.     Implementing regulations require an EIS's discussion to "rigorously explore and objectively evaluate all reasonable alternatives…" *Id.* § 1502.14(a).

85.     The "existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992).

86.     Federal Defendants refused to consider any middle-ground alternative that involved mining less coal, despite abundant record evidence that the Colstrip Power Plant will cease operations within ten years, obviating the need to strip-mine all the coal in Area F. The Federal Defendants' failure to consider a reduced coal mining alternative precluded the agency from examining in detail any just transition alternative and increases the likelihood that an abrupt "bust," predicted in 1973 by the Montana Department of Health and Environmental Sciences, will come to pass.

87.     Federal Defendants' failure to consider reasonable and viable alternatives was arbitrary and capricious and unlawful, and/or constitutes "agency action unlawfully withheld or unreasonably delayed," in violation of NEPA, 42 U.S.C. § 4332(2)(C), NEPA's implementing regulations, and the APA, 5 U.S.C. §§ 706(2)(A), 706(1).

## FIFTH CAUSE OF ACTION

**(ESA Violation: Arbitrary No Effect Determination and Failure to Consult on Pallid Sturgeon)**

88.     Conservation Groups incorporate by reference all preceding paragraphs.

89.     The Endangered Species Act requires that all federal agencies, in consultation with the U.S. Fish and Wildlife Service, ensure that their actions are "not likely to jeopardize the continued existence of any endangered or threatened species." 16 U.S.C. § 1536(a)(2).

90.     In making this determination, agencies must "use the best scientific and commercial data available." *Id.*

91.     The agency proposing the action (action agency) must first determine whether the action "may affect" a species listed as threatened or endangered. *Id.*

92.     Any possible effect, no matter how small, and no matter whether the effect is beneficial or adverse, requires a "may affect" determination under the ESA.

93.     Before taking any action that may affect any endangered or threatened species, the action agency must consult with the appropriate fish and wildlife agency, which is the U.S. Fish and Wildlife Service for the pallid sturgeon. *Id.*

94.     There are two forms of consultation, formal and informal. Formal consultation is necessary if an action is likely to adversely affect a listed species.

32

50 C.F.R. § 402.14(a)-(b). Formal consultation results in preparation of a biological opinion. *Id.* § 402.14(h).

95.     Formal consultation is not necessary if the action agency concludes and the fish and wildlife agency concurs that the proposed action may affect but is not likely to adversely affect endangered or threatened species. *Id.* § 402.13(a).

96.     When evaluating the effects of an action, agencies must consider direct, indirect, and cumulative effects, as well as the environmental baseline. 50 C.F.R. § 402.02 (2019).

97.     "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.*

98.     Cumulative effects are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

99.     The environmental baseline "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impacts of State or private actions which are contemporaneous with the consultation in process." *Id.*

100.   The action area is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.*

101.   All coal from the Area F expansion will be burned at the Colstrip Power Plant (with a negligible amount of "waste coal" burned at the Rosebud Power Plant), resulting, foreseeably, in significant water withdrawals by the Colstrip Power Plant from the Yellowstone River. The impacts of the water withdrawals will especially exacerbate low summer flows in the Yellowstone due to climate change, resulting in magnified and cascading ecological impacts.

102.   The Colstrip Power Plant withdraws all water used at the power plant, approximately 50,000 acre-feet per year, from the Yellowstone River, equivalent to the water withdrawals of 50,000 homes or 37,000 pivot sprinkler systems.

103.   During low flows, the power plant may consume more than 6% of the river's flow.

104.   Pallid sturgeon, which are listed as endangered species, inhabit the Yellowstone River. There are only approximately 125 pallid sturgeon that inhabit the upper Missouri River basin, which includes the Yellowstone and Missouri Rivers above Lake Sakakawea in North Dakota and below the Fort Peck and Cartersville dams in Montana.

105.    The population of pallid sturgeon in the upper Missouri River basin likely a genetically distinct population of pallid sturgeon.

106.    The Yellowstone River provides the best opportunity for pallid sturgeon recovery in the upper Missouri River basin.

107.    Pallid sturgeon migrate upstream to the Carterville Dam at Forsyth, Montana, just below the water intake for the Colstrip Power Plant.

108.    Given baseline conditions of water quality and water quantity in the Yellowstone River and given projected reduced summer flows in the river due to the worsening impacts of climate change, the foreseeable indirect and cumulative effects of continued large-scale water withdrawals for the Colstrip Power Plant may adversely the continued survival and recovery of pallid sturgeon in the upper Missouri River basin.

