Shiloh S. Hernandez
Melissa A. Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org
hornbein@westernlaw.org

*Attorneys for Plaintiffs*

Nathaniel Shoaff (*pro hac vice*)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorney for Plaintiff Sierra Club*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> DEB HAALAND *et al.*,[1] <br><br> Defendants. | Case No. 1:19-cv-00130-SPW-TJC <br><br> **PLAINTIFFS' BRIEF IN SUPPPORT OF MOTION FOR SUMMARY JUDGMENT** |

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Haaland is automatically substituted for her predecessor, Scott de la Vega.

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... ii

TABLE OF AUTHORITIES .................................................................................. iv

EXHIBIT INDEX ................................................................................................... ix

ABBREVIATIONS AND SHORT FORMS ............................................................ x

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

LEGAL BACKGROUND ....................................................................................... 8

STANDARD OF REVIEW .................................................................................... 11

ARGUMENT .......................................................................................................... 12

I.      Conservation Groups' members' long-standing ties to areas
        impacted by the expansion demonstrate standing. ...................................... 12

II.     OSM failed to take a hard look at cumulative impacts to surface
        water in disregard of its own experts' recommendations and in
        violation of NEPA. ...................................................................................... 16

III.    OSM touted the economic benefits of the expansion, while
        refusing to disclose billions of dollars of harm from the project's
        GHG emissions, violating NEPA's hard look requirement ......................... 20

IV.     OSM improperly excluded water withdrawals from the
        Yellowstone River from the scope of its analysis, in disregard of its
        experts' recommendations and in violation of NEPA and the ESA ............. 24

        A.      OSM's refusal to consider impacts of water withdrawals
                required for coal combustion violated NEPA. .................................. 24

        B.      OSM's refusal to consider impacts of water withdrawals for
                coal combustion violated the ESA. ................................................... 27

C.     Alternatively, OSM's failure to reinitiate consultation after receiving new information detailing impacts of water withdrawals on pallid sturgeon violated the ESA. ............................ 29

V.     OSM failed to consider a reasonable range of alternatives in violation of NEPA. ...................................................................... 31

A.     OSM violated NEPA by only considering virtually identical action alternatives .................................................................. 32

B.     OSM further violated NEPA by failing to consider a reasonable mid-range alternative that aligned with the expected useful life of the Colstrip Power Plant. ............................... 34

VI.    Vacatur is the proper remedy. ..................................................... 37

CONCLUSION .................................................................................... 40

CERTIFICATE OF COMPLIANCE ...................................................... 41

# TABLE OF AUTHORITIES

## Cases

*'Ilio'ulaokalani Coal. v. Rumsfeld*,
    464 F.3d 1083 (9th Cir. 2006) ......................................................... 31

*Alliance for the Wild Rockies v. USFS*,
    907 F.3d 1105 (9th Cir. 2018) ........................................................ 37

*Alliance for Wild Rockies v. Probert*,
    412 F. Supp. 3d 1188 (D. Mont. 2019) ........................................... 30

*Balt. Gas & Elec. Co. v. NRDC*,
    462 U.S. 87 (1983) ............................................................................. 8

*Bark v. USFS*,
    958 F.3d 865 (9th Cir. 2020) ..................................................... 11, 17

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ........................................................ 19

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
    575 F.3d 999 (9th Cir. 2009) .......................................................... 10

*California v. Bernhardt*,
    472 F. Supp. 3d 573 (N.D. Cal. 2020) ....................................... 20, 23

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971) ........................................................................ 11

*Columbia Riverkeeper v. USACE*,
    No. 19-6071 RJB, 2020 WL 6874871 (W.D. Wash. Dec. 9, 2020) ................... 25

*Cook Inletkeeper v. Raimondo*,
    No. 19 CV 238-SLG, 2021 WL 13214496 (D. Alaska Mar. 30, 2021) ............. 30

*Ctr. for Biological Diversity v. Bernhardt*,
    982 F.3d 723 (9th Cir. 2020) ..................................................... 25, 37

*Ctr. for Biological Diversity v. NHTSA*,
    538 F.3d 1172 (9th Cir. 2008) ........................................................ 22

*DHS v. Regents of Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ..................................................................... 11

*Diné Citizens Against Ruining Our Env't v. OSM*,
   82 F. Supp. 3d 1201 (D. Colo. 2015) ............................................... 25

*Diné Citizens Against Ruining Our Env't v. OSM*,
   No. 12-CV-1275-JLK, 2015 WL 1593995 (D. Colo. April 6, 2015) ............... 39

*Friends of Yosemite v. Kempthorne*,
   520 F.3d 1024 (9th Cir.  2008) ........................................................ 31

*Great Basin Res. Watch v. BLM*,
   844 F.3d 1095 (9th Cir. 2016) ........................................................ 18

*Hanly v. Kleinhienst*,
   471 F.2d 823 (2d Cir. 1972) ........................................................... 19

*High Country Conservation Advocates v. USFS*,
   52 F. Supp. 3d 1174 (D. Colo. 2014) ............................... 20, 22, 34, 36

*Humane Soc'y v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) ........................................................ 37

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ...................................................................... 12

*Idaho Farm Bureau Fed'n v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995) ......................................................... 37

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
   305 F.3d 957 (9th Cir. 2002) ......................................................... 18

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
   387 F.3d 989 (9th Cir. 2004) ......................................................... 17

*Ksanka Kupaqa Xa'lcin v. FWS*,
   No. CV 19-20-M-DWM, 2021 WL 1415255 (D. Mont. Apr. 14, 2021) ..... 27, 28, 29, 37

*MEIC v. OSM*,
   274 F. Supp. 3d 1074 (D. Mont. 2017) ........................................................ 20, 23

*Motor Vehicle Mfrs. v. State Farm*,
   463 U.S. 29 (1983) .................................................................................... 11

*Muckleshoot Indian Tribe v. USFS*,
   177 F.3d 800 (9th Cir. 1999) ...................................................................... 31, 33

*Nat'l Parks Conservation Ass'n v. EPA*,
   788 F.3d 1134 (9th Cir. 2015) .......................................................................... 35

*Neighbors of Cuddy Mountain v. USFS*,
   137 F.3d 1372 (9th Cir. 1998) .......................................................................... 17

*Rocky Mountain Wild v. Bernhardt*,
   No. 19-CV-929-DBB-CMR, 2020 WL 7264914 (D. Utah Dec. 10,
   2020) ........................................................................................................ 36

*S. Fork Band v. U.S. Dep't of Interior*,
   588 F.3d 718 (9th Cir. 2009) ............................................................................ 19

*Salmon Spawning & Recovery Alliance v. Gutierrez*,
   545 F.3d 1220 (9th Cir. 2008) .......................................................................... 12

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017) ....................................................................... 25

*Standing Rock Sioux Tribe v. USACE*,
   471 F. Supp. 3d 71 (D.D.C. 2020) ................................................................... 37

*Standing Rock Sioux Tribe v. USACE*,
   985 F.3d 1032 (D.C. Cir. 2021) ................................................................... 37, 39

*Ten Lakes Snowmobile Club v. USFS*,
   No. CV 15-148-M-DLC, 2017 WL 4707536 (D. Mont. Oct. 18, 2017) ........... 12

*TVA v. Hill*,
   437 U.S. 153 (1978) .................................................................................. 9, 38

*Utah Physicians for a Healthy Env't v. BLM,*
  No. 19-CV-256-DBB, 2021 WL 1140247 (D. Utah Mar. 24, 2021)................. 20

