IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, et al., | CV 19-130-BLG-SPW-TJC |
| Plaintiffs, | **FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE** |
| vs. | |
| DEB HAALAND, et al., | |
| Defendants, | |
| and | |
| WESTMORELAND ROSEBUD MINING, LLC and INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 400, | |
| Intervenor Defendants. | |

Plaintiffs Montana Environmental Information Center ("MEIC"), Indian

People's Action, 350 Montana, Sierra Club, and WildEarth Guardians

("Plaintiffs") bring this action challenging Federal Defendants' approval of a Mine

Plan Modification for the Rosebud Mine located near Colstrip, Montana.  (Doc.

55.)  Westmoreland Rosebud Mining, LLC, formerly known as Western Energy

Company ("Westmoreland") owns and operates the Rosebud Mine, and was

granted leave to intervene in this action as a Defendant.  (Doc. 9.)  The

1

International Union of Operating Engineers, Local 400 was also granted leave to intervene as a Defendant.  (Doc. 80.)

Judge Watters has referred the case to the undersigned under 28 U.S.C. § 636(b)(1)(B).  (Doc. 43.)  Presently before the Court are Plaintiffs' Motion for Summary Judgment (Doc. 136), Federal Defendants' Cross Motion for Summary Judgment (Doc. 148), and Intervenor Defendants' Cross Motion for Summary Judgment (Doc. 150).  The motions are fully briefed and ripe for the Court's review.

Having considered the parties' submissions, the Court recommends that Plaintiffs' Motion for Summary Judgment be **GRANTED in part**; Intervenor Defendants' Motion for Summary Judgment be **GRANTED in part**; and Federal Defendants' Motion for Summary Judgment be **DENIED**.

## I.    BACKGROUND

This case concerns the Rosebud Mine ("the Mine"), which is a 25,949-acre surface coal mine located near Colstrip, Montana.  The Mine began strip-mining operations in 1968 and has grown incrementally since its inception through various expansions, termed Areas A, B, C, D, and E.  In November 2011, Westmoreland submitted an application to the Montana Department of Environmental Quality ("MDEQ") to permit the addition of Area F to the Mine.  Westmoreland also requested a Mine Plan Modification from the Office of Surface Mining

Reclamation and Enforcement ("OSM") to exercise its existing lease rights in Area F. The Area F expansion sought to add approximately 6,500 acres to the Rosebud Mine. The expansion is expected to yield approximately 70.8 million tons of recoverable coal and extend the operational life of the Mine by 8 years.

Coal from the Mine is sent almost exclusively to the neighboring Colstrip Power Plant ("the Plant") by a conveyor system.[1] The coal is burned to boil water in a turbine to produce electricity. As a water source, the Plant withdraws water from the Yellowstone River and transports it 30 miles by pipeline for use at the Plant to combust the coal. The Plant consumes between 22,000 and 50,000 acre-feet of water annually from the Yellowstone River.

In November 2018, the MDEQ and OSM jointly issued the final Environmental Impact Statement ("EIS") on the mine expansion. The EIS considered three alternative actions: (1) a no-action alternative, (2) the proposed action, and (3) the proposed action with additional mitigation measures.

In April 2019, the MDEQ issued a Record of Decision approving Alternative 2, with conditions. One of the conditions prohibited mining of approximately 74 acres in Section 12 within Area F.

---

[1] The Rosebud Mine delivers between 7.7 and 9.95 million tons of coal annually to the Colstrip Power Plant, and approximately 300,000 tons of "waste coal" to the nearby Rosebud Power Plant. (A.R. 116-030393-95.)

In June 2019, OSM issued a Record of Decision approving the Area F expansion, with the excluded 74 acres in Section 12.

On November 18, 2019, Plaintiffs filed this action. (Doc. 1.) Plaintiffs allege the Federal Defendants violated NEPA by failing to adequately consider the mine expansion's cumulative effects on surface water, the adverse impacts of greenhouse gas emissions, the effects of water withdrawals from the Yellowstone River, and a reasonable range of alternatives. (Doc. 98.) Plaintiffs also contend the Federal Defendants violated the Endangered Species Act "ESA" by failing to properly consider and consult on the effects of water withdrawals from the Yellowstone River on pallid sturgeon. (*Id.*) Plaintiffs request the Court vacate and set aside the entire Mine Plan Modification Decision. (*Id.*)

## II.    LEGAL STANDARDS

The National Environmental Policy Act ("NEPA") is a procedural statute enacted to protect the environment by requiring government agencies to meet certain procedural safeguards before taking action affecting the environment. *Cal. Ex. rel. Lockyer v. US. Dept. of Agric.,* 575 F.3d 999, 1012 (9th Cir. 2009). In other words, NEPA "force[s] agencies to publicly consider the environmental impacts of their actions before going forward." *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 963 (9th Cir. 2002). NEPA requires an agency proposing a major federal action significantly impacting the environment to

4

prepare an environmental impact statement ("EIS") to analyze potential impacts and alternatives. 42 U.S.C. § 4332(C).

Because NEPA does not contain a separate provision for judicial review, courts review an agency's compliance with NEPA under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. 5 U.S.C. § 706(2)(A). Judicial review of administrative agency decisions under the APA is based on the administrative record compiled by the agency – not on independent fact-finding by the district court. *Camp v. Pitts,* 411 U.S. 138, 142 (1973).

In reviewing an agency action under the APA, the Court must determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 43 (1983).

Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *Id.* Review is highly deferential to the agency's expertise, and presumes the agency action to be valid. *Arkansas v.*

*Oklahoma,* 503 U.S. 91, 112 (1992).  The agency, however, must articulate a rational connection between the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made."  *Id.*; *see also Midwater Trawlers Co-op v. Dep't of Commerce,* 282 F.3d 710, 716 (9th Cir. 2002).  Thus, the reviewing court must look at whether the decision considered all of the relevant factors or whether the decision was a clear error of judgment.  *Id.*

A court's review under NEPA is limited to whether the agency "took a 'hard look' at the environmental impacts of a proposed action."  *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).  A "hard look" under NEPA requires consideration of all foreseeable direct and indirect effects, and the likely cumulative impact of the agency action.  *Idaho Sporting Congress*, 305 F.3d at 973; 40 C.F.R. § 1502.16, 1508.7, 1508.8.  A hard look should involve a discussion of adverse impacts that does not improperly minimize negative side effects.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005).  "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided."  *Conservation Cong. v. Finely*, 774 F.3d 611, 621 (9th Cir. 2014).  Once the court is "satisfied that a proposing agency has taken a hard look at a decision's environmental consequences, [its]

review is at an end." *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir. 1992).

## III.   DISCUSSION

### A.   Standing

Plaintiffs assert they have standing based on the standing of their members, Derf Johnson (an MEIC member and employee and Sierra Club member), Steve Gilbert (an MEIC and Sierra Club member), Michaelynn Hawk (an Indian People's Action member and executive director), Jeremy Nichols (a WildEarth Guardians member and employee), and John Woodland (a 350 Montana member). Intervenor Defendants contest Plaintiffs' standing, arguing they cannot prove injury connected to Area F.[2]

An organization has standing to sue when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Individual members would have standing to sue in their own right if they have (1) "suffered

---

[2] Federal Defendants do not challenge Plaintiffs' standing to bring this action, but do argue they lack standing for their ESA claim.  Because the Court finds it unnecessary to reach the Plaintiff's ESA claim, the Court does not separately address Federal Defendants' standing objection.

an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 180-81 (2000) (*citing Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992)). "Once plaintiffs seeking to enforce a procedural requirement establish a concrete injury, 'the causation and redressability requirements are relaxed.'" *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (*citing W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011)).

The Court finds Plaintiffs MEIC, Sierra Club and WildEarth Guardians have demonstrated sufficient injury to establish standing based on the declarations of Mr. Johnson, Mr. Gilbert and Mr. Nichols.[3]  An environmental plaintiff

---

[3] Plaintiffs did not contest Intervenor Defendants' arguments that Ms. Hawk and Mr. Woodland lack standing.  The Court finds Ms. Hawk lacks standing because she does not claim a particularized injury in relation to Area F.  Ms. Hawk avers that she has lived in Lame Deer and Colstrip, and continues to visit regularly. (Doc. 137-3 at ¶ 5-7.)  But she does not state she has viewed or visited the area near Area F.  The Court also finds Mr. Woodland lacks standing because he fails to state a concrete plan to return to the affected area.  Mr. Woodland states that he visited Colstrip on one occasion, and plans to travel back to the area "within the next few years."  (Doc. 137-5 at ¶¶ 7, 10.)  Mr. Woodland's assertions of a desire to return to the area someday, without "any specification of *when* the someday will be – do not support a finding of the 'actual or imminent' injury that our cases require."  *Defenders of Wildlife*, 504 U.S. at 564 (emphasis in original).  Therefore,

"adequately allege[s] injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183.  The Court finds Mr. Johnson, Mr. Gilbert, and Mr. Nichols have made that showing here.

Mr. Johnson attests that he has taken numerous trips to the southeastern Montana prairie and forests, and more specifically has regularly visited the Colstrip region and has viewed the proposed Area F expansion area from public roads.  (Doc. 137-1 at ¶¶ 6-10.)  He further avers that where the Mine is visible, the beauty of the area is "desecrated," and greatly harms his appreciation and enjoyment of the area.  (*Id.* at ¶ 10.)

Mr. Gilbert attests that he has a long history of visiting the Colstrip area, and has engaged in activities such as hunting, viewing the countryside while driving through the area, and conducting field work.  (Doc. 137-2 at ¶¶ 9-12.)  Specifically, Mr. Gilbert states that he has traveled the public roads near Area F and viewed the expansion of strip-mining operations, and has hunted birds five to ten miles downstream from the Mine.  (*Id.* at ¶¶ 12, 17.)  He states that his aesthetic experience is compromised by the industrial development of the Mine and Power Plant.  (*Id.* at ¶ 16.)

---

Plaintiffs have not demonstrated standing for Plaintiffs Indian People's Action or 350 Montana, and it will be recommended that those Plaintiffs be dismissed.

Mr. Nichols attests that he has regularly visited the area where the Mine and Area F are located as part of trips to southeast Montana to view wildlife and recreate outdoors.  (Doc. 137-4 at ¶¶ 9-10.)  Most recently, he hiked on public lands in an area just northwest of the mining operations, and hiked and viewed wildlife on lands south and east of Colstrip.  (*Id.*).  He states that the sights and sounds of the mining activities diminish his recreation enjoyment of the area.  (*Id.* at ¶¶ 12-14.)

Intervenor Defendants contend Plaintiffs cannot establish standing because their alleged injuries are self-inflicted.  Courts have recognized that a person "who goes looking for pollution cannot claim an aesthetic injury in fact from seeing it." *Ctr. for Bio. Diversity v. U.S. Env't Prot. Agency*, 937 F.3d 533, 540 (5th Cir. 2019).  But a declarant's environmental activism does not automatically preclude them from fulfilling the requirements for standing.  *Ohio Valley Env't Coal., Inc. v. Maple Coal Co.*, 808 F.Supp.2d 868, 879 (S.D. W. Va. 2011).  Where a declarant has preexisting connections to an area, their advocacy to protect the area does not defeat standing.  *Id.* at 881.  To the contrary, a declarant's personal connection to an area, combined with an interest in environmental issues and involvement in an environmental organization may "add[] credence to his assertion that he has suffered injury in fact."  *Id.*

10

In their declarations, Mr. Johnson, Mr. Gilbert, and Mr. Nichols have attested to recreational activities and aesthetic interests in the area around Area F in addition to their involvement with the Plaintiff environmental organizations. (Docs. 137-1 at ¶¶ 6, 10-11; 137-2 at ¶¶ 9, 11-12; 137-4 at ¶¶ 9-10.)  Thus, the Court finds this case is distinguishable from *Ctr. for Bio. Diversity*, 937 F.3d 533, where the Fifth Circuit found one of the plaintiffs' members lacked standing because he had been specifically searching for oil spills in the Gulf of Mexico, and *Ohio Valley*, 808 F.Supp.2d 868, where the district court found two of the plaintiffs' members lacked standing because they had no connection to the affected area before the lawsuit.

