IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, et al., | CV 19-130-BLG-SPW |
| Plaintiffs, | |
| vs. | ORDER ADOPTING MAGISTRATE'S FINDINGS AND RECOMMENDATIONS |
| DEB HAALAND, et al., | |
| Defendants, | |
| and | |
| WESTMORELAND ROSEBUD MINING, LLC and INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 400, | |
| Intervenor Defendants. | |

Before the Court are United States Magistrate Judge Timothy Cavan's

Findings and Recommendations, filed on February 11, 2022. (Doc. 177). Judge

Cavan recommended that this Court grant Plaintiffs' Motion for Summary

Judgment (Doc. 136) in part, and grant Intervenor Defendants' Cross Motion for

Summary Judgment (Doc. 150) as to the dismissal of Plaintiffs Indian People's

Action and 350 Montana. Judge Cavan recommended that the Court deny

Intervenor Defendants' motion in all other respects, and deny Federal Defendants'

Cross Motion for Summary Judgment (Doc. 148). Plaintiffs, Federal Defendants,

and Intervenor Defendants each have timely objected to Judge Cavan's Findings

and Recommendations. (Doc. 180, 182, 183). After careful review of the filed

objections and supplemental authorities (Docs. 189, 190, 191, 192, 197), the Court

adopts in part and rejects in part Judge Cavan's Findings and Recommendations.

## I.      Legal Standards

### A.      Standard of Review

The parties are entitled to a de novo review of those findings to which they

have "properly objected." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1).

The portions of the findings and recommendations not properly objected to or not

objected to by any party will be reviewed for clear error. *See McDonnell Douglas*

*Corp. v. Commodore Bus. Mach., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981);

*Thomas v. Arn*, 474 U.S. 140, 149 (1985). Clear error exists if the Court is left

with a "definite and firm conviction that a mistake has been committed."

*McMillan v. United States*, 112 F.3d 1040, 1044 (9th Cir. 1997) (citation omitted).

The Court may accept, reject, or modify, in whole or in part, those findings and

recommendations objected to. 28 U.S.C. § 636(b)(1).

An objection is proper if it "identif[ies] the parts of the magistrate's disposition that the party finds objectionable and present[s] legal argument and supporting authority, such that the district court is able to identify the issues and the reasons supporting a contrary result." *Mont. Shooting Sports Ass'n v. Holder*, 2010 WL 4102940, at *2 (D. Mont. Oct. 18, 2010). "It is not sufficient for the objecting party to merely restate arguments made before the magistrate or to incorporate those arguments by reference." *Id.* Objections are not "a vehicle for the losing party to relitigate its case." *Hagberg v. Astrue*, 2009 WL 3386595, at *1 (D. Mont. Oct. 14, 2009) (citation omitted).

Congress created magistrate judges to provide district judges "additional assistance in dealing with a caseload that was increasing far more rapidly than the number of judgeships." *Thomas*, 474 U.S. at 153. There is no benefit to the judiciary "if the district court[ ] is required to review the entire matter de novo because the objecting party merely repeats the arguments rejected by the magistrate." *Hagberg*, 2009 WL 3386595, at *1.

The District of Montana Local Rule 72.3(a) also provides that an objection to a magistrate judge's findings and recommendations must itemize:

> (1) each factual finding of the magistrate judge to which objection is made, identifying the evidence in the record the party relies on to contradict that finding; and

> (2) each recommendation of the magistrate judge to which objection is made, setting forth the authority the party relies on to contradict that recommendation.

D. Mont. L. R. 72.3(a).

## B.    Summary Judgment Standard

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See id.* at 587.

## C.    NEPA Standard of Review

NEPA is a procedural statute enacted to protect the environment by requiring government agencies to meet certain procedural safeguards before taking any action affecting the environment. *See Cal.* ex. rel. *Lockyer v. U.S. Dept. of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009).  In other words, NEPA "force[s]

agencies to publicly consider the environmental impacts of their actions before going forward." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002). As such, an agency proposing a major federal action significantly impacting the environment must prepare an environmental impact statement ("EIS") to analyze potential impacts and alternatives. 42 U.S.C. § 4332(C).

Because NEPA does not contain a separate provision for judicial review, courts review an agency's compliance with NEPA under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; 5 U.S.C. § 706(2)(A). Judicial review of administrative agency decisions under the APA is based on the administrative record compiled by the agency—not on independent fact-finding by the district court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

In reviewing an agency action under the APA, the Court must determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *Id.* Review is highly deferential to the agency's expertise and presumes the agency action to be valid. *Arkansas v. Oklahoma*, 503 U.S. 91, 112 (1992). The agency, however, must provide a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Id. See also Midwater Trawlers Co-op v. Dep't of Com.*, 282 F.3d 710, 716 (9th Cir. 2002). Thus, the reviewing court must look at whether the decision considered all the relevant factors or whether the decision was a clear error of judgment. *Id.*

A court's review under NEPA is limited to whether the agency "took a 'hard look' at the environmental impacts of a proposed action." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010). A hard look under NEPA requires consideration of all foreseeable direct and indirect effects, and the likely cumulative impact of the agency action. *Idaho Sporting Congress*, 305 F.3d at 973 (citations omitted). A hard look also involves a discussion of adverse impacts and does not improperly minimize negative side effects. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005). "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Conservation Cong. v. Finely*, 774 F.3d 611,

621 (9th Cir. 2014). Once the court is "satisfied that a proposing agency has taken a hard look at a decision's environmental consequences, [its] review is at an end." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992).