109.    Despite these foreseeable impacts to pallid sturgeon during the 19 years of operations of Area F, the agencies determined that the Area F expansion would have no effect on pallid sturgeon and therefore refused to complete informal or formal consultation with the U.S. Fish and Wildlife Service.

110.    The action agencies specifically refused to consider impacts to the Yellowstone River from water withdrawals from the power plant.

111.   The action agencies unlawfully and erroneously excluded water withdrawals from the Yellowstone River from the action area and the indirect and cumulative effects of water withdrawals from the effects of the action.

112.   The irrationality of this decision is starkly demonstrated by their *inclusion* of the coal plant emissions and emissions deposition area in their analysis.

113.   Further, the action agencies unlawfully failed to consider the impacts of the power plant pollution to pallid sturgeon in light of the degraded environmental baseline (in which large portions of the Yellowstone River are impaired for excessive pollution) and foreseeable cumulative effects.

114.   The action agencies improperly limited the action area to the area around the mine.

115.   After some degree of informal consultation from the action agencies, the U.S. Fish and Wildlife Service concurred in the action agencies' improperly limited action area.

116.   The action agencies and the U.S. Fish and Wildlife Service, based in part on their improperly delimited action area, erroneously concluded that pallid sturgeon are not present in the direct or indirect effects analysis area.

117.   The action agencies' no effect determination and the concurrence by the U.S. Fish and Wildlife Service with respect to pallid sturgeon was arbitrary and

capricious and not in accordance with the ESA, 16 U.S.C. § 1536, or the APA, 5 U.S.C. § 706(2)(A).

118.   The Federal agencies failed to initiate and complete informal or formal consultation with the U.S. Fish and Wildlife Service regarding potential effects of the mine expansion on pallid sturgeon, which was arbitrary and capricious and not in accordance with the ESA, 16 U.S.C. § 1536, and/or the APA, 5 U.S.C. § 706(2)(A).

### SIXTH CAUSE OF ACTION

### (ESA Violation: Arbitrary Failure to Reinitiate Consultation on Pallid Sturgeon)

119.   Conservation Groups incorporate by reference all preceding paragraphs.

120.   The ESA requires federal agencies to reinitiate consultation if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b).

121.   After Federal Defendants issued their June 2019 ROD for the Area F expansion, Conservation Groups sent them new information showing that pallid sturgeon had migrated up the Yellowstone River to just below the water intake for the power plant and that foreseeable water withdrawals for the power plant as a

result of the Area F expansion may adversely affect the survival and recovery of pallid sturgeon.

122.   Federal Defendants had not considered this information about how the Area F expansion may affect pallid sturgeon in their ROD.

123.   On April 8, 2020, Conservation Groups sent written notice to Federal Defendants of their failure to reinitiate consultation. Federal Defendants did not respond to this notice.

124.   The Federal agencies failure to reinitiate consultation with the U.S. Fish and Wildlife Service regarding potential effects of the mine expansion on pallid sturgeon, which was arbitrary and capricious and not in accordance with the ESA, 16 U.S.C. § 1536, and/or the APA, 5 U.S.C. § 706(2)(A)

## PRAYER FOR RELIEF

WHEREFORE, Conservation Groups respectfully request that this Court:

A.   Declare that Federal Defendants' actions violate NEPA, the regulations and policies promulgated thereunder, and the APA;

B.   Declare that the Federal Defendants' actions violated the ESA, the APA, and the regulations and policies promulgated thereunder;

C.   Vacate and set aside Federal Defendants' action;

D.      Enjoin Federal Defendants from re-issuing or approving the Rosebud

Mine Expansion until Federal Defendants have demonstrated compliance with

NEPA, the ESA, and the APA;

E.      Enjoin operations in the Rosebud Mine Expansion area until Federal

Defendants have demonstrated compliance with NEPA, the ESA and the APA;

F.      Award Conservation Groups their fees, costs, and other expenses as

provided by applicable law;

G.      Issue such relief as Conservation Groups subsequently request or that

this Court may deem just, proper, and equitable.

Respectfully submitted this 19th day of October, 2020.

/s/ Melissa Hornbein
Melissa A. Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4852
hornbein@westernlaw.org

Shiloh S. Hernandez
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org

*Attorneys for Plaintiffs Montana
Environmental Information Center, Indian
People's Action, 350 Montana, WildEarth
Guardians, and Sierra Club*

Nathaniel Shoaff (*admitted pro hac vice*)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorney for Plaintiff Sierra Club*