*W. Org. of Res. Councils v. BLM* (*WORC*),
  No. CV 16-21-GF-BMM, 2018 WL 1475470 (D. Mont. Mar. 26,
  2018) ....................................................................................... 31, 34, 36

*W. Watersheds v. Kraayenbrink,*
  632 F.3d 472 (9th Cir. 2011) ............................................... 10, 12, 18

*WildEarth Guardians v. Bernhardt,*
  No. CV 17-80-BLG-SPW, 2021 WL 363955 (D. Mont. Feb. 3, 2021) ...... passim

*WildEarth Guardians v. EPA,*
  759 F.3d 1064 (9th Cir. 2014) ......................................................... 11

*WildEarth Guardians v. U.S. Dep't of Agric.,*
  795 F.3d 1148 (9th Cir. 2015) ......................................................... 12

*WildEarth Guardians v. Zinke,*
  No. CV 17-80-BLG-SPW-TJC, 2019 WL 2404860 (D. Mont. Feb. 11,
  2019) ............................................................................................ 24

## Statutes

16 U.S.C. § 1536.................................................................................. 9

42 U.S.C. § 4332................................................................................ 31

5 U.S.C. § 706............................................................................... 11, 37

Mont. Code Ann. § 15-23-715 ...................................................... 8, 39

Wash. Rev. Code Ann. § 19.405.030 ............................................. 8, 39

## Regulations

40 C.F.R. § 1500.1............................................................................... 8

40 C.F.R. § 1502.14........................................................................ 9, 31

40 C.F.R. § 1502.16............................................................................. 8

40 C.F.R. § 1508.7 ................................................................ 9, 19

40 C.F.R. § 1508.8 ................................................................ 8, 24

50 C.F.R. § 402.02 .............................................................. 10, 28

50 C.F.R. § 402.14 .................................................................... 9

50 C.F.R. § 402.16 .............................................................. 29, 30

84 Fed. Reg. 44,976 (Aug. 27, 2019) ................................. 10, 28

85 Fed. Reg. 43,304 (July 16, 2020) ........................................ 9

Mont. Admin. R. 17.24.322 .................................................... 36

**Rules**

Fed. R. Civ. P. 56 ................................................................... 11

**Other Authorities**

Department of Interior, Sec. Order 3399 (Apr. 16, 2021) ...................................... 22

## EXHIBIT INDEX

Exhibit 1              Declaration of Derf Johnson

Exhibit 2              Declaration of Steve Gilbert

Exhibit 3              Declaration of Michaelynn Hawk

Exhibit 4              Declaration of Jeremy Nichols

Exhibit 5              Declaration of John Woodland

Exhibit 6              Declaration of Brian Moench, M.D.

Exhibit 7              Declaration of James Hansen, Ph.D.

**ABBREVIATIONS AND SHORT FORMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record[2] |
| Conservation Groups | Montana Environmental Information Center, Indian People's Action, 350 Montana, Sierra Club, WildEarth Guardians |
| EIS | Environmental impact statement |
| ESA | Endangered Species Act |
| OSM | Secretary of Interior Deb Haaland, U.S. Office of Surface Mining, Reclamation and Enforcement, U.S. Department of the Interior, Marcelo Calle, David Berry, Casey Hammond, Lanny Erdos, Aurelia Skipwith, U.S. Fish and Wildlife Service |
| GHG | Greenhouse gas |
| NEPA | National Environmental Policy Act |
| ROD | Record of decision |
| SCC | Social Cost of Carbon |

---

[2] Citations to the Administrative Record use the following format: AR-[row number of document in index]-[bates number of pin cite or range].

**INTRODUCTION**

Plaintiff Conservation Groups challenge the approval of the Area F expansion of the Rosebud Mine under the National Environmental Policy Act (NEPA) and Endangered Species Act (ESA). The approval by the U.S. Office of Surface Mining, Reclamation and Enforcement et al. (collectively, "OSM") allows the sprawling strip-mine to expand by approximately 6,500 acres into headwater basins of West Fork Armells Creek. It extends the life of the strip-mine by 18 years and allows mine operator Westmoreland Rosebud Mining, LLC (Westmoreland) to supply 68.5 million of tons of coal to the expensive and antiquated Colstrip Power Plant.

The mine-mouth operation, consisting of the strip-mine and adjacent power plant (together, "coal complex"), is one of the nation's largest sources of air pollution and a significant source of water pollution. Throughout the environmental review process, OSM repeatedly ignored the pleas of the public and the advice of its own experts, making four significant errors.

First, OSM ignored the public and agency experts who urged a detailed, quantitative analysis of cumulative impacts to surface waters using abundant historical data. Although an agency hydrologist warned, "I don't know what our story would be if we avoided this and someone were to challenge us on it given that a historic dataset exists," OSM demurred, offering only a perfunctory,

qualitative statement that cumulative impacts would range from minor to major, with no further detail, in violation of NEPA.

Second, OSM disregarded requests to provide a fair accounting of the climate impacts from the mine's climate pollution by use of the social cost of carbon (SCC), a robust, peer-reviewed methodology that monetizes impacts of greenhouse gas (GHG) emissions. Instead, OSM touted the purported economic benefits of the expansion, quantifying hundreds of millions of dollars in wages, taxes, royalties, and the like, while refusing to quantify the substantial costs of the mine expansion, though it had the means to do so. Indeed, a political appointee directed staff to include economic "benefits" but exclude any costs associated with the SCC, in violation of NEPA.

Third, OSM refused to analyze the foreseeable impacts of annual withdrawals of 50,000 acre-feet of water from the Yellowstone River. The very purpose of the Area F expansion is to boil this water at the Colstrip Power Plant (a "boiler") to generate electricity. OSM experts recommended that "the Yellowstone River should be included in the analysis area" because the "Colstrip Power Plants get their process water from the river." Endangered pallid sturgeon (*Scaphirhynchus albus*) inhabit the Yellowstone River near the plant's intake bays and may be harmed by these massive water withdrawals, given ever-declining

2

flows due to climate change. But OSM excluded these foreseeable impacts from the scope of its analysis without any rationale, in violation of NEPA and the ESA.

Fourth, OSM failed to include a reasonable range of alternatives. The agency instead considered only the "no action" and two virtually identical action alternatives that entailed mining the same amount of coal, over the same project area, for the same number of years, with the same amount of GHG emissions, in violation of NEPA.

Given the gravity of these errors and the extraordinary harm caused by the coal complex, this Court should vacate OSM's decision and remand the matter for the required hard look at environmental impacts.

## FACTUAL BACKGROUND

Colstrip, Montana, location of the coal complex, lies in the Pine Breaks region of the American West that stretches from the Musselshell River in Montana roughly to the Black Hills of South Dakota. AR-633-12980. The Pine Breaks are distinguished from neighboring plains by their more rugged topography, relatively abundant water supply, and move diverse ecology. AR-633-12980. The project area sits at the foot of the Little Wolf Mountains, in an basin drained by tributaries of West Fork Armells Creek, itself a tributary of the Yellowstone River. AR-633-12980-81. This area, ancestral territory of the Crow and Northern Cheyenne Peoples, has been occupied for at least 9,000 years, evidenced by rock art, historic

cairns, prehistoric campsites near perennial springs, and homesteads. AR-633-12985, 12990-93, 13015-16, 13037; AR-1112-140512-18.