Intervenor Defendants also argue Mr. Gilbert's declaration fails to state a sufficiently concrete allegation of future use.  Although vague assertions of a desire to return to an area "do not support a finding of [] 'actual or imminent' injury," *Defenders of Wildlife*, 504 U.S. at 564, "[r]epeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000).  Here, Mr. Gilbert explains that he is an avid outdoorsman and has made at least annual visits to the area surrounding the Mine over the past four decades.  (Doc. 137-2 at ¶¶ 9, 11.)  He further states he plans to

11

continue to visit and recreate in and around East Fork Armells Creek, West Fork Armells Creek, Colstrip, and the Rosebud Mine.  (*Id.* at ¶ 17.)  The Court finds Mr. Gilbert has stated a sufficiently concrete and credible allegation of future use.

Intervenor Defendants further argue Plaintiffs cannot establish an injury which will be redressed by a favorable decision, because they lack an adequate nexus to Area F.  An environmental plaintiff cannot establish standing by merely offering "averments which state only that one of [the organization's] members uses unspecified portions of an immense tract of territory, on some portion of which mining activity has occurred or probably will occur by virtue of the governmental action."  *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990).  Nevertheless, proximity to the site on which the challenged activity is occurring can be sufficient.  *Laidlaw*, 528 U.S. at 181-84; *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001).  In *Laidlaw*, for example, the Supreme Court found the plaintiff had standing where its members lived 20 miles and recreated up to 40 miles away from the facility at issue.  *Laidlaw*, 528 U.S. at 181-83.  *See also Sierra Club v. Franklin Cty. Power of Ill.*, 546 F.3d 918, 925 (7th Cir. 2008); *Ecological Rights Found.*, 230 F.3d at 1148 (noting the injury in fact requirement in environmental cases is not "reducible to inflexible, judicially mandated time or distance guidelines").

Intervenor Defendants assert Mr. Gilbert has not shown that he recreated on or near Area F, but rather only that he rode in a vehicle and viewed parts of Area F from the road.  But where "an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact." *Cantrell*, 241 F.3d at 681.  *See also Sierra Club v. Jewell*, 764 F.3d 1, 6 (D.C. Cir. 2014) (finding the plaintiffs "possess interests in observing the landscape from surrounding areas, for instance, or in enjoying the Battlefield while on public roads").

Intervenor Defendants also challenge Mr. Nichols standing because he lives over 500 miles away from the Mine.  The fact Mr. Nichols lives in Colorado, however, does not automatically defeat his standing.  "An environmental plaintiff need not live nearby to establish a concrete injury[.]" *Cantrell*, 241 F.3d at 680; *Ecological Rts. Found.*, 230 F.3d at 1149 ("[A] person who uses an area for recreational purposes does not have to show that he or she lives particularly nearby to establish an injury-in-fact due to possible or feared environmental degradation.").  Here, Mr. Johnson, Mr. Gilbert and Mr. Nichols aver to visiting and recreating in the area near the Mine and viewing Area F.  The Court finds their declarations demonstrate an adequate nexus to the affected area to show injury in fact.

13

Accordingly, the Court finds MEIC, Sierra Club, and WildEarth Guardians have standing because Mr. Johnson, Mr. Gilbert and Mr. Nichols' declarations adequately demonstrate their personal stake in this controversy.

### B.     Cumulative Impacts to Surface Water

Plaintiffs first argue OSM failed to take a hard look at cumulative impacts to surface waters.  Plaintiffs contend OSM provided only a perfunctory and qualitative statement about generalized impacts to surface water, rather than conducting a detailed and quantified analysis.  Federal Defendants counter that OSM has discretion in how to organize and present information in the EIS, and that the required hard look at cumulative effects can be found in the direct and indirect effects analysis.  Intervenor Defendants argue the cumulative effects analysis is adequate because the necessary quantitative analysis can be found in MDEQ's Cumulative Hydrological Impact Assessment ("CHIA") and water quality modeling.

A "hard look" under NEPA requires consideration of both foreseeable direct and indirect effects, as well as cumulative impacts. *Idaho Sporting Congress*, 305 F.3d at 973.  A cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . .  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of

14

time." 40 C.F.R. § 1508.7. A direct effect is "caused by the action and occur[s] at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

Ninth Circuit case law is clear – to properly consider cumulative impacts, "some quantified or detailed information is required." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998). The cumulative impact analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004). "Without such information, neither the courts nor the public, in reviewing the [agency's] decisions, can be assured that the [agency] provided the hard look that it is required to provide." *Cuddy Mountain*, 137 F.3d at 1379. Thus, conclusory presentations or "general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.* at 993, 995. *See also Bark v. United States Forest Serv.*, 958 F.3d 865 (9th Cir. 2020) (finding cumulative impacts analysis insufficient where there was no attempt to quantify cumulative impacts, but only "conclusory statements, based on 'vague and uncertain analysis'").

Here, although the EIS discusses cumulative impacts, it fails to provide the detailed, quantified analysis required to satisfy NEPA.  The EIS listed multiple actions that would cumulatively affect surface water.  (A.R. 116-31106-08.)  But "simply listing all relevant actions is not sufficient" for cumulative impacts analysis.  *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104-05 (9th Cir. 2016).  Rather than provide a meaningful analysis of the identified actions, the EIS set forth the following three-sentence conclusion:

> The Proposed Action would contribute long-term cumulative impacts on surface water hydrology that would range from minor to major. This would occur due to changes in stream and spring flows, loss of springs, loss of ponds or reduction in water supple to ponds, and changes in the hydrologic balance.  The Proposed Action would contribute short-term and long-term adverse cumulative impacts on surface water quality due to backfilling with spoil, surface disturbances, and changes in the hydrologic balance that would range from minor to major.