## II.     Facts

The parties do not object to Judge Cavan's factual findings. As a result, the Court adopts the facts as set out by Judge Cavan and reiterates only those necessary to its analysis below.

## III.    Discussion

Plaintiffs, Federal Defendants, and Intervenor Defendants filed timely objections to the Findings and Recommendations, some of which are proper, and some of which are improper.[1] The Court will analyze those issues properly objected to under de novo review, and those improperly objected to under clear error review.

For the reasons explained below, the Court adopts in part and rejects in part Judge Cavan's Findings and Recommendations.

### A.     Intervenor Defendants' Objections

#### 1.  Standing

---

[1] No party objects to Judge Cavan's findings that 350 Montana and Indian People's Action lack standing. As such, the Court will adopt his findings and recommendations on this issue without further analysis and dismiss 350 Montana and Indian People's Action.

Intervenor Defendants object to Judge Cavan's finding that Montana Environmental Information Center ("MEIC"), Sierra Club, and WildEarth Guardians have standing based on the declarations of Derf Johnson, Steve Gilbert, and Jeremy Nichols, respectively.  However, their objection is merely a restatement of their arguments previously presented to Judge Cavan.  Further, evidence that Intervenor Defendants allege Judge Cavan overlooked was, in fact, discussed by Judge Cavan in his Findings and Recommendations.  (*Compare* Doc. 177 at 10-13 (discussing Intervenor Defendants' arguments for why Plaintiffs cannot establish standing) and Doc. 183 at 9-11 (listing the same evidence considered by Judge Cavan)).  Since Intervenor Defendants have not properly objected to standing, the Court overrules the objections and reviews Judge Cavan's findings and recommendations for clear error.  Intervenor Defendants' request for additional discovery is proper, however the Court finds that the record contains sufficient information to determine whether Plaintiffs have standing.

### i.   Standing for MEIC

With respect to standing of MEIC, Judge Cavan noted that Johnson has taken numerous trips to the southeastern Montana prairie and forests to recreate, and has regularly visited the Colstrip region and viewed the proposed area from public roads. (Doc. 137-1 at ¶¶ 6-10).  Johnson's declaration further clarifies that he traveled to Colstrip four to five times annually over the past decade, and one to

three times per year since 2019. (Doc. 137-1 at ¶ 7). During these trips, Johnson "routinely drives on roads adjacent to the active mine site and into the proposed Area F expansion." (*Id.*).

Intervenor Defendants argue that Johnson only claimed a generalized interest in southeast Montana, and that Johnson's only purpose in traveling to the area of the mine was to document litigation as part of the duties of his employment. (Doc. 183 at 13-14, 17-18). These facts, Intervenor Defendants argue, negate Johnson's injury and MEIC's standing.

The Court does not agree. Johnson has spent the last decade traveling to the Colstrip region as many as five times per year. (Doc. 137-1 at ¶ 7). This is not a fleeting interest in the area, but rather a sustained engagement with the Colstrip area for years before this litigation commenced. *Ohio Valley Env't Coal., Inc. v. Maple Coal Co.*, 808 F. Supp. 2d 868, 881-82 (S.D. W. Va. 2011) (plaintiff's environmental activism, combined with a pre-existing connection to the area, does not defeat standing). Intervenor Defendants allege that Colstrip is many miles away from Area F, and thus not sufficiently close to Area F for the purposes of standing. However, Colstrip is intrinsically tried to Area F and the active mine, since the mine supplies coal exclusively to Colstrip Power Plant. (Doc. 177 at 3 (citing A.R. 116-030393-95)). Additionally, the Court is unwilling to apply such inflexible limits on the number of miles that count or do not count for standing, as

9

Intervenor Defendants allege the law requires. *Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 181-84 (2000) (finding that proximity to the site of the challenged activity is sufficient); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1148 (9th Cir. 2000) (noting the injury in fact requirement in environmental cases is not "reducible to inflexible, judicially mandated time or distance guidelines").

Combining Johnson's recreation in, appreciation of, and environmental activism in southeast Montana, Johnson averred more than a generalized interest in the area. Further, his environmental activism served to enhance, not disprove, his connection to the area. *Ohio Valley Env't Coal.* 808 F. Supp. 2d at 881-82. As such, the Court finds that Judge Cavan's finding of standing for MEIC based on Johnson's declaration was not in clear error and adopts his findings on this issue.

### ii.   Standing for Sierra Club

With respect to standing of Sierra Club, Judge Cavan found that Gilbert attested to a "long history" of visiting the Colstrip area for activities such as hunting, viewing the countryside while driving, and conducting field work. (Doc. 177 at 9). Notably, Judge Cavan found that Gilbert has hunted birds five to ten miles downstream from Rosebud Mine, traveled the public roads near Area F, and viewed the expansion of strip-mining operations. (*Id.*).

Intervenor Defendants lodged similar objections to Judge Cavan's finding of standing for Gilbert as it did for Johnson, namely that Gilbert does not have an

interest in the specific area in which Area F would be located and created his own injury for the purposes of standing. (Doc. 183 at 13-14, 17-18).

The Court agrees with Judge Cavan's finding that Johnson sufficiently stated injury, providing Sierra Club with standing in this case, because his findings are unequivocally supported by Gilbert's declaration. In fact, Gilbert stated he has been using the area for professional and recreation purposes for four decades and plans to use the area in the future. (Doc. 137-2 at ¶¶ 9-13). Additionally, the area used by Gilbert is declared with specificity, such that the Court can determine its proximity to Area F for the purposes of standing. (Doc. 173-2 at 5-7). In contrast, Intervenor Defendants' proffered evidence that Gilbert fabricated standing are cherry-picked from the record. (*Cf.* Doc. 183 at 14 and Doc. 136-2 at ¶¶ 12-13). As such, the Court finds no clear error in Judge Cavan's finding of standing for Sierra Club and adopts his findings on this issue.