**Image 1:** Area F—Black Hank Creek and Little Wolf Mountains in background. AR12983.



A consortium of utilities from Montana, Washington, and Oregon built Units 1 and 2 of the Colstrip Power Plant in the early 1970s, and Units 3 and 4 in the 1980s. AR-116-30394. From the beginning, the plant was designed as a "mine mouth" operation. AR-1112-140402. The plant is required to obtain all of its coal from the mine. AR-157-29119. The mine has no other market for its coal. AR-93-

18501. The plant has always piped all process water—50,000 acre-feet each year—from the Yellowstone River near Forsyth. AR-1112-140394; Doc. 102, ¶ 102.

When Montana approved the first units in 1973, it anticipated a "boom and bust cycle[]," ending when "the coal['s] … use for production of electricity becomes obsolete," which may, due to "[i]mproper reclamation," "destroy the original economic base of the region," agriculture. AR-112-140490. The agency warned, "The long-term adverse effects may well outweigh the short-term gains." AR-1112-140394.

Nearly fifty years later, the projections of environmental degradation and coal's obsolescence have borne out. The strip-mine permit-area now sprawls across approximately 32,000 acres, an area larger than Billings.[3] AR-116-30392 (existing 25,949 acres and expansion of 6,746 acres). Of the 18,626 acres strip-mined to date, only 3% have been fully reclaimed. AR-116-30457. There are "miles of open pits w[ith] little evidence of focused reclamation." AR-1144-143493. The coal complex spreads across the headwater basins of the East and West Forks of Armells Creek. AR-116-30630. The plant and the majority of the strip-mine impact the East Fork, which is now impaired and fails to meet water quality standards for a host of pollutants: nitrate plus nitrite, total nitrogen, total dissolved solids,

---

[3] Wikipedia, Billings, Montana, https://en.wikipedia.org/wiki/Billings,_Montana (Billings is approximately 43 square miles or 27,520 acres).

specific conductance, iron, aluminum, phosphorous, and habitat alterations. AR-116-30622, 30630; AR-1198-145051.

The power plant, in turn, emits thousands of tons of harmful and toxic pollution annually, including particulate matter (PM), oxides of nitrogen ($NO_X$), sulfur dioxide ($SO_2$), arsenic, lead, and mercury. AR-116-30871-72. Units 3 and 4, which remain after the 2020 closure of Units 1 and 2, annually emit nearly 12 million tons of GHGs. AR-116-30909. The power plants' leaking ash ponds have contaminated the local aquifer. AR-116-30432; AR-1161-143948. Rosebud County, home to the coal complex, "has one of the highest concentrations" of particulate matter in Montana. AR-116-30601. Public health ranks in the lowest 25th percentile in Montana, with elevated incidence of asthma and lung cancer. AR-623-21209-10; AR-116-30607. These are well-documented impacts of air pollution from coal, which annually causes thousands of deaths and hospitalizations in the United States. AR-116-30607; AR-646-23565-68.

**Image 2:** Colstrip Power Plant and Mine



OSM issued the final environmental impact statement (EIS) for the Area F expansion in November 2018 and approved it in June 2019. AR-116-30354; AR-202-37582. The decision expands the strip-mine into 6,746 acres of breaks and grasslands in the headwaters of West Fork Armells Creek. AR-202-37564; AR-116-30392. It permits Westmoreland to strip-mine 68.5 million tons of coal over 18 years (through 2037).[4] AR-202-37564. Virtually all the coal will be sent to the Colstrip Power Plant (approximately one percent, 105,000 tons of high-sulfur waste coal, is sent annually to the adjacent Rosebud Power Plant). AR-202-37564.

---

[4] Coal reserves in Area F are sufficient alone to supply the plant for 8 years (at 2018 rates, which declined 25-30% with the closure of Units 1 and 2, AR-93-18506), but will be mined concurrently with other reserves to supply the plant through the late 2030s. AR-116-30459-60.

When approving the expansion, OSM knew that Units 1 and 2 would close by 2022; that multiple owners of Units 3 and 4 determined the ever-more-expensive[5] plant's useful life would end by 2027; and that by law, Oregon utilities are required to leave the plant by 2030.[6] AR-116-30394, -30433. Existing coal reserves, excluding Area F, are sufficient to meet the plant's needs through 2030, when most owners are required to end their coal use. AR-116-30402-03, 30459-60. But coal reserves in Area F are shallower than existing reserves and more profitable. *See* AR-1019-13747. New strip-mine expansions—like Area F—also enjoy additional tax subsidies. Mont. Code Ann. § 15-23-715.

## LEGAL BACKGROUND

NEPA, "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a), requires agencies to analyze and disclose "any adverse environmental effects which cannot be avoided," including "ecological" "economic" and "social" impacts and their significance. 40 C.F.R. §§ 1502.16(a)(2), 1508.8(b). This "hard look at the environmental consequences," *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (internal quotation omitted), must extend beyond the direct impact of the proposed action, and

---

[5] AR-320-199.

[6] In May 2019, Washington enacted legislation to eliminate coal-fired electricity from its utilities by 2025. Wash. Rev. Code Ann. § 19.405.030.

consider "indirect" and "cumulative" effects. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8. Indirect effects are those reasonably foreseeable impacts caused by the action that occur later in time or are farther removed in distance from the project. *Id.* § 1508.8. Cumulative impacts result from an action's incremental impact "when added to other past, present, and reasonably foreseeable future actions," and "can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7. NEPA requires agencies to consider "all reasonable alternatives" that would lessen or avoid those impacts. *Id.* § 1502.14.[7]

"[T]he Endangered Species Act of 1973 [is] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978). The ESA requires all federal agencies, in consultation with the U.S. Fish and Wildlife Service, to ensure that their actions are "not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). Making this inquiry, the agency proposing the action— here, OSM—must use the "best scientific and commercial data available." *Id.* The action agency must evaluate whether the action "may affect" a species listed as threatened or endangered. 50 C.F.R. § 402.14(a). The "may affect" determination

---

[7] The NEPA regulations, 40 C.F.R. 1500 *et. seq.*, were amended in July 2020, effective September 2020. 85 Fed. Reg. 43,304 (July 16, 2020). Citations to NEPA regulations throughout this brief are to those in effect at the time of OSM's 2019 decision and apply to this Court's analysis.

is a "relatively low" threshold. *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575

F.3d 999, 1018 (9th Cir. 2009). "Any possible effect, whether beneficial, benign,

adverse, or of an undetermined character, triggers the formal consultation

requirement." *W. Watersheds v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011)

(quotation omitted).

　　　When evaluating effects of an action under the ESA, agencies must consider

direct, indirect, and cumulative effects, as well as the environmental baseline. 50

C.F.R. § 402.02.[8] "Indirect effects are those that are caused by the proposed action

and are later in time, but still are reasonably certain to occur." *Id.* Cumulative

effects are "those effects of future State or private activities, not involving Federal

activities, that are reasonably certain to occur within the action area of the Federal

action subject to consultation." *Id.* The environmental baseline "includes the past

and present impacts of all Federal, State, or private actions and other human

activities in the action area, the anticipated impacts of all proposed Federal projects

in the action area that have already undergone formal or early section 7

consultation, and the impacts of State or private actions which are

contemporaneous with the consultation in process." *Id.*

_____

[8] ESA regulations were amended in September 2019. 84 Fed. Reg. 44,976, 44,976
(Aug. 27, 2019). While the revision was not intended to change "the scope of the[]
effects analyses." *Id.* at 44,990, citations to ESA regulations here are to those in
effect at the time of OSM's June 2019 decision.