(A.R. 116-31108.)

This general, qualitative statement falls short.  Stating, without elaboration, that cumulative impacts to surface water "would range from minor to major" is akin to the "general statements about possible effects and some risk" that the Ninth Circuit has consistently held to be insufficient to constitute a hard look.  *Klamath-Siskiyou*, 387 F.3d at 995; *Cuddy Mountain*, 137 F.3d at 1380.  Further, the EIS did not offer any justification for why more detailed information could not be provided.  *Cuddy Mountain*, 137 F.3d at 1380.  Indeed, as Plaintiffs point out,

16

OSM's own staff recognized the deficiency in the cumulative impacts analysis and pointed out that OSM had access to data necessary to conduct a thorough analysis. (A.R. 1138-142973; 1138-142981.)

Federal Defendants correctly note that OSM has discretion in how to organize and present information in the EIS. *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1002 (9th Cir. 2013). But the manner in which OSM organized and presented the information in the EIS is not the problem. Rather, the problem is the lack of substance. *Id.* ("Whether [the agency] complied with NEPA [] turns on the *substance* of the FEIS rather than its form[.]") (emphasis in original). Further, contrary to Federal Defendants' argument, the discussion of direct and indirect impacts on surface water contained elsewhere in the EIS is not a substitute for a meaningful cumulative impacts analysis. *Idaho Sporting Congress*, 305 F.3d at 973 (NEPA requires analysis of both cumulative impacts and direct and indirect effects); 40 C.F.R. §§ 1508.7; 1508.8(a).

Intervenor Defendants' argument that the CHIA can save the EIS's cumulative effects analysis is similarly unavailing. The CHIA was prepared by the MDEQ as part of its permitting process to comply with the Montana Strip and Underground Mine Reclamation Act. It determined whether the proposed mining operations "are designed to prevent material damage to the hydrologic balance outside the permit area." (A.R. 116-030440.) As stated in the EIS, "material

17

damage is not assessed in this EIS, which has been prepared to comply with MEPA and NEPA." *Id.* Thus, the CHIA involved a review to comply with Montana permitting law, not to satisfy NEPA's cumulative impacts analysis. It is not a NEPA document. *South Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) ("A non-NEPA document – let alone one prepared and adopted by a state government – cannot satisfy a federal agency's obligations under NEPA"). The EIS also did not incorporate or tier to the CHIA, which is dated after the issuance of the EIS. Nor could it have properly done so; "[a] NEPA document cannot tier to a non-NEPA document." *Klamath-Siskiyou*, 387 F.3d at 998, citing *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002 (holding that "tiering to a document that has not itself been subject to NEPA review is not permitted").

Accordingly, the Court finds OSM failed to take a "hard look" at cumulative impacts to surface waters.

### C.    Greenhouse Gas Analysis

Next, Plaintiffs assert OSM's analysis of greenhouse gas emissions violated NEPA. Plaintiffs do not dispute that OSM sufficiently disclosed greenhouse gas emission, nor do they challenge OSM's use of the proxy methodology as a means

to disclose greenhouse gas impacts.[4]  Rather, Plaintiffs argue OSM presented a

skewed socioeconomic analysis as it relates to greenhouse gas emissions.

Plaintiffs argue OSM touted the socioeconomic benefits of the mine expansion, but

failed to account for its associated socioeconomic costs.  Plaintiffs argue it was

arbitrary and capricious for OSM to ignore scientific tools, such as the Social Cost

of Carbon Protocol ("SCC"), to monetize the harm from greenhouse gas emissions.

Defendants counter that because cost-benefit analyses are not required by NEPA,

OSM was not required to monetize greenhouse gas impacts, and OSM's choice of

methodology is entitled to deference.

Defendants are correct that NEPA does not require a cost-benefit analysis.

*Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining (MEIC)*, 274 F.Supp.3d

1074, 1096 (D. Mont. 2017); *High Country Conservation Advocates v. U.S. Forest

Serv.*, 52 F.Supp.3d 1174, 1191 (D. Colo. 2014).  But "when an agency chooses to

quantify the socioeconomic benefits of a proposed action, it would be arbitrary and

capricious for the agency to undervalue the socioeconomic costs of that plan by

failing to include a balanced quantification of those costs."  *WildEarth Guardians*

---

[4] It is generally reasonable for an agency to use the proxy methodology as a means
to disclose greenhouse gas impacts.  *See e.g. W. Org. of Res. Councils v. BLM
(WORC)*, 2018 WL 1475470, *14 (D. Mont. Mar. 26, 2018) (holding BLM's use
of the proxy method was reasonable); *WildEarth Guardians v. Jewell*, 2017 WL
3442922, *12 (D. N.M. Feb. 16, 2017) (holding OSM satisfied its obligation to
consider greenhouse gas effects by using the predicted volume of greenhouse gas
emissions as a proxy for assessing potential climate change impacts).

*v. Bernhardt*, 2021 WL 363955, *9 (D. Mont. Feb. 3, 2021).  Thus, if an agency

elects to quantify the benefits of a proposed action, it must also quantify the costs,

or offer non-arbitrary reasons for its decision not to do so.  *Id.*; *High Country*, 52

F.Supp.3d at 1191-92.

The SCC Protocol is a tool agencies can use to quantify costs associated

with greenhouse gas emissions.  *Mont. Envtl. Info. Ctr. v. U.S. Office of Surface

Mining*, 274 F.Supp.3d 1074, 1095 (D. Mont. 2017).  The SCC Protocol "attempts

to value in dollars the long-term harm done by each ton of carbon emitted."  *Sierra

Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357, 1375 (D.C. Cir. 2017).  Courts

do not mandate the use of the SCC Protocol.  *Utah Physicians for Healthy Envir. v.