### iii.   Standing for WildEarth Guardians

With respect to standing for WildEarth Guardians, Judge Cavan found Nichols "regularly visited the area where the Mine and Area F are located as part of trips to southeast Montana to view wildlife and recreate outdoors." (Doc. 177 at 10). The most recent of these visits involved him hiking on public lands in the area northwest of the mining operations, and hiking and viewing wildlife on lands south and east of Colstrip. (*Id.*).

11

Intervenor Defendants object to Judge Cavan's finding of standing for Nichols on behalf of WildEarth Guardians because the only visits to the area that would qualify Nichols for standing were generally to southeast Montana; the only trip he specified was in the project area occurred three months after WildEarth Guardians sent a citizens complaint to Office of Surface Mining Reclamation and Enforcement ("OSM") to halt operations at Rosebud Mine for alleged Surface Mining Control and Reclamation Act violations. (Doc. 46-9).

The Court agrees with Intervenor Defendants on this point. In Nichols' declaration, Nichols asserts the following to demonstrate an existing interest in the area of the mine and Area F:

> "I am also very familiar with the area where the Rosebud mine and Area F are located. I visit this area around once every two years and have since 2011. I visit the area as part of regular trips to southeast Montana to view wildlife, recreate outdoors, enjoy public lands, and to get away from things in Colorado. I greatly enjoy being outdoors in southeast Montana's rolling hills and open spaces. It's a very special and beautiful place."

(Doc. 137-4 at ¶ 9).

Though Nichols attests to traveling to the "area where the Rosebud mine and Area F are located," this provides the Court with little understanding of specifically where Nichols traveled or his conception of the bounds of the "area" of the mine and proposed action. His successive statement—that his trips to the area of the mine and Area F were part of regular trips to southeast Montana—are similarly not

12

helpful to the Court in judging Nichols' use of the area, since the region of southeast Montana is vast.

Given the vagueness of Nichols' historic interest in the area, the Court is left to rely on Nichols most recent visit to the mine area in June 2018. (Doc. 137-4 at ¶¶ 9-11). Though Nichols recreated on public lands near the mine, his trip also coincided with WildEarth Guardians' 2018 request to the OSM seeking cessation of the mine. (Doc. 46-9). Without sufficient facts demonstrating Nichols' established interest in the area, the temporal parallel between Nichols' trip and WildEarth Guardians' engagement in the dispute over the Rosebud Mine suggest use of the area in pursuit of environmental activism without a pre-existing personal connection. *Ctr. for Bio. Diversity, v. U.S. Env't Prot. Agency*, 937 F.3d 533, 540 (5th Cir. 2019) (plaintiff "who goes looking for pollution cannot claim an aesthetic injury in fact from seeing it."); *Ohio Valley Env't Coal.,* 808 F. Supp. 2d at 881.

Because the Court finds nothing in Nichols' declaration specifying the area in which he visited for personal recreation except for the 2018 trip, the Court holds that Judge Cavan's finding of standing for WildEarth Guardians based on the declaration of Nichols was made in clear error. The Court rejects this finding and dismisses WildEarth Guardians from the case.

## 2. Cumulative Impacts to Surface Water

13

Intervenor Defendants' objections to Judge Cavan's finding that the EIS violated NEPA by not taking a hard look at Area F's cumulative impacts to surface water contain proper and improper components. The Court will apply clear error and de novo review where appropriate.

### i.   Sufficiency of the Cumulative Impacts Assessment

A hard look under NEPA requires consideration of both foreseeable direct and indirect effects, as well as cumulative impacts. *Idaho Sporting Congress*, 305 F.3d at 973. A cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. A direct effect is "caused by the action and occur[s] at the same time and place." *Id.* § 1508.8(a). Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

To properly consider cumulative impacts, "some quantified or detailed information is required." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998). The cumulative impact analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of*

14

*Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004).  "Without such information, neither the courts nor the public, in reviewing the [agency's] decisions, can be assured that the [agency] provided the hard look that it is required to provide." *Cuddy Mountain*, 137 F.3d at 1379.  So, conclusory presentations or "general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.* at 993, 995.  *See also Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020) (finding cumulative impacts analysis insufficient where there was no attempt to quantify cumulative impacts, but only "conclusory statements, based on 'vague and uncertain analysis'").

In his Findings and Recommendations, Judge Cavan concluded that the EIS "discusses cumulative impacts" but "fails to provide the detailed, quantified analysis required to satisfy NEPA." (Doc. 177 at 16).  Specifically, Judge Cavan noted that the EIS lists multiple actions that would cumulatively affect surface water, then provides a three-sentence summary of the impacts. (*Id.* (citing A.R. 116-31106-08)).  That summary states that the mine expansion would "contribute to long-term adverse cumulative impacts on surface water hydrology that would range from minor to major," and "to short-term and long-term adverse cumulative impacts on surface water quality ... that would range from minor to major." (A.R. 116-31108).  The summary also specifies the activities that would contribute to the

15

adverse cumulative impacts. (*Id.*)  Judge Cavan found the list plus the conclusion devoid of the meaningful analysis required by NEPA. (Doc. 177 at 16).