## STANDARD OF REVIEW

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Agency compliance with NEPA is reviewed under the Administrative Procedure Act (APA), which provides that a court "shall … hold unlawful and set aside agency action findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While the standard of review is deferential, courts must nonetheless engage in a "thorough, probing, in depth review" of the agency action. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). Agency action is arbitrary and capricious if the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Bark v. USFS*, 958 F.3d 865, 869 (9th Cir. 2020) (quoting *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1069-70 (9th Cir. 2014)). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself," *Motor Vehicle Mfrs. v. State Farm*, 463 U.S. 29, 50 (1983), not "*post hoc* rationalizations" of counsel, *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020).

## ARGUMENT

**I.     Conservation Groups' members' long-standing ties to areas impacted by the expansion demonstrate standing.**

To establish standing a plaintiff must show (1) injury in fact that is

(2) traceable to the challenged conduct and (3) redressable by a favorable decision.

*WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015).

For procedural claims under NEPA or the ESA, a plaintiff establishes injury in fact

by identifying a "geographic nexus" with the location suffering an environmental

impact. *Id.* (quoting *W. Watersheds*, 632 F.3d at 485). Once this is established, "the

causation and redressability requirements are relaxed." *W. Watersheds*, 632 F.3d at

485. The plaintiff then need only show that enforcement of the procedure "could

protect their concrete interests." *Salmon Spawning & Recovery Alliance v.

Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008).

Conservation Groups have standing because (1) at least one member has

standing; (2) the interests they seek to protect are germane to the organizations'

purposes; and (3) the action does not require participation of individual members.

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "[O]nce

one Plaintiff organization establishes standing, all Plaintiffs have standing." *Ten

Lakes Snowmobile Club v. USFS*, No. CV 15-148-M-DLC, 2017 WL 4707536, at

*5 (D. Mont. Oct. 18, 2017).

12

The groups have standing because their members have standing. Ex. 1, ¶¶ 6-15 (Declaration of Derf Johnson); Ex. 2, ¶¶ 9-21 (Declaration of Steve Gilbert); Ex. 3, ¶¶ 2-9 (Declaration of Michaelynn Hawk); Ex. 4, ¶¶ 9-21 (Declaration of Jeremy Nichols); Ex. 5, ¶¶ 3-13 (Declaration of John Woodland). Messieurs Johnson, Gilbert, Nichols, and Woodland, and Ms. Hawk have concrete interests in the pine breaks country at the foot of the Little Wolf Mountains in and around Area F, the communities of Lame Deer and Colstrip, and the Yellowstone River. Johnson Decl., ¶¶ 5-8, 11; Gilbert Decl., ¶¶ 9-12, 16-17; Hawk Decl., ¶¶ 5-7; Nichols Decl., ¶¶ 9-12; Woodland Decl., ¶¶ 7-10.

**Image 3:** Pine Breaks in Area F. Gilbert Decl., ¶ 12.



These pine breaks will be obliterated by the Area F expansion, the communities choked by the toxic and harmful pollution emitted when the Area F coal is burned, and the Yellowstone River drained of 50,000 acre-feet annually for the coal complex. Johnson Decl., ¶¶ 9-13; Gilbert Decl., ¶¶ 12-17; Hawk Decl., ¶¶ 4, 8; Nichols Decl., ¶¶ 13-16; Woodland Decl., ¶ 10; Ex. 6, ¶¶ 5, 23 (Declaration of Brian Moench, M.D.); Ex. 7, at 19-20 (Declaration of James Hansen, Ph.D.). This harm establishes a geographic nexus and concrete injury.

**Images 4 and 5:** Strip Mine in in Area F, and Colstrip Generating Station seen from Colstrip. Gilbert Decl., ¶ 12; Johnson Decl., ¶ 10.





If OSM's decision is vacated, a new, lawful decision could reduce this harm.

Johnson Decl., ¶ 15; Gilbert Decl., ¶ 21; Hawk Decl., ¶ 9; Nichols Decl., ¶¶ 17-21;

Woodland Decl., ¶ 13.

## II.    OSM failed to take a hard look at cumulative impacts to surface water in disregard of its own experts' recommendations and in violation of NEPA.

OSM failed to take a hard look at cumulative impacts to surface waters by

refusing to attempt, let alone conduct, a *detailed* and *quantified* analysis of such

impacts, contrary to the recommendations of the public and its own experts. OSM

has decades of data on surface water impacts from the coal complex that should have been used to analyze cumulative water impacts of mining in Area F. AR-117-31550-51. Instead, after listing the other activities that would have cumulative effects on surface waters, OSM offered only a *perfunctory* and *qualitative* three-sentence statement about generalized impacts to surface water:

> The Proposed Action would contribute long-term adverse cumulative impacts on surface water hydrology that *would range from minor to major*. This would occur due to changes in stream and spring flows, loss of springs, loss of ponds or reduction in water supply to ponds, and changes in the hydrologic balance. The Proposed Action would contribute short-term and long-term adverse cumulative effects on water quality due to backfilling with spoil, surface disturbances, and changes in the hydrologic balance that *would range from minor to major*.

AR-116-31108 (emphasis added).

These statements are nearly identical to those consistently found inadequate by the Ninth Circuit. *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994 (9th Cir. 2004) (statements that cumulative impacts would be "'minor' or 'major'" insufficient); *Neighbors of Cuddy Mountain v. USFS*, 137 F.3d 1372, 1379-80 (9th Cir. 1998) ("To 'consider' cumulative effects, some quantified or detailed information is required….General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided."); *Bark*, 958 F.3d at 872 ("conclusory assertions" and "vague and uncertain analysis" "without attempting

17

to quantify" cumulative impacts are insufficient); *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1104 (9th Cir. 2016) ("simply listing" other actions "is not sufficient").

Further, OSM repeatedly ignored its own experts' advice about a properly quantified and detailed cumulative effects analysis based on the abundant historical data on surface water that was available. *See Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002) (cumulative-effects analysis arbitrary where agency "ignored the detailed and well-supported conclusions of its own scientists"); *W. Watersheds*, 632 F.3d at 492-93 (BLM failed to address concerns of its own experts and thus did not provide a "full and fair" discussion of the environmental impacts). One agency hydrologist explained:

> Please describe [cumulative] impacts in *much greater detail*. NEPA requires all available data to be utilized for these types of analyses. *This is not sufficient*…. At a minimum, the available water monitoring datasets for the other areas of the Rosebud Mine (Areas A, B, C, etc.) need to be analyzed along with the Area F data to determine the cumulative effects. *I don't know what our story would be if we avoided this and someone were to challenge us on it given that a historic dataset exists*, some analysis is no doubt already done in the CHIA, PHC and other documents, and there isn't a significant cost (drilling wells, etc.) associated with obtaining the data.

AR-1138-142980; *see also* AR-1138-142973-81 (detailing concerns and attaching guidance on proper analysis); AR-1139-142984-90.