U.S. Bureau of Land Mgmt.*, 528 F.Supp.3d 1222, 1231 (D. Utah 2021); *WildEarth

Guardians v. Zinke*, 2019 WL 2404860, *12 n. 7 (D. Mont. Feb. 11, 2019), report

and recommendation adopted by *WildEarth Guardians*, 2021 WL 363955 at *8-10.

Nevertheless, when an agency quantifies the economic benefits of a proposed

action, courts do consider whether the agency provided reasoned explanations for

declining to use the SCC Protocol.  *High Country*, 52 F.Supp.3d at 1191-92 ("The

agencies, of course, might have been able to offer non-arbitrary reasons why the

[SCC] protocol should not have been included in the FEIS.  They did not.");

*WildEarth Guardians v. Zinke*, 368 F.Supp.3d 41, 78-79 (D. D.C. 2019); *Utah

Physicians*, 528 F.Supp.3d at 1231.

The Court agrees with Plaintiffs that OSM's analysis of greenhouse gas emissions was arbitrary and its record justifications for not using the SCC Protocol lack merit.[5]  Defendants assert NEPA does not require a cost-benefit analysis, and OSM did not undertake one here.[6]  Defendants contend OSM's discussion of socioeconomic conditions in the EIS was not a partial cost-benefit analysis, because there is a difference between discussing economic impacts and discussing economic benefits.  But "[t]his is distinction without difference where, as here, the economic benefits of the action were quantified while the costs were not."  *MEIC*, 274 F.Supp.3d at 1096, n.9.  Further, the EIS expressly identified the increased economic activity as a "benefit" in its statement of "Purpose, Need, and Benefits." (A.R. 116-030400.)

---

[5] The Court will only discuss the reasons OSM provided in the EIS for not using the SCC Protocol because Defendants' "post-hac rationalizations . . . are irrelevant to the question of whether the agencies complied with NEPA at the time they made their respective decisions."  *High Country*, 52 F.Supp.3d at 1192.

[6] It appears OSM has abandoned the three other justifications it set forth in the EIS for not using the SCC Protocol, as Federal Defendants do not counter Plaintiffs' arguments in this respect.  To the extent they remain at issue, however, the Court finds they lack merit.  First, it is irrelevant the SCC Protocol was "originally developed" for rulemakings.  *High Country*, 52 F.Supp.3d at 1190, 1192.  Next, the prior Administration's decision to withdraw the SCC Protocol is not a valid basis to reject its scientific methodology.  *WildEarth Guardians*, 2021 WL 363955 at *9.  Finally, OSM's argument that in order for the SCC Protocol to provide any meaningful insight, the broader benefits of coal production would have to be considered, has previously been rejected by this Court.  *WildEarth Guardians*, 2019 WL 2404860 at *12.

In its analysis here, OSM clearly quantified the socioeconomic benefits of the proposed mine expansion.  The EIS identified several "benefits" of the mine expansion, including "continued employment," "ongoing tax base . . . to federal, state, and local governments," "ongoing royalty payments," and "continued support to local businesses."  (A.R. 116-030400.)  Then, OSM went on to catalogue and quantify, in detail, various aspects of the economic benefits of the mine expansion.[7]  (A.R. 116-031018-26.)  Accordingly, the Court finds OSM quantified the benefits of the mine expansion without providing a balanced quantification of the costs, or at least a reasonable justification for failure to do so.

Intervenor Defendants urge the Court to find OSM adequately justified its decision not to use the SCC Protocol because of the variability in the Protocol's calculations.  But the fact the SCC Protocol is expressed in a range of values is not necessarily a valid reason to decline to quantify the costs of greenhouse gas emissions altogether.  *See High Country*, 52 F.Supp.3d at 1192 (noting that although there is a wide range of estimates about the social cost of greenhouse gas

---

[7] This case is distinguishable from *WildEarth Guardians*, 368 F.Supp.3d at 78-79, where the BLM's discussion of socioeconomic benefits was "abbreviated and involved little quantification."  For example, the EA at issue in that case noted "the State of Wyoming receives a percentage of the Federal oil and gas lease sale receipts" but did not calculate "the dollar value of that percentage."  *Id.* at 78. Whereas, here, the EIS contained several detailed tables setting forth specific dollar amounts associated with projected revenues from the mine expansion.  (A.R. 116-031022-26.)

emissions, it was arbitrary for the agencies to decide not to quantify the costs at all because the "agencies effectively zeroed out the cost"); *Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1200 (9th Cir. 2008) (rejecting uncertainty argument as arbitrary and capricious because "while the record shows that there is a range of values, the value of carbon emissions reduction is certainly not zero").  *But see 350 Mont. v. Bernhardt*, 443 F.Supp.3d 1185, 1196 (D. Mont. 2020), *appeal docketed*, No. 20-35411 (9th Cir. May 13, 2020).

Nevertheless, even assuming OSM could justify its decision not to use a particular tool – i.e., the SCC Protocol – the EIS fails to demonstrate why OSM could not present a balanced quantitative analysis of the economic costs of greenhouse gas emissions.  *See Utah Physicians*, 528 F.Supp.3d at 1231-32 (finding that even though the BLM cited adequate reasons for not using the SCC Protocol, the BLM's "treatment of GHGs and their costs is still problematic" because the EIS failed to "paint a clear picture for decisionmakers and the public of the impacts of the GHGs that will result from the project.").

Accordingly, the Court finds OSM failed to take a "hard look" at the costs of greenhouse gas emissions.