Intervenor Defendants allege that Judge Cavan applied the wrong legal standard to the EIS's cumulative impact analysis, namely that only a detailed *or* quantified analysis is required, not a detailed *and* quantified analysis. (Doc. 183 at 29, n.9). Intervenor Defendants are correct that "detailed *or* quantified" is the standard for cumulative impact assessments under NEPA. *Cuddy Mountain*, 137 F.3d at 1379.

However, Judge Cavan never states that a detailed *and* quantified analysis is required, except when summarizing Plaintiffs' position. (Doc. 177 at 14). In fact, he writes, "Ninth Circuit case law is clear – to properly consider cumulative impacts, 'some detailed *or* quantified information is required.'" (Doc. 177 at 15) (citations omitted) (emphasis added). Given Intervenor Defendants' mischaracterization of the legal standard correctly applied by Judge Cavan in determining the sufficiency of the cumulative impacts assessment, the Court adopts Judge Cavan's findings on this legal issue.

Intervenor Defendants also argue that Judge Cavan siloed his understanding of OSM's cumulative impact analysis to the EIS's three sentence summary at A.R. 116-31108. (Doc. 183 at 12-13). Intervenor Defendants presented the same

argument in its briefing in front of Judge Cavan in the first instance, so the Court reviews this finding for clear error.

The Court agrees with Judge Cavan, finding that the three pages of cumulative impact analysis only contain a list of activities that would contribute to adverse impacts on surface water and vague descriptions about those impacts' severity and duration. The section is devoid of "meaningful analysis or a statement of reasons" as to why the agency concluded the activities listed would have such effects. *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1223 (9th Cir. 2008). Instead, the cumulative impact analysis contains "conclusory statements, based on 'vague and uncertain analysis.'" *Bark*, 958 F.3d at 872 (citations omitted). *See also Klamath-Siskiyou Wildlands Ctr*, 387 F.3d at 994.

Furthermore, assertions by Intervenor Defendants that the direct and indirect effects sections of the EIS provide the missing analysis are unfounded because these sections—when read in tandem with the three-page cumulative effects section—do not amount to a detailed or quantified analysis of the cumulative impacts to surface water. Rather, members of the public are tasked with piecing together the three sections in order to come to their own conclusions about the cumulative impacts to surface water. Such an expectation contravenes the core of an EIS, which is to "foster both informed decision-making and informed public participation." *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1072.

17

Accordingly, the Court agrees with Judge Cavan's findings and recommendations on the cumulative impacts analysis and adopts them in full. The Court remands the EIS to the agency and orders Federal Defendants to remedy the violation of NEPA's cumulative effects analysis requirement as set forth above.

### ii. Incorporation of the Cumulative Hydrological Impact Assessment

Intervenor Defendants object to Judge Cavan's finding that the EIS improperly relied on a Montana Department of Environmental Quality ("MDEQ") document to supplement its analysis of Area F's cumulative impacts to surface water. Intervenor Defendants properly objected to Judge Cavan's finding that the Cumulative Hydrological Impact Assessment ("CHIA") was neither properly incorporated nor tiered into the EIS, and that such an incorporation or tiering was not possible because the CHIA was issued after the EIS. Since the timing objection is dispositive, the Court does not need to consider Intervenor Defendants' remaining objections. The Court will analyze the first two objections to the CHIA under a de novo review.

NEPA regulations mandate agencies to reduce excessive paperwork through a variety of procedures, including incorporating other environmental analyses by reference. 40 C.F.R. § 1500.4(l). Agencies can incorporate existing planning studies, analyses, or other relevant information into an EIS, regardless of whether it is produced through the NEPA process. *Id.* § 1501.12. So long as incorporation

"cut[s] down on bulk without impeding agency and public review of the action,"

NEPA mandates that agencies incorporate such materials. *Id.* Importantly,

"[a]gencies may not incorporate material by reference unless it is reasonably

available for inspection by potentially interested persons within the time allowed

for comment." *Id.*

Tiering, on the other hand, involves adopting the analysis from an EIS or

environmental assessment ("EA") for a broad program or policy into the EIS or EA

for a project- or site-specific action within the program or policy. *Id.* § 1501.11(b).

Tiering exclusively involves EISs and EAs produced pursuant to NEPA by the

federal agency proposing the action, and is only available to the agency if the

previous document actually discusses the impacts of the project at issue. *Id.* §

1501.11(a); *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,

588 F.3d 718, 726 (9th Cir. 2009).

Judge Cavan found that the agency could not incorporate or tier to the

CHIA—a non-NEPA document—to satisfy its analysis of Area F's cumulative

impacts on surface water because (1) the agency cannot "tier" to a non-NEPA

document, and (2) the CHIA was published after the EIS. (Doc. 177 at 18)

(citation omitted).

Judge Cavan conflated the tiering and incorporation processes in his

Findings and Recommendations. As stated in 40 C.F.R. § 1501.12, agencies are

*required* to incorporate non-NEPA documents when independent analyses would be duplicative. Further, tiering is not relevant here because OSM is not referencing by incorporation a programmatic EIS or EA that preceded the EIS for Area F. As such, the Court will not consider Judge Cavan's analysis on whether a non-NEPA document can be incorporated.