The hydrologist added: "Cumulative impacts to water resources (surface and ground) from the other areas of the Rosebud Mine need to be analyzed more

thoroughly. The discussion … is mostly qualitative in nature and does not make specific predictions for cumulative effect on water quality and quantity from the entirety of the mine." AR-1138-142981.[9]

In sum, surface water in the Colstrip area is already significantly degraded, with the mine and power plant likely causes. AR-116-30622; AR-1161-143948; AR-1198-145051; *see also* AR-116-30432 (ash ponds leaking to shallow groundwater). In adding "one more" large contributor to this pollution burden and extending the coal complex's impacts for nearly two decades, OSM was required to take a hard look at cumulative impacts to water resources. *Hanly v. Kleinhienst*, 471 F.2d 823, 831 (2d Cir. 1972). But rather than heed the entreaties of its own experts and the public to conduct a detailed and quantitative cumulative impacts analysis, OSM managed only a perfunctory and qualitative analysis, stating in

---

[9] In response to comments, OSM suggested that the missing cumulative impacts analysis could be found in a portion of Westmoreland's *permit application* called the Probable Hydrologic Consequences Report. AR-117-31551 (Response 5-53). That document, however, was prepared to comply with Montana's coal mining law and accordingly only analyzed impacts from mining in Area F—a fraction of the cumulative impact analysis area identified in the EIS. NEPA requires the much broader analysis of cumulative impacts from past, present, and reasonably foreseeable actions of any type. 40 C.F.R. § 1508.7. Moreover, OSM's analysis of impacts must be found in the EIS itself, not in supplemental documentation, nor buried somewhere in the administrative record. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998). "A non-NEPA document—let alone one prepared and adopted by a state government—cannot satisfy a federal agency's obligations under NEPA." *S. Fork Band v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009).

three sentences that impacts would range from minor to major. This was arbitrary and violated NEPA.

**III.  OSM touted the economic benefits of the expansion, while refusing to disclose billions of dollars of harm from the project's GHG emissions, violating NEPA's hard look requirement.**

As this Court recently held, "when an agency chooses to quantify the socioeconomic benefits of a proposed action, it would be arbitrary and capricious for the agency to undervalue the socioeconomic costs of that plan by failing to include a balanced quantification of those costs." *WildEarth Guardians v. Bernhardt*, No. CV 17-80-BLG-SPW, 2021 WL 363955, at *9 (D. Mont. Feb. 3, 2021). With respect to fossil fuels, if an agency touts significant economic benefits of development, it may not ignore rigorous scientific tools, such as the SCC,[10] that monetize the harm from resulting GHG emissions. *WildEarth Guardians*, 2021 WL 363955, at *9; *Utah Physicians for a Healthy Env't v. BLM*, No. 19-CV-256-DBB, 2021 WL 1140247, at *6 (D. Utah Mar. 24, 2021); *California v. Bernhardt*, 472 F. Supp. 3d 573, 623 (N.D. Cal. 2020); *MEIC v. OSM*, 274 F. Supp. 3d 1074, 1098-99 (D. Mont. 2017); *High Country Conservation Advocates v. USFS*, 52 F. Supp. 3d 1174, 1192 (D. Colo. 2014).

---

[10] The SCC, created by an Interagency Working Group comprised of more than a dozen federal agencies and offices, estimates the economic damages caused by each incremental ton of carbon dioxide, including impacts on human health, flood damage, and decreased agricultural productivity. AR-116-30913.

Here, although OSM quantified the nearly 12 million tons of direct and indirect GHG emissions the project will cause each year, AR-116-30909, it failed to take the next step and discuss the *actual effects* of that pollution. As in the cases cited above, OSM quantified at length the purported project benefits while refusing to similarly quantify economic costs through use of the SCC.[11] For example, OSM provided a nine-page section meticulously calculating an array of supposed economic gains from the project, monetizing tens of millions of dollars from "wages and revenue generated from the purchase of supplies, materials, and services," "indirect" and "induced" downstream economic activity, and taxes and royalties. AR-116-31018-26. OSM labeled these revenue sources as "benefits." AR-114-30400. The EIS includes seven different tables quantifying various aspects of the purported economic benefits of the mine: T.149 "Direct Economic Effects": $87,871,000; T.150 "Indirect Economic Effects": $9,024,400; T.151 "Induced Economic Effects": $5,853,400; T.152 "Total Annual Economic Effects": $102,748,800; T.153 "Direct Annual Government Revenues": $17,219,000 in taxes and royalties; T.154 "Total Annual Governmental Revenues": $18,592,000; and T.155 "Projected Effects on Government Revenues (2022-2037)": $13,014,000. AR-116-31022-26.

---

[11] *See* AR-117-31470-74 (detailing rigorous peer-reviewed development of SCC).

What is more, the inclusion of benefits and exclusion of costs appears intentional. In 2017, then-Counselor to the Secretary of Interior for Energy Policy Vincent DeVito expressly directed agency staff to disclose "positive impacts of employment and related benefits" in the draft EIS, but "[r]emove" the SCC and costs of GHGs to "align" with a Trump Administration "order to rescind info on GHGs."[12] AR-1050-14328; AR-1210-145419.

This is precisely the one-sided and misleading analysis that courts have repeatedly rejected. *See, e.g.*, *WildEarth Guardians*, 2021 WL 363955 at *9; *see also Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1198 (9th Cir. 2008) (agency "cannot put a thumb on the scale by undervaluing the benefits [of GHG reductions] and overvaluing the costs of more stringent standards").

OSM offered four excuses for refusing to use the SCC, AR-116-30914, but all lack merit. First, it is irrelevant that the SCC was "originally developed" for rulemakings. *High Country*, 52 F. Supp. 3d at 1192. The SCC measures the incremental impact of each ton of carbon dioxide—whether those tons result from agency regulations or agency approvals of specific projects. AR-117-31373 (elaborating error).[13]

---

[12] Of course, a President may not "rescind" facts or science.

[13] *See also* Department of Interior, Sec. Order 3399, § 5(b) (Apr. 16, 2021) (recognizing SCC "can be a useful measure to assess the climate impacts of GHG emissions changes *for Federal proposed actions, in addition to rulemakings*"

Second, as this Court and others have explained, the prior Administration's political decision to withdraw the SCC is not a valid basis for rejecting this robust scientific methodology. "The President did not alter by fiat what constitutes the best available science," and thus, the SCC "remains a viable model tool for monetizing the costs of [GHG] emissions." *WildEarth Guardians*, 2021 WL 363955, at * 9 (quoting *California*, 472 F. Supp. 3d at 611).

Third, Conservation Groups do not dispute that "NEPA does not require cost-benefit analysis," AR-116-30914, but OSM nonetheless may not place its "thumb on the scale by inflating the benefits of the action while minimizing its impacts," *MEIC*, 274 F. Supp. 3d at 1098, as it did here. This is true whether OSM included a formal cost-benefit analysis or not. Here, the record reveals how far OSM went to put its thumb on the scale. The Department of Interior's Office of Energy Policy directed OSM staff to "Remove SCC section," of the draft EIS and to "Update socioeconomic section *to include beneficial impacts of project*." AR-1050-014328 (emphasis added); *see also* AR-1210-145419. Staff notes on this directive explicitly state: "*Avoided talking about this because cost-benefit analysis is not included in document to that scale; would contradict this rationale*." AR-1050-014328 (emphasis added).

---

(emphasis added)), *available at* https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3399-508_0.pdf.

Fourth, OSM asserts that because it did not monetize the "full social benefits of coal-fired energy production," quantifying some of the costs associated with GHG emissions would be "potentially inaccurate and not useful." AR-116-30914. But OSM's decision not to include *some* purported (and unidentified) economic benefits of coal combustion does not justify OSM's failure to include *any* economic costs of that activity—using the SCC would balance OSM's analysis, not unbalance it. *WildEarth Guardians v. Zinke*, No. CV 17-80-BLG-SPW-TJC, 2019 WL 2404860, at *12 (D. Mont. Feb. 11, 2019), *recommendations adopted*, *WildEarth Guardians*, 2021 WL 363955. Moreover, OSM's suggestion that without the Area F expansion, society would entirely lose the benefit of the energy created by burning Area F coal, as opposed to simply getting that energy from some other source, is hyperbole and false. *See* AR-1184-144632 (coal second most expensive energy source).