/ / /

/ / /

D.     **Water Withdrawals from the Yellowstone River - NEPA**

Plaintiffs argue OSM violated NEPA by refusing to consider the impacts of water withdrawals from the Yellowstone River that are required for coal combustion.  Defendants counter that water withdraws from the Yellowstone River were properly excluded from the indirect effects analysis because the Colstrip Power Plant's use of river water is beyond the scope of Area F impacts.

Under NEPA, agencies must consider indirect effects of the proposed action, which are effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b). "Indirect effects may include . . . related effects on air and water and other natural systems, including ecosystems."  *Id.*  NEPA does not require agencies to examine everything for which a proposed action could conceivably be a but-for cause. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004).  But NEPA does require agencies to consider indirect effects that are reasonably foreseeable. *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir. 1998); *Public Citizen*, 541 U.S. at 767 ("NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause," which is analogous "to the 'familiar doctrine of proximate cause from tort law.'").

Impacts from coal combustion and coal transportation, for example, are reasonably foreseeable indirect effects of coal mining that must be considered.  *See*

24

*e.g., WildEarth Guardians*, 2021 WL 363955 at *5-10; *MEIC*, 274 F.Supp.3d at 1091-99.  Plaintiffs contend that the withdrawals from the Yellowstone River are likewise reasonably foreseeable effects that OSM should have considered. Defendants counter that case law only requires analysis of downstream emissions of coal combustion, not other impacts related to power plant operations.  But the test for determining whether an impact must be considered is reasonable foreseeability.  Thus, while courts have found combustion emissions are a reasonably foreseeable indirect effect of mining, combustion is not the only foreseeable effect.  *See e.g.*, *WildEarth Guardians*, 2021 WL 363955 at *5-6 (finding effects of coal trains were reasonably foreseeable); *MEIC*, 274 F.Supp.3d at 1091-93 (same); *350 Mont.*, 443 F.Supp.3d at 1195 (finding risk of train derailments was reasonably foreseeable).

In this case, the operations of the Mine and the Power Plant are intricately connected.  The Mine is the sole source of coal for the Power Plant.  Substantially all the coal from the Mine is transported by a conveyor system directly to the Plant. Therefore, if coal is mined from Area F, it will be combusted at the Colstrip Power Plant.[8]  (A.R. 116-030393-95; 93-18501; 202-37564.)  The Power Plant burns the coal to boil water to produce electricity, and that water – between 22,000 and

---

[8] A small amount of "waste coal" is trucked to the Rosebud Power Plant (A.R. 116-030393), but otherwise the coal from the Mine is consumed at the Colstrip Power Plant.  (A.R. 116-030934).

50,000 acre-feet – is withdrawn annually from the Yellowstone River.  (A.R. 112-140394; Docs. 73-5 at ¶ 18; 102 at ¶ 102.)  Thus, the mining and combustion of Area F coal will necessarily require withdrawals from the Yellowstone River.  The Court finds this is not only a reasonably foreseeable result of mining Area F coal, the withdrawals will occur with certainty.

Indeed, OSM staff recognized the water withdrawals were reasonably foreseeable.  (A.R. 1019-013750; 1025-013867-68; 1026-013884.)  During the preparation of the EIS, agency personnel raised the issue of whether impacts to the Yellowstone River should be discussed.  (A.R. 1025-013867-68; 1026-013883-84.)  OSM acknowledged that it could only omit impacts to the Yellowstone River "as long as a good rationale can be provided."  (A.R. 1025-013868; *See also* A.R. 1026-13884 ("If we make justification that analysis area doesn't extend to Yellowstone, then we don't have to talk about it.")  But ultimately, OSM offered no reasoned analysis whatsoever in support of its decision to exclude the Yellowstone River withdrawals from its indirect effects analysis.  Instead, OSM merely stated the Yellowstone River had been excluded, without any rationale.  (*See* A.R. 117-031539 ("The Yellowstone River is not included in the direct, indirect, or cumulative effects analysis area . . . and water quantity impacts to the Yellowstone River as a result of power plant cooling operations were not analyzed in the EIS.")).  This was insufficient.

26

An agency may not unilaterally decide to exclude foreseeable effects of a proposed action without providing any justification. *See Ksanka Kupaqa Xa'lcin v. U.S. Fish & Wildlife Serv.*, 534 F.Supp.3d 1261, 1272-73 (D. Mont. 2021) (holding agency was "required to consider the effects" of the entire proposed action "or provide a reasonable explanation why it did not [do] so"); *Ctr. for Biological Diversity v. Bernhardt*, 982 F. 3d 723, 740 (9th Cir. 2020) (finding that because greenhouse gas emissions were foreseeable, "the EIS 'should have either given a quantitative estimate of the downstream greenhouse gas emissions' that will result from consuming oil abroad, or 'explained more specifically why it could not have done so.'"). Federal Defendants argue OSM's decision not to address the withdrawals from the Yellowstone River is owed deference. But the Court "cannot defer to a void." *Ore. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010).

Intervenor Defendants raise additional arguments for why they believe OSM was not required to consider the water withdrawals from the Yellowstone River. The Court, however, is prohibited from relying upon post-hoc rationalizations of counsel to uphold the agency's decision. *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008). "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

Moreover, the premises of the arguments are either incorrect or cannot be supported based on the record.  Intervenor Defendants assert, for example, that OSM lacks authority over the Power Plant's water withdrawals, citing *Dep't of Transp. v. Public Citizen*, 541 U.S. 752 (2004).  In *Public Citizen*, the Supreme Court held an agency does not have an obligation to consider environmental effects if it has no authority to act on that information.  *Public Citizen*, 541 U.S. at 770.  In that case, because the Federal Motor Carrier Safety Administration had no authority to categorically exclude Mexican motor carriers from operating in the United States, it was not required to consider the environmental effects of their cross-border operations.  Those environmental impacts had "no effect on [the agency's] decision making – [the agency] simply lack[ed] the power to act on whatever information might be contained in the EIS."  *Id*. at 768.