However, Judge Cavan's finding that the CHIA cannot be properly incorporated because it was published after the EIS is correct and provides a sufficient basis for dismissal of the CHIA as a substitute cumulative impacts analysis. NEPA regulations plainly state that the agency shall not incorporate a document "unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment." 40 C.F.R. § 1501.12. Here, the CHIA was published on April 18, 2019 (A.R. 125-307313-500), well after the March 5, 2018, deadline for public comment (A.R. 22-014388-90). The record contains no evidence of the EIS reopening for public comment following the publication of the CHIA, so the agency could not rely on the CHIA to supplement its cumulative impacts analysis.

Accordingly, the Court finds no error with Judge Cavan's rejection of the CHIA as a substitute for the EIS's cumulative impacts analysis for surface water and adopts his Findings and Recommendations on the cumulative impacts issue in

full.  The Court remands the EIS to OSM and orders Federal Defendants to remedy

the violation of NEPA's cumulative effects analysis requirement as set forth above.

### 3. Greenhouse Gas Emissions

Intervenor Defendants object to three of Judge Cavan's findings on OSM's

greenhouse gas emissions ("GHG") analysis: (1) OSM was required to quantify the

economic costs of GHGs from Area F, (2) OSM did not quantify the economic

costs of GHGs from Area F, and (3) OSM was required to use the Social Cost of

Carbon ("SCC") method of calculating the economic costs of GHGs and provided

inadequate reasons for refusing to do so.  (Doc. 183 at 26-29).  Intervenor

Defendants cite the 9th Circuit's recent holding in *350 Montana v. Haaland*, 29

F.4th 1158 (9th Cir. 2022), issued after Judge Cavan's Findings and

Recommendations, to support its objection.  (Doc. 191).

Intervenor Defendants asserted identical arguments as objections one and

two to Judge Cavan in the first instance, so the Court will review those for clear

error. The third objection and the introduction of *350 Montana*, however, are

proper, so the Court will review both under de novo review

### i.   Obligation to Quantify the Economic Costs of the Area F GHGs

NEPA does not require an EIS to contain a cost-benefit analysis.  *High*

*Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1191

(D. Colo. 2014).  However, this Court has held that "when an agency chooses to

quantify the socioeconomic benefits of a proposed action, it would be arbitrary and capricious for the agency to undervalue the socioeconomic costs of that plan by failing to include a balanced quantification of those costs." *WildEarth Guardians v. Bernhardt*, 2021 WL 363955, at \*9 (D. Mont. Feb. 3, 2021). So, if an agency elects to quantify the benefits of a proposed action, it must also quantify the costs, or offer non-arbitrary reasons for its decision not to do so. *Id.*; *High County*, 52 F. Supp. 3d at 1191-92. *See also 350 Montana*, 29 F.4th at 1176 (the agency cannot decline to "consider evidence relevant to indirect and cumulative impacts.").

Judge Cavan held that "OSM clearly quantified the socioeconomic benefits of the proposed mine expansion." (Doc. 177 at 22). The EIS identified several "benefits" of the mine expansion, including "continued employment," "ongoing tax base . . . to federal, state, and local governments," "ongoing royalty payments," and "continued support to local businesses." (*Id.* (citing A.R. 116-030400)). OSM then "catalogue[d] and quantif[ied], in detail, various aspects of the economic benefits of the mine expansion." (*Id.* (citing A.R. 116-031018-26)). Judge Cavan found OSM's explanation that the quantified economic benefits were actually "economic outputs" because some economists have noted their harms unconvincing. The Intervenor Defendants rejected this recharacterization of the "economic outputs" as benefits by Judge Cavan.

The Court agrees with Judge Cavan that the EIS arbitrarily quantified the economic benefits of GHG emissions under the veil of the term "economic outputs," and thus was required to quantify the economic costs. Continued employment, tax revenue, royalty payments, and support of local businesses are commonly understood as economic benefits. Labeling these effects of the mine as "outputs" because they can be framed as negative would open all economic benefits and costs to a similar interpretation, leading to skewed presentations of the economic impacts of agency actions. *WildEarth Guardians*, 2021 WL 363955, at *8, 9 (adopting magistrate finding that analyzing the economic benefits without analyzing the costs "effectively skew[s] the analysis by adding weight to the beneficial side of the argument without fairly analyzing the negatives."). In short, the EIS cannot avoid quantifying the economic costs of GHG emissions simply by applying a neutral label.

Accordingly, the Court agrees with Judge Cavan's determination that OSM was required to quantify the economic costs of GHG emissions from Area F because it quantified the economic benefits. The Court remands the EIS to OSM and orders Federal Defendants to remedy its inadequate GHG emissions analysis as set forth above.

    ii. **EIS's quantification of the Economic Costs of the Area F GHG Emissions**

23

Intervenor Defendants next argue that even if OSM was required to quantify the economic costs of GHG emissions from Area F, the EIS contains such a quantification. (Doc. 183 at 27-28). In support of this proposition, Intervenor Defendants cite to a variety of points in the record, none of which contain a quantification of the economic costs of GHG emissions from Area F. (*Id.* at 21) Instead, the record cites provided by Intervenor Defendants mainly contain OSM's reasons for not using SCC and for defining the economic benefits as "economic outputs." (*E.g.,* A.R. 116-30577-92 (describing global impacts of GHGs on the climate and the metric tons of emissions from Montana mines; A.R.116-30896-914 (same); A.R. 117-31368-78 (responding to comments with reasons to not use SCC and to not quantify the economic costs of GHGs from Area F)). The Court rejects this objection and adopts Judge Cavan's finding that OSM violated NEPA by refusing to quantify the economic costs of GHG emissions from Area. The Court remands the EIS to OSM and orders Federal Defendants to remedy its inadequate GHG emissions analysis as set forth above.