## IV. OSM improperly excluded water withdrawals from the Yellowstone River from the scope of its analysis, in disregard of its experts' recommendations and in violation of NEPA and the ESA.

### A. OSM's refusal to consider impacts of water withdrawals required for coal combustion violated NEPA.

NEPA requires agencies to include within the scope of their analysis those indirect effects that are removed in time and distance, but still "reasonably foreseeable." 40 C.F.R. § 1508.8. Thus, for example, in approving a mine

24

expansion, agencies must consider impacts of combustion and coal transportation. *E.g.*, *WildEarth Guardians*, 2021 WL 363955, at *5-10.[14] The "entire purpose" of an action is plainly foreseeable. *Sierra Club v. FERC*, 867 F.3d 1357, 1371-72 (D.C. Cir. 2017) (gas combustion at gas plant foreseeable effect of building gas pipeline for plant).

Here, OSM knew virtually all coal from Area F would be burned at the Colstrip Power Plant. AR-202-37564. The *entire purpose* of mining the coal is to burn it at the plant to boil water to produce electricity, which necessitates withdrawing approximately 50,000 acre-feet from the Yellowstone River annually. AR-1112-140394; Doc. 102, ¶ 102. The public repeatedly urged OSM to include these foreseeable water withdrawals within the scope of its analysis. AR-1065-137936; AR-117-31539-42. Conservation Groups noted that pallid sturgeon—which were documented migrating to just below the plant's intake bays near Forsyth in 2018 and 2019 (Doc. 98, ¶ 107; Doc. 102, ¶ 107)—may be impacted by

---

[14] *Diné Citizens Against Ruining Our Env't v. OSM*, 82 F. Supp. 3d 1201, 1214 (D. Colo. 2015), *vacated as moot*, 643 F. App'x 799 (10th Cir. 2016) (in approving mine expansion, agency required to assess combustion impacts from mine-mouth coal plant); *see also, e.g.*, *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736-40 (9th Cir. 2020) (in approving offshore platform, failure to consider foreign consumption of oil was arbitrary); *Columbia Riverkeeper v. USACE*, No. 19-6071 RJB, 2020 WL 6874871, at *3-4 (W.D. Wash. Dec. 9, 2020) (in approving permit for methanol refinery, failure to consider foreseeable upstream and downstream GHG emissions was arbitrary).

the cumulative impact of the reduced flows from withdrawals and climate change. AR-117-31542.

Agency experts, in fact, *foresaw* the water withdrawals and the need to include them in the scope of the analysis. In 2016, agency staff noted: "Water from Castle Rock [Lake, the impoundment next to the plant] comes from Yellowstone … [n]eed to discuss all of this in the EIS." AR-1019-13750. In 2017, an agency hydrologist commented that "the Yellowstone River should be included in the analysis area." AR-1025-13867. Experts from the contractor (ERO) drafting the EIS concurred: "ERO agrees that water rights from the Yellowstone River should be discussed (since the Colstrip Power Plants get their process water from the river) …." AR-1025-13867. Staff knew that "[a] pipeline carries water from the Yellowstone to Colstrip," and that "Yellowstone withdrawals" could be determined by "looking at the water rights database." AR-1026-13884.

Despite abundant evidence that withdrawals from the Yellowstone are a foreseeable (and, indeed, intended) result of combustion of Area F coal, OSM refused to include those impacts in the scope of its analysis and provided no justification for its decision: "The Yellowstone River is not included in the direct, indirect, or cumulative effects analysis area … and water quantity impacts to the Yellowstone River as a result of power plant cooling operations were not analyzed in the EIS." AR-117-31539. But an agency's unilateral decision to ignore

foreseeable impacts is insufficient justification to exclude them from the scope of its analysis. *Ksanka Kupaqa Xa'lcin v. FWS*, No. CV 19-20-M-DWM, 2021 WL 1415255, at *6 (D. Mont. Apr. 14, 2021) (explaining, in ESA case, that agency may not unilaterally narrow the scope of analysis required by law). As in *WildEarth Guardians*, *Diné CARE*, *Columbia Riverkeeper*, *Center for Biological Diversity*, and *Sierra Club*, OSM violated NEPA by excluding foreseeable indirect effects—here water withdrawals—from the scope of its analysis.

    **B.**    **OSM's refusal to consider impacts of water withdrawals for coal combustion violated the ESA.**

OSM's refusal to consider foreseeable (and intended) water withdrawals from the Yellowstone River also violated the ESA. Since 2018, endangered pallid sturgeon have been documented migrating to just below the plant's water intake bays (at Forsyth). Doc. 98, ¶ 107; Doc. 102, ¶ 107; *see also* AR-1202-145092. The historical range of pallid sturgeon extends upstream of the intakes, and sturgeon recovery involves restoration of this range. AR-1121-141366; AR-1121-141310 (map of historical range); AR-1121-141355 (map of Great Plains Management Unit). The best available science indicates that dwindling flows in the Yellowstone due to worsening climate impacts, overallocation of demands on the river, and the plant's voluminous water withdrawals may affect pallid sturgeon. AR-117-31542; AR-1121-141337; AR-1202-145081. OSM unlawfully ignored this science.

Under the ESA, agencies are required to consider direct, indirect, and cumulative effects of an action, as well as the environmental baseline. 50 C.F.R. § 402.02; *see supra* Legal Background. In *Ksanka Kupaqa Xal'cin*, 2020 WL 1415255, at *7-8,[15] this Court held that the effects analysis of the U.S. Forest Service and U.S. Fish and Wildlife Service violated the ESA because it excluded analysis of mine operations caused by and reasonably certain to result from the approval of an initial exploration permit. The Court noted that mine operations would begin "immediately after" exploration operations and that "decades of agency analysis" demonstrated that mine operations would be reasonably certain to occur following exploration. *Id.*

So too here. The mine and power plant were designed to operate in tandem. AR-1112-140402. The plant is required to obtain coal from the mine. AR-157-29119. The mine would shut down if it did not supply coal to the plant. AR-93-18501. Virtually all (99%) coal from Area F will be burned at the plant. AR-202-37564. The plant, in turn, was designed to obtain all of its coal from the mine and all of its enormous water needs from the Yellowstone (which the plant boils to generate electricity). AR-1112-140394. OSM knew this. AR-1019-13750; AR-

---

[15] *Ksanka Kupaqa Xal'cin* applied the revised consultation regulations, but as noted those regulations did not change the scope of the effects analysis. 84 Fed. Reg. at 44,990.

1025-13867; AR-1026-13884. Thus, mining in Area F will *cause* additional withdrawals from the Yellowstone River because it will extend the life of the mine *and* the power plant, and the withdrawals were reasonably certain to occur when the Area F expansion was approved. OSM, however, wholly ignored the effects of water withdrawals, and limited its effects analysis to headwaters streams in Area F. AR-117-31540, 31542.[16] As in *Ksanka Kupaqa Xal'cin*, 2020 WL 1415255, at *7-8, OSM's decision to unilaterally restrict the scope of its effects analysis violated the ESA.

### C.   Alternatively, OSM's failure to reinitiate consultation after receiving new information detailing impacts of water withdrawals on pallid sturgeon violated the ESA.