That is not the case here.  OSM has authority to recommend approval, disapproval or conditional approval of mining plans based on "[i]nformation prepared in compliance with [NEPA]."  30 C.F.R. §§ 746.13(b).  *See also* 736.14; 30 U.S.C. § 207(c).  It thus has the authority to consider the direct and indirect environmental effects of mining the coal in Area F in its NEPA analysis, and can act on that information in recommending approval or disapproval of the proposed action.  OSM's decision will determine the availability of coal to be combusted at the Colstrip Power Plant and, in turn, the water withdrawals from the Yellowstone

28

River necessary for that process.  Therefore, because OSM has the authority to act on information it compiles under its NEPA analysis, *Public Citizen* does not excuse it from considering the reasonably foreseeable indirect effects of the mining plans it approves.  See e.g., *Ctr. for Biological Diversity*, 538 F.3d at 1213-14 (if an agency has statutory authority to act, the rule from *Public Citizen* does not apply); *WildEarth Guardians*, 2021 WL 363955 at *6 (holding OSM was not constrained from considering effects of coal transportation); *Dine Citizens Against Ruining Our Envir. v. U.S. Office of Surface Mining Reclamation and Enf't*, 82 F.Supp.3d 1201, 1217 (D. Colo. 2015) (rejecting argument that OSM was excused from considering combustion-related impacts of a proposed mine expansion on the basis that OSM could not impose conditions on the operations of the nearby power plant).

Next, Intervenor Defendants assert mining Area F will not change or increase the rate of water withdrawals at the Power Plant.  But activities that extend the duration of harmful indirect effects must be considered, even if they do not change the rate of the activity.  *S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 725 (9th Cir. 2009) (finding that where proposed mine expansion would create ten additional years of transportation of toxic ore to an off-site facility, the agency was required to consider the air quality impacts of the transportation, even though no increase in the rate of ore

shipments was proposed); *Dine Citizens*, 82 F.Supp.3d at 1214-15 (finding that even though proposed mine expansion would not change the rate of coal combustion at the nearby power plant, OSM was not excused from considering effects of the combustion because the mine expansion would result in an additional 12.7 million tons of coal being combusted). Thus, even if the *rate* of water withdrawals at the Power Plant would not change, the Area F expansion will result in the combustion (using Yellowstone River water) of an additional 70.8 million tons of coal for an additional eight years. As such, the "status quo" argument advanced by Intervenor Defendants would not excuse OSM from considering the water withdrawals.

Intervenor Defendants also claim that the water withdrawals will continue with or without Area F coal because the Power Plant will operate with coal from other sources. But the record is unclear on this point. Currently, the Power Plant is restricted to burning coal from the permit areas of the Rosebud Mine. (A.R. 116-030461.) Without the Area F expansion, existing permit areas will be depleted in 3 to 5 years. (Doc. 73-2 at ¶ 7.) Thus, it is conceivable that without the Area F expansion, Power Plant operations would cease, including the withdrawals from the Yellowstone River.

For the Power Plant to use coal from another source, it would have to achieve modification of its Major Facility Siting Act certificates, air quality

permits, and other applicable permits.  (A.R. 116-030461.)  Although the EIS

"assumes that the power plants would be able to achieve any modifications

necessary" (*Id.*), there is no indication how likely or plausible that scenario may

be.  Evidence in the record is not clear on this point.  For example, NorthWestern

Corporation, a joint owner of the Power Plant, stated "[i]t would be cost

prohibitive for the Colstrip Co-Owners to buy and ship coal from a mine other than

the Colstrip Complex."  (A.R. 1204-145337.)  A Mine employee also opined in an

email that if the Mine were to shut down, he was "unsure of what the plant would

do for coal."  (A.R. 93-018501.)  Further, Intervenor Defendants have made

inconsistent statements themselves about whether barring Area F mining could

lead to closure of the Power Plant.  *Compare* Doc. 150-1 at 43 ("[A]n order from

this Court barring access to Area F has a high likelihood of closing the Mine . . .

potentially leading to closure of the Colstrip Power Plant") *with* Doc. 161 at 27

("[E]ven if Plaintiffs were able to convince this Court to shut down the Mine, the

power plant . . . can obtain coal from other sources.").  Thus, the Court does not

find Intervenor Defendants' post-hoc arguments persuasive based on the record

before the Court.

     In sum, it appears water withdrawals from the Yellowstone River are a

reasonably foreseeable indirect effect of mining Area F coal.  OSM, therefore, was

required to address the water withdrawals in the EIS or explain why it did not do

so.  Its failure to do either was arbitrary and capricious.

**E.     Water Withdrawals from the Yellowstone River - ESA**

Plaintiffs further contend OSM violated the ESA by failing to consider

impacts of water withdrawals from the Yellowstone River on the endangered pallid

sturgeon.  Because the Court has found OSM's failure to consider water

withdrawals violated NEPA and warrants setting aside the EIS on that issue, the

Court need not reach the merits of Plaintiffs' additional pallid sturgeon challenge.

**F.     Consideration of Alternatives**

Finally, Plaintiffs argue OSM failed to consider a reasonable range of

alternatives.  Plaintiffs raise two arguments: first, that OSM violated NEPA by

only considering virtually identical action alternatives; and second, that OSM

failed to consider an undefined "mid-range" alternative that would have provided

for less coal development.  Defendants counter that OSM evaluated a reasonable

range of alternatives, and that a mid-range option would not have satisfied the

purpose and need of the project.

NEPA requires agencies to consider "alternatives to the proposed action."

42 U.S.C. § 4332(2)(C)(iii).  "The scope of the alternatives analysis depends on the

underlying 'purpose and need' specified by the agency for the proposed action."