### iii. *350 Montana* and OSM's Obligation to Use SCC to Quantify GHGs

The final issue presented by this set of objections concerns how OSM must quantify the economic costs of GHG emissions based on the 9th Circuit's ruling in *350 Montana*. 29 F.4th 1158. *350 Montana* held that agencies are not required to apply SCC to quantify GHGs, so long as they provide a valid reason; agencies

generally are afforded discretion in matters of scientific expertise, and calculation of the cost of GHGs is no exception. 29 F.4th at 1176 ("prescribing a specific metric for the agency to use on remand is not our role."). Furthermore, the 9th Circuit took no issue with the agency's proffered reason for not using SCC, namely that the method is too uncertain and provides too wide of a range of values to quantify environmental impacts of incremental GHG emissions. *Id.* at 1175-76. The 9th Circuit also accepted the agency's rationale that SCC was developed for rulemaking, not project-level analyses. *Id.* at 1176. Importantly, however, *350 Montana* did not allow the agency off the hook from properly analyzing the effects of GHG emissions from a project. *Id.* Rather, the court reiterated that NEPA requires that "agencies provide 'high quality' information and '[a]ccurate scientific analysis,'" and that the agency failed to do so. *Id.* (quoting 40 C.F.R. § 1500.1).

Judge Cavan found that OSM provided an inadequate justification for not using SCC and was required to use SCC to quantify the economic costs of GHG emissions from Area F. (Doc. 177 at 21-23). The Court rejects these findings squarely on the holding of *350 Montana*. First, OSM was not required to use SCC. *350 Montana*, 29 F.4th at 1176. Second, OSM provided an acceptable rationale for not using SCC, namely that SCC is too uncertain to provide value and that SCC was designed for rulemaking, not project-level analysis. (A.R. 116-30913-14); *Id.* at 1175-76. Accordingly, the Court rejects Judge Cavan's finding that OSM was

required to use SCC to calculate the economic costs of GHGs from Area F and provided inadequate reasons for not doing so.  However, the Court reminds OSM of its obligation to provide high quality, accurate scientific analysis on the economic costs of GHGs from Area F under NEPA.  *Id.* at 1176.

The Court remands the EIS to OSM and orders Federal Defendants to remedy the violation of NEPA's GHG analysis requirement as set forth above.

### 4.  Water Withdrawals from the Yellowstone River

Intervenor Defendants objected to Judge Cavan's finding that OSM violated NEPA when it refused to analyze the indirect effects of the mine expansion on water withdrawals from the Yellowstone River.  (Doc. 183 at 30-34).  The objection restated the arguments presented to Judge Cavan in the first instance. Since Intervenor Defendants have not made proper objections on the water withdrawals issue, the Court overrules the objections without further analysis.  As such, the Court finds Judge Cavan did not commit clear error on the water withdrawals issue and adopts his findings on the issue in full.  The Court remands the EIS to OSM and orders Federal Defendants to remedy the violation of NEPA's indirect effects analysis requirement as set forth above.

### B.    Plaintiffs' Objections

### 1. Alternatives Analysis

Plaintiffs broadly object to Judge Cavan's application of caselaw to determine that OSM did not violate NEPA by analyzing similar alternatives and by not analyzing a middle-ground alternative. (Doc. 182 at 6). Since Plaintiffs provide new caselaw to counter Judge Cavan's findings, portions of both objections are proper, and the Court will review them de novo. As the Court's holdings on these objections are dispositive of the issue, the Court will not review the remainder of Plaintiffs' objections on the issue.

i.   **Judge Cavan's reliance on *Laguna Greenbelt* in rejecting Plaintiffs' argument that OSM's alternatives were identical**

"The 'heart' of an EIS is its exploration of possible alternatives" to an agency action. *New Mexico* ex rel. *Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 708 (10th Cir. 2009) (citing 40 C.F.R. § 1502.14). As such, an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004). "Without substantive, comparative environmental impact information regarding other possible courses of action, the ability of an EIS to inform agency deliberation and facilitate public involvement would be greatly degraded." *Richardson*, 565 F.3d at 708.

Judge Cavan found that, though Alternatives 2 and 3 are similar, they are not identical, so OSM did not violate NEPA. (Doc. 177 at 34). Judge Cavan based his holding on the similarities between the Area F alternatives to those challenged in

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517 (9th Cir. 1994). There, the agency analyzed the sufficiency of three alternatives to a toll road project: a no-action alternative and two alternatives that authorized the same alignment and lane configuration but differed in their operation and method of connecting to the main interstate. *Id.* at 524. The 9th Circuit took no issue with the similarity of the alternatives, noting that NEPA only requires discussion in detail of "all the alternatives that were feasible" and a brief discussion of the reasons others were eliminated. *Id.* Based on the standard set forth in *Laguna*, Judge Cavan determined that the additional mitigation measures proposed in Alternative 3 "sufficiently distinguished it from Alternative 2." (Doc. 177 at 34 (citing A.R. 116-030528-31 (proposed mitigation measures in Alternative 3); A.R. 116-030535-42 (noting that the EIS presented the alternatives in comparative form))).

Plaintiffs object to Judge Cavan's comparison of this case and *Laguna*, arguing that the alternatives in the EIS are essentially identical, like those found to have violated NEPA in *Western Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013). In *Western Watersheds Project*, the EA for reauthorization of certain grazing permits considered a no action-alternative and three action alternatives, all of which authorized the same grazing level (3,120 animal unit months) as the previous permit. *Id.* at 1050. The only difference between the three action

alternatives was the terms and conditions the agency would impose to minimize the impact of the permit on Endangered Species Act-protected species.[2] *Id.* at 1050. The court found this alternatives analysis violated NEPA because there was "no meaningful difference" between the alternatives considered in detail; the alternatives would "authorize the same underlying action—permitting grazing at a level of 3,120 AUMs." *Id.* at 1051 (citing *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (per curiam) (concluding that the EIS violated NEPA when the two action alternatives considered in detail were "virtually identical")).

Plaintiffs here assert that the alternatives considered for Area F were also virtually identical because the only difference between Alternatives 2 and 3 were mitigation measures—akin to the terms and conditions in *Western Watersheds Project*. (Doc. 182 at 2). Moreover, Plaintiffs argue that Alternatives 2 and 3 here are even more identical than those in *Western Watersheds Project* because the mitigation measures were dismissed by OSM as "'negligible,' unnecessary, and ultimately meaningless" in terms of their impact on the environment. (Doc. 182 at 14 (citing A.R. 143-37569-72)).

---

[2] Under the Endangered Species Act, when an incidental take of protected species is authorized, the U.S. Fish & Wildlife Service provides the action agency or applicant with a list of terms and conditions that the agency or applicant must follow to minimize the take of the at-issue species. 50 C.F.R. §§ 402.14(i)(1)(i)-(iv).

The Court agrees with Plaintiffs that the NEPA alternatives analysis violation found in *Western Watersheds Projects* is on point. Like the grazing permit alternatives, Alternatives 2 and 3 here authorize the same underlying action: a permit area of 6,746 acres and the mining of 2,159 acres. (A.R. 116-30403, 116-30408). Also like the grazing permit alternatives, the only meaningful difference between the alternatives is the mitigation measures designed to lessen the environmental impact of Area F. (*Id.*). In fact, the actual difference between the alternatives in this case is even narrower, since OSM determined in the Record of Decision ("ROD") that the mitigation measures in Alternative 3 would have provided "a negligible benefit ... to affected resources." (A.R. 143-37569). In effect, Alternative 3 merely required Westmoreland to undertake meaningless reclamation in order for it to receive its permit. Finally, the NEPA violation here is more egregious than that in the EA in *Western Watersheds Project* because an EIS imposes on the agency a higher burden of alternatives analysis than an EA. *W. Watersheds Project*, 719 F.3d at 1050.

In sum, without any other alternatives to which OSM could compare in detail the project effects, the Court finds that OSM's consideration only of a no-action alternative and Alternatives 2 and 3 violated NEPA. Further, the fact OSM did not reveal this negligible benefit until the ROD was published and the public had no opportunity to provide comment, once again, undermines NEPA's core

purpose of fostering informed decision-making public participation. *Richardson*, 565 F.3d at 708.

Accordingly, the Court rejects Judge Cavan's findings on this issue. The Court remands the EIS to OSM and orders Federal Defendants to remedy the violation of NEPA's alternatives analysis requirement as set forth above.

### 2. OSM's Decision Not to Analyze a Middle-Ground Alternative

Plaintiffs also object to Judge Cavan's finding that OSM did not need to analyze a middle-ground alternative, namely one that would have permitted fewer acres than Alternative 2, because Judge Cavan did not address the fact that Defendants disproved each of their excuses for not having a middle-ground alternative by selecting an unanalyzed middle-ground alternative in the ROD.

The scope of alternatives the agency must analyze "depends on the underlying 'purpose and need' specified by the agency for the proposed action." *League of Wilderness Def.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012). The EIS "need only evaluate alternatives that are 'reasonably related to the purposes of the project.'" *Id.* (citing *Westlands Water Dist.*, 376 F.3d at 868). Further, agencies are not required to consider "remote or speculative" alternatives, only feasible ones. *Westlands Water Dist.*, 367 F.3d at 868 (citations omitted). However, "[t]he existence of a viable but unexamined alternative renders an environmental impact statement

31

inadequate." *Id. See also Richardson*, 565 F.3d at 708 (requiring agencies to develop "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned.").

Judge Cavan held that OSM properly considered and rejected a middle-ground alternative because it was neither feasible nor reasonably related to the purposes of the project. (Doc. 177 at 35-36). Judge Cavan accepted OSM's rationale to reject a middle-ground alternative because it was "not operationally feasible, would have substantially similar effects to the action alternatives, and would run afoul of the BLM regulations and Montana state laws that require full recovery of coal." (Doc. 177 at 36 (citing A.R. 116-30532-33)). Judge Cavan also noted the stated purpose of the project was to "allow continued operations at the Rosebud Mine by permitting and developing a new surface-mine permit area," but he did not explain why a middle-ground alternative was outside the scope of the purpose of the project. (Doc. 177 at 35 (citing A.R. 116-30434)).

Plaintiffs object that Judge Cavan failed to address that OSM disproved its own reasoning that a middle-ground alternative was infeasible by selecting an unanalyzed alternative with 74 fewer acres than originally proposed. (Doc. 182 at 16). Plaintiffs further contend that courts have overturned agencies that decline to analyze but ultimately select a middle-ground alternative. (Doc. 182 at 17).

The Court agrees with Plaintiffs that OSM skirted its obligation to analyze a middle-ground alternative that was in-fact feasible, as demonstrated by the ROD, by stating in the EIS that it was infeasible.  OSM thus violated NEPA because a "viable" alternative existed that it refused to examine, which renders the EIS "inadequate." *Westlands Water Dist.*, 367 F.3d at 868.  Additionally, OSM selected an unanalyzed alternative that it had an obligation to analyze under the public participation standards of NEPA. *See Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169, 1185-87 (D. Utah 2020) (overturning analysis where agency asserted only full development alternatives would meet purpose and need, then approved an unanalyzed middle-ground action).

Furthermore, the Federal Defendants and Intervenor Defendants' arguments regarding its infeasibility prior to MDEQ's publication of its ROD in April 2018 pursuant to state environmental procedural laws are unpersuasive to the Court. Intervenor Defendants assert that the Montana Strip Underground Mine Reclamation Act required all the coal recoverable in Area F to be permitted, therefore barring OSM from permitting, let alone analyzing, fewer than the full acres proposed. (Doc. 190 at 11-12).  However, Intervenor Defendants admit that MDEQ found that mining the 74 excluded acres would *also* violate Montana law. (*Id.*)  Under this logic, a permit authorizing the mining of all the proposed acres is also infeasible and thus arguably excludable from the alternatives analysis.

33

Federal Defendants assert a similar argument, adding that NEPA only required a brief discussion of the middle-ground alternative and reasons for its rejection. (Doc. 189 at 8). However, because the alternative was viable for this project, OSM must analyze its effects in detail, even if only to better understand the difference in environmental impacts of permitting all versus some of the proposed acreage. *Richardson*, 565 F.3d at 708 (requiring agencies to develop "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned.").

Accordingly, the Court rejects Judge Cavan's findings on this issue and finds OSM's alternatives analysis violated NEPA. The Court remands the EIS to OSM and orders Federal Defendants to remedy the violation of NEPA's alternatives analysis requirement as set forth above.

## C.   Water Withdrawals from the Yellowstone River – ESA

Plaintiffs argued in their motion for summary judgment that OSM violated the ESA by failing to consider the impacts of water withdrawals from the Yellowstone River on the endangered pallid sturgeon. (Doc. 177 at 32). Judge Cavan found that because OSM's failure to consider the impacts of water withdrawals violated NEPA and warranted setting aside the EIS on that issue, he did not need to reach the merits of Plaintiffs' ESA challenge. (*Id.*).

No party objected to Judge Cavan's finding on the ESA issue, so the Court reviews the ESA issue for clear error. The Court finds no clear error and adopts Judge Cavan's findings on this issue in full.

## D.     Remedy

All parties object to the remedy recommended by Judge Cavan for OSM's NEPA violations. Intervenor Defendants object to Judge Cavan's recommendation for any vacatur, while Plaintiffs object to Judge Cavan's recommendation of deferred rather than immediate vacatur. (Doc. 183 at 34-35; Doc. 182 at 19-21)) Both of these objections are largely restatements of their arguments in front of Judge Cavan in the first instance. As such, the Court will review these objections under a clear error review. Federal Defendants properly objected to Judge Cavan's remand for 365 days, asking for 19 months from the date of this order to remedy the EIS. The Court will review their objection under a de novo review.

### 1. Balance of the equities

Intervenor Defendants and Plaintiffs objected to Judge Cavan's balancing of the equities: Plaintiffs argued that the equities weighed in favor of immediate vacatur, and Intervenor Defendants argued that the equities weighed against any vacatur. Both objections are reiterations of the parties' briefings, so the Court overrules the objections without further analysis. The Court finds no clear error and adopts Judge Cavan's recommendation for deferred vacation.

### 2.  Time for OSM to Remedy the EIS

Federal Defendants object to Judge Cavan's recommendation that the agency have 365 days on remand to remedy the EIS before it is vacated.  Federal Defendants request 19 months because of insufficient staffing to complete the edits to this EIS and those ordered by this Court for the Spring Creek Mine.  (Doc. 180 at 5-9).  Federal Defendants support their request with a declaration from a OSM employee who oversees NEPA compliance for mines in Montana.  (Doc. 180-1). The declaration explains why Federal Defendants need the extra time, and how the requested duration is consistent with extensions granted by other courts.  (*Id*. at 6).

Courts "routinely defer to the judgment of agencies when assessing timelines that involve complex scientific and technical questions." *Ctr. for Sci. in the Pub. Int. v. U.S. Food & Drug Admin.*, 74 F. Supp. 3d 295, 301 (D.D.C. 2014). On OSM's extension request, the Court will similarly defer to the judgment of OSM and provide it 19 months to remedy the EIS until the EIS is vacated.

## IV.  Conclusion

For the reasons discussed above, Judge Cavan's Findings and Recommendations (Doc. 177) are ADOPTED in part and REJECTED in part.

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment is (Doc. 136) is **GRANTED**.  The Court remands the EIS to OSM and

orders Federal Defendants to remedy its analysis of the cumulative effects of the mine on surface water, indirect effects of water withdrawals from the Yellowstone River, socioeconomic impacts of GHGs, and alternatives to conform with NEPA.

**IT IS FURTHER ORDERED** that Intervenor Defendants' Cross Motion for Summary Judgment is (Doc. 150) is **GRANTED IN PART** as to the dismissal of Plaintiffs Indian People's Action, 350 Montana, and WildEarth Guardians for lack of standing, and **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Federal Defendants' Cross Motion for Summary Judgment is **DENIED**.

Federal Defendants shall have 19 months from the date of this order to complete a corrective NEPA analysis and prepare an updated EIS.  If Federal Defendants have not prepared an updated EIS by the end of the 19 months, the EIS will be vacated.

DATED this 30th day of September 2022.

SUSAN P. WATTERS
United States District Judge