"Reinitiation of consultation is required … [i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2). "The crux of the matter is whether the new information reveals effects that were not previously

---

[16] OSM's response to comments also averred that the "nearest pallid sturgeon populations are located 60 miles from the Colstrip Power Plant." AR-117-31542. That was false. In 2018 and 2019, sturgeon were documented migrating to the Cartersville Dam at Forsyth, just downstream of the plant's intake bay. (Doc. 98, ¶ 106; Doc. 102, ¶ 107.).

considered." *Alliance for Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1204 (D.

Mont. 2019) (internal quotation omitted) (quoting 50 C.F.R. § 402.16(b)).[17]

Here, as noted, OSM did not consider the foreseeable and reasonably certain

water withdrawals necessary for combustion of Area F coal. This alone was

unlawful. *See supra* Argument Part IV.B. In a concerted effort to persuade OSM to

consult, Conservation Groups *twice* provided OSM with a report from biologist

Marcus Griswold, Ph.D., synthesizing the relevant science and detailing the

adverse impacts of water withdrawals for the power plant on pallid sturgeon. AR-

1202-145090-116. The report concluded that "continued operations of the water

pumping system for Talen Montana, LLC [the power plant] from the Yellowstone

River over the next 20 years threatens the survival of the pallid sturgeon" and the

"recovery process for the pallid sturgeon." AR-1202-145116. Despite receiving

this report in November 2019 and again in April 2020, OSM did not reinitiate

consultation. AR-1202-145076; Doc. 102, ¶ 123. This violated the ESA. 50 C.F.R.

§ 402.16(b); *Probert*, 412 F. Supp. 3d at 1204.

---

[17] If the Court rules for Conservation Groups' on the effects analysis, reinitiation becomes moot. *Cook Inletkeeper v. Raimondo*, No. 19 CV 238-SLG, 2021 WL 13214496, at *16 (D. Alaska Mar. 30, 2021).

**V.    OSM failed to consider a reasonable range of alternatives in violation of NEPA.**

OSM violated NEPA by considering only virtually identical action alternatives and ignoring a viable mid-range alternative that would have limited Area F to less coal over a smaller area to align mining with the expected end of Colstrip Power Plant's useful life in 2027 and the exit of most owners by 2030.

NEPA requires agencies to consider "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). This is the "heart" of the NEPA process and mandates agencies to "rigorously explore and objectively evaluate *all* reasonable alternatives." 40 C.F.R. § 1502.14 (emphasis added). "An agency first violates this provision of NEPA where it considers 'essentially identical' alternatives." *W. Org. of Res. Councils v. BLM* (*WORC*), No. CV 16-21-GF-BMM, 2018 WL 1475470, at *7 (D. Mont. Mar. 26, 2018) (quoting *Friends of Yosemite v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir.  2008)); *Muckleshoot Indian Tribe v. USFS*, 177 F.3d 800, 813-14 (9th Cir. 1999) (considering only "no action" and "virtually identical" action alternatives violates NEPA). "An agency also may violate NEPA when it fails to examine all reasonable alternatives." *WORC*, 2018 WL 1475470, at *7. "The existence of reasonable but unexamined alternatives renders an EIS inadequate." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1095 (9th Cir. 2006).

## A.    OSM violated NEPA by only considering virtually identical action alternatives.

OSM violated NEPA by considering only a no action alternative (alternative 1) and two virtually identical full-production alternatives: the proposed action (alternative 2) and the proposed action with a handful of mitigation measures that OSM itself described as "negligible"[18] (alternative 3). AR-116-30402-08; AR-202-37569. Both action alternatives entailed strip-mining the same amount of coal (68.5 million tons), from the same permit area (6,746 acres), over the same amount of time (18 years), resulting in the same GHG emissions. AR-116-30392, 30403, 30408. Thus, the environmental effects under both action alternatives are identical for most resources[19] and "similar" for the remaining resources.[20] Ultimately, OSM's Record of Decision (ROD) dismissed each proposed mitigation measure that supposedly distinguished Alternative 3, as "unnecessary"; providing only

---

[18] Negligible means "so small or unimportant or of so little consequence as to warrant little or no attention; trifling." Negligible, *Merriam-Webster's Online Dictionary*, www.merriam-webster.com.

[19] *See* AR30535-42 (impacts identical for air quality, climate change, water rights, fish and wildlife, special status species, socioeconomic conditions, environmental justice, recreation, access and transportation, and solid and hazardous waste).

[20] AR30535-42 (impacts "similar" for topography, public health, geology, surface water, groundwater, vegetation, wetlands and riparian zones, visual resources, land use, and soil).

"limited," "not measurable," or "negligible benefit"; or "already covered" by provisions in Alternative 2. AR-202-37569-73.

Indeed, OSM's technical staff explained that the "negligible" mitigation measures in alternative 3 were insufficient to establish a valid range of alternatives: "To be a true alternative under NEPA, an alternative would need to have an actual change to the mine plan (which is rare). The 'agency-mitigated' alternative contains no actual change to the mine plans, but rather is just a list of mitigations, which would be unenforceable." AR-1002-12632. Similarly, an agency engineer noted that "[t]he EIS confuses the description of alternatives with mitigation measures. Mitigation measures are added after analysis of impacts and are in addition to items which are already required under regulatory compliance with other laws." AR-1002-12637. A hydrologist observed that "there isn't much distinction between alternatives." AR-1139-142984. Indeed, Westmoreland informed the agencies that it "opposed all [mitigation] measures and would not voluntarily implement them." AR-1060-14485 (follow attachment titled "DRAFTMeeting Notes 06212018 Preferred Alternative 09112018" at page 1).

As in *WORC* and *Muckleshoot*, OSM's consideration of virtually identical action alternatives was arbitrary and violated NEPA.

**B.    OSM further violated NEPA by failing to consider a
reasonable mid-range alternative that aligned with the
expected useful life of the Colstrip Power Plant.**

Failure to consider middle-ground coal alternatives is unlawful. *WORC*,

2018 WL 1475470, at *7; *High Country Conservation Advocates v. USFS*, 951

F.3d 1217, 1224 (10th Cir. 2020).

Here, the public urged OSM to consider a mid-range coal development

alternative. AR-116-30533. Through a mid-range alternative, OSM could have

helped envision an orderly and just transition from fossil fuels. AR-117-31569-78;

AR-1065-137920-25. This alternative was reasonable given that the majority of

plant owners, Washington and Oregon utilities, either identified 2027 as end of the

"useful life" of Units 3 and 4 or are required by law to "eliminate coal as a power

source by 2030," AR-116-30433, years prior to the 2037 date through which Area

F is projected to operate. AR-202-37564 (project to last 18 years). Westmoreland

admitted "the mine will shut down" if it could not supply coal to the plant. AR-93-

18501. Because a mid-range alternative was reasonable (indeed, inevitable), the

failure to analyze such an alternative was unlawful. *WORC*, 2018 WL 1475470, at

*7; *High Country*, 951 F.3d at 1224.

OSM offered three conclusory excuses for rejecting a mid-range alternative,

none of which have merit: (1) it would not be "operationally feasible"; (2) the

effects would be "substantially similar" to those of the proposed action and

alternative 3; and (3) it would violate a Montana administrative rule on coal

conservation, Administrative Rule of Montana 17.24.322. AR-116-30553.

First, with regard to operational feasibility, the mine is already segmented

into areas A-F, each developed in discrete sequences. AR-116-30398, AR-1217-

146186. Any doubt about the feasibility of a mid-range alternative was dispelled

by the ROD, in which OSM *ultimately approved* an action (not listed in any of the

alternatives) that reduced the area and duration of mining in Area F (by 74 acres

and 1 year). AR-202-37563. If a mid-range alternative was infeasible, this decision

would have been impossible: it clearly was not. *See Nat'l Parks Conservation*

*Ass'n v. EPA*, 788 F.3d 1134, 1142 (9th Cir. 2015) ("inconsistent analysis is

arbitrary").

Second, the record does not support the notion that reduced mining would

have "substantially similar" impacts to the proposed action. For example, reducing

mining by one-half would reduce surface disturbance by one-half, reducing local

air pollution by thousands of tons of criteria pollutants and GHG emissions by tens

of millions of tons (AR-116-30871, 30912)—hardly, "substantially similar"

impacts. Regarding criteria pollutants alone, OSM did not dispute evidence from

2012 that pollution from Colstrip causes approximately 18 premature deaths per

year,[21] AR-117-31564, meaning that a 50% reduction in combustion of Area F coal would avoid nearly *one hundred premature deaths* from respiratory illness. That alone is a meaningful distinction. *See Rocky Mountain Wild v. Bernhardt*, No. 19-CV-929-DBB-CMR, 2020 WL 7264914, at *8 & n.118 (D. Utah Dec. 10, 2020) (mid-range alternatives were "significantly distinguishable" from other alternatives, requiring analysis).

Third, Montana regulations did not constrain OSM from considering a reduced-mining alternative. Rule 17.24.322 requires state permit applications to include a "coal conservation plan" showing the coal company will mine "all of the mineable and marketable coal" in a proposed mine plan area. *See generally* Mont. Admin. R. 17.24.322. The rule does not apply to OSM, and its plain language does not prevent OSM from approving a smaller mine plan area. Again, this is demonstrated by the fact that the ROD excluded 74 acres within Area F, foreclosing OSM's argument that Rule 17.24.322 was a barrier to a mid-range alternative. AR-202-37563.

Thus, none of OSM's excuses have merit, and its failure to consider a middle ground alternative violated NEPA. *WORC*, 2018 WL 1475470, at *7; *High Country*, 951 F.3d at 1224.

---

[21] As noted below, the updated analysis shows significantly greater mortality and health impacts.

## VI. Vacatur is the proper remedy.

Under the APA, courts "*shall* … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added); *Alliance for the Wild Rockies v. USFS*, 907 F.3d 1105, 1121 (9th Cir. 2018). "There is therefore a presumption of vacatur in most cases," which "can only be overcome in rare circumstances." *Ksanka Kupaqa Xa'lcin*, 2021 WL 1415255, at *8 (internal quotation omitted) (quoting *Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 (9th Cir. 2010)). Thus, a court may decline vacatur if granting it would undermine statutory goals. *E.g.*, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995). Conversely, declining vacatur is improper if it "would subvert [statutory] objectives." *Standing Rock Sioux Tribe v. USACE*, 985 F.3d 1032, 1051 (D.C. Cir. 2021). Vacatur is especially appropriate in NEPA cases, as here, because "if you can build first and consider environmental consequences later, NEPA's action-forcing purpose loses its bite." *Id.* (quoting *Standing Rock Sioux Tribe v. USACE*, 471 F. Supp. 3d 71, 85 (D.D.C. 2020)); *Ctr. for Biological Diversity*, 982 F.3d at 751 (vacating decision that violated NEPA and ESA); *accord Ksanka Kupaqa Xa'lcin*, 2021 WL 1415255, at *8.

Here, as in *Standing Rock*, *Center for Biological Diversity*, and *Ksanka*, the presumptive remedy of vacatur is appropriate, given the statutory objectives of

NEPA and the ESA. Allowing Westmoreland to continue to strip-mine Area F prior to completion of lawful NEPA and ESA analyses would negate the laws' precautionary approach. *E.g.*, *TVA*, 437 U.S. at 194 (ESA prioritizes species protection). Moreover, the harmful impacts of stripping and burning Area F coal are extraordinary. It will cause *hundreds of premature deaths* and billions of dollars of harm to public health. Moench Decl., ¶¶ 4, 23. The GHG emissions from the expansion worsen the already grave impacts of climate change, pushing the world closer to the point of no return and causing billions of dollars of harm to the public. Hansen Decl., at 19-20 (Area F is "incompatible" with restoring a "habitable climate system"); AR-117-31535 (calculating cost of GHG emissions using SCC to exceed $5 billion). OSM itself recognized that the expansion's cumulative effects on surface water will be "major," "permanently preclude[ing]" existing uses. AR-116-31108; AR30932 (defining "major" impacts). The water withdrawals from the plant, combined with the worsening effects of climate change, threaten the survival and recovery of pallid sturgeon. (Doc. 92-4, ¶¶ 14-17.) These myriad impacts will irreparably harm Conservation Groups' interests, including permanent destruction of tribal artifacts and landmarks. Decl., ¶¶ 9-13; Gilbert Decl., ¶¶ 12-17; Hawk Decl., ¶¶ 4, 8; Nichols Decl., ¶¶ 13-16; Hawk Decl., ¶¶ 4-8; Woodland Decl., ¶ 10. In the words of Dr. Moench, "[I]t is hard to imagine

any business should be allowed to operate if it causes this magnitude of economic, health, and mortality consequences." Moench Decl., ¶ 23.

By contrast, vacatur will not cause significant disruption. Westmoreland admits it has existing permitted reserves to operate for years. (Doc. 73-2, ¶ 3 (admitting Westmoreland has approximately 30 million tons of permitted reserves outside Area F).) Thus, vacatur will not impact employment. Furthermore, since certain tax subsidies are unavailable for mining existing permitted reserves (other than Area F), vacatur will likely *increase* public revenue. Mont. Code Ann. § 15-23-715. And finally, it is clear the majority of power plant owners are planning a near-term exit. AR-116-30394; *see* Wash. Rev. Code Ann. § 19.405.030. A remand process that details a middle-ground alternative and just transition would greatly benefit the Lame Deer and Colstrip communities. (*See* Doc. 63-8 (City of Colstrip seeking transition funding); Doc. 63-9 (Northern Cheyenne seeking transition planning).)

In sum, the presumptive remedy of vacatur is appropriate and necessary to honor the congressional intent of NEPA and the ESA. *See, e.g.*, *Diné Citizens Against Ruining Our Env't v. OSM*, No. 12-CV-1275-JLK, 2015 WL 1593995, at *3 (D. Colo. April 6, 2015); *Standing Rock*, 985 F.3d at 1051.

## CONCLUSION

This Court should grant Conservation Groups' motion for summary

judgment and vacate approval of the Area F expansion.

Respectfully submitted this 3rd day of May, 2021.

/s/ Shiloh Hernandez
Shiloh S. Hernandez
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4861
hernandez@westernlaw.org

Melissa A. Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4852
hornbein@westernlaw.org

*Attorneys for Plaintiffs Montana
Environmental Information Center, Indian
People's Action, 350 Montana, WildEarth
Guardians, and Sierra Club*

Nathaniel Shoaff (*admitted pro hac vice*)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorney for Plaintiff Sierra Club*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(d)(2)(E), I hereby certify that the number of words in this brief, excluding caption, certificates, tables, exhibit index, and signature block does not exceed 8,000 words. I relied on a word-processing system to obtain this word count.

<u>/s/ Shiloh Hernandez</u>
Shiloh S. Hernandez