*League of Wilderness Def.-Blue Mountains Biodiversity Project v. U.S. Forest*

*Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012). The EIS "need only evaluate alternatives that are 'reasonably related to the purposes of the project.'" *Id.* citing *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004). "The 'rule of reason' guides both the choice of alternatives as well as the extent to which the Environmental Impact Statement must discuss each alternative." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Under the rule of reason, the EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Id.* "Alternatives that do not advance the purpose of the [project] will not be considered reasonable or appropriate." *Native Ecos. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005). "But if an alternative is eliminated from detailed study, the agency must 'briefly discuss [its] reasons' for doing do." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1046-47 (9th Cir. 2013); *N. Alaska Envt'l Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006).

The EIS examined three alternatives in detail – a no action alternative (Alternative 1), and two action alternatives (Alternative 2 and Alternative 3). (A.R. 116-030454-542.) The EIS acknowledged that the two action alternatives were similar. (A.R. 116-030528.) The EIS stated that the level of mining would be the same under Alternative 2 and 3. (*Id.*) Likewise, the amount of surface disturbance would be similar, although under Alternative 3 the location of the

33

disturbance may be different.  (*Id.*)  Alternative 3, however, added several additional environmental mitigation measures.  (A.R. 116-030527-31.)

The Court does not find OSM's range of alternatives deficient simply because Alternatives 2 and 3 are similar.  Under NEPA, "there is no minimum number of alternatives that must be discussed."  *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994); *Native Ecos. Council*, 428 F.3d at 1245-46 ("To the extent that [plaintiff] is complaining that having only two final alternatives – no action and a preferred alternative – violates the regulatory scheme, a plain reading of the regulations dooms that argument . . . the regulation does not impose a numerical floor on alternatives to be considered.").  Moreover, similarities between alternatives alone, does not violate NEPA.  *Laguna*, 42 F.3d at 524 (upholding EIS that that discussed in detail two similar action alternatives and a no-action alternative).

Here, the additional mitigation measures proposed in Alternative 3 sufficiently distinguished it from Alternative 2.  Alternative 3 included additional environmental protective measures, such as a water management plan, additional wetlands mitigation requirements, modified reclamation and revegetation efforts, a geological survey, and paleontology mitigations.  (A.R. 116-030528-531.)  Further, the EIS presented the alternatives in comparative form, illustrating their differences and providing a clear basis for weighing the relative effects of each.  (A.R. 116-

030535-542.)  Thus, although Alternatives 2 and 3 share certain impacts, they are not identical.  Accordingly, OSM did not violate NEPA based on the similar nature of Alternatives 2 and 3.

Likewise, the Court finds OSM's decision to eliminate a mid-range alternative from detailed analysis did not violate NEPA.  The EIS considered seven other potential alternatives including, limiting mining to private coal only, and mining within a smaller disturbance area, for a shorter duration and/or within a different timeframe.  (A.R. 116-030531-34.)  OSM ultimately eliminated each from further study as not feasible or for failing to meet the purpose and need of the project.  (*Id.*)

"The range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project."  *Laguna Greenbelt*, 42 F.3d at 524.  The stated purpose of the proposed action here was to "allow continued operations at the Rosebud Mine by permitting and developing a new surface-mine permit area."  (A.R. 116-030434.)  The need for the action was "to provide Western Energy the opportunity to exercise its valid existing rights (VER) granted by BLM under federal coal lease M82186 to access and mine undeveloped federal coal reserves located in the project area."  (A.R. 116-030434.)  OSM briefly discussed its reasons for finding the potential mid-range alternatives were not reasonable or feasible.  (A.R. 116-030531-34.)  For example, OSM

concluded the mid-range alternatives would not be operationally feasible, would

have substantially similar effects to the action alternatives, and would run afoul of

the BLM regulations and Montana state laws that require full recovery of coal.

(A.R. 116-030532-533.)  "This is all NEPA requires."  *Laguna*, 42 F.3d at 524.

*See also Native Ecos. Council*, 428 F.3d at 1246 ("So long as 'all reasonable

alternatives' have been considered and an appropriate explanation is provided as to

why an alternative was eliminated, the regulatory requirement is satisfied.").

 Accordingly, the Court finds OSM's alternatives analysis satisfied NEPA.

### G.     Remedy

Having found Federal Defendants in violation of NEPA, the Court must

determine the appropriate remedy.  Plaintiffs argue the presumptive remedy of

vacatur is appropriate.  Defendants counter that the equities support a remand

without vacatur.

"Although not without exception, vacatur of an unlawful agency action

normally accompanies a remand."  *Alliance for the Wild Rockies v. U.S. Forest

Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).  But the Court "is not required to set

aside every unlawful agency action."  *Nat'l Wildlife Fed. v. Espy*, 45 F.3d 1337,

1343 (9th Cir. 1995).  The Court may remand without vacatur "when equity

demands."  *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir.

1995).  To determine whether an invalid agency decision should be vacated or left

36

in place, courts consider "how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012).

Here, the Court finds the equities weigh in favor of remanding without immediate vacatur. On the one hand, Plaintiffs point to serious and significant environmental concerns associated with mining and combusting Area F coal. But vacatur would not have an immediate effect on harms such as greenhouse gas emissions or water withdrawals because those harms will continue at least until other areas of the Mine are depleted. On the other hand, immediate vacatur would have detrimental consequences for the Mine, its employees and the Colstrip community. Further, through additional analyses and decision-making on remand, OSM may be able to cure the deficiencies in the EIS.

Accordingly, based on the circumstances of this case, the Court recommends that vacatur be deferred for a period of 365 days from the date of a final order on the pending motions for summary judgment. During this time period, Federal Defendants should be directed to correct the NEPA violations outlined above.

## III.   CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that:

1.      Plaintiffs' Motion for Summary Judgment (Doc. 136) be **GRANTED in part** as set forth above;

2.      Intervenor Defendants' Cross Motion for Summary Judgment (Doc. 150) be **GRANTED in part** as to the dismissal of Plaintiffs Indian People's Action and 350 Montana, and **DENIED** in all other respects; and

3.      Federal Defendants' Cross Motion for Summary Judgment (Doc. 148) be **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 11th day of February, 2022